IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

MARGUERITE HOFFMAN,               §
                                  §
                    Plaintiff,    §
                                  §   Civil Action No. 3:10-CV-0953-D
VS.                               §
                                  §
L&M ARTS, et al.,                 §
                                  §
                    Defendants.   §

MEMORANDUM OPINION
AND ORDER

In this removed action arising from the alleged breach of a confidentiality agreement under which a valuable painting was sold by a recognized patroness of the arts, and the subsequent public auction of the painting at a well-known art auction house, the court must decide whether plaintiff has stated claims on which relief can be granted and whether the court can exercise *in personam* jurisdiction over one defendant. For the reasons that follow, the court grants two defendants' motions to dismiss under Fed. R. Civ. P. 12(b)(6), grants in part and denies in part two defendants' Rule 12(b)6) motions, grants one defendant's Rule 12(b)(2) motion to dismiss for lack of *in personam* jurisdiction, and grants plaintiff leave to replead her claims that are being dismissed under Rule 12(b)(6).

I

This suit is brought by plaintiff Marguerite Hoffman ("Hoffman") against defendants L&M Arts ("L&M"), Sotheby's, Inc. ("Sotheby's"), Tobias Meyer ("Meyer"), David Martinez ("Martinez"),

and Studio Capital, Inc. ("Studio Capital") arising from the private sale and subsequent public auction of a Mark Rothko painting that Hoffman once owned. Hoffman sues L&M, Martinez, and Studio Capital for breach of contract, Sotheby's and Meyer for tortious interference with contract, and Sotheby's for unjust enrichment.[1]

Hoffman, a Dallas resident and patroness of the arts, once owned Mark Rothko's 1961 oil painting, Untitled ("the Rothko painting").[2] Her ownership was well known because the Rothko painting had been the subject of some media coverage and had been displayed in the Dallas Museum of Art as part of a special

---

[1]In a September 1, 2010 letter to the court, Hoffman's counsel confirms that she no longer seeks injunctive relief, a request originally included when she filed the case in state court.

[2]In deciding the Rule 12(b)(6) motions to dismiss, the court construes Hoffman's claims in the light most favorable to her, accepts as true all well-pleaded factual allegations, and draws all reasonable inferences in her favor. *See, e.g., Lovick v. Ritemoney Ltd.*, 378 F.3d 433, 437 (5th Cir. 2004). The court has also accepted as true the content of the agreement identified as Exhibit A to Martinez and Studio Capital's appendix, *see* Martinez/Studio Capital June 30, 2010 App. 2, because the agreement included as Exhibit A is quoted in Hoffman's first amended petition ("amended petition"), and the language of the agreement is central to Hoffman's claims. *See Kane Enters. v. MacGregor (USA) Inc.*, 322 F.3d 371, 374 (5th Cir. 2003) ("[T]he court may review the documents attached to the motion to dismiss . . . where the complaint refers to the documents and they are central to the claim." (citing *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000)). Consideration of Exhibit A is appropriate because, "[i]n so attaching, the defendant merely assists the plaintiff in establishing the basis of the suit, and the court in making the elementary determination of whether a claim has been stated." *Collins*, 224 F.3d at 499.

exhibition of works from her collection.

Hoffman decided to sell the Rothko painting in early 2007 during a time when she faced uncertain financial circumstances following her husband's death. She could have sold the painting at public auction, taking advantage of the publicity to obtain a higher price. But she opted for a private, confidential sale to avoid the embarrassment of disclosing publicly that she was selling the painting.

To ensure utmost privacy, Hoffman worked through intermediaries to arrange a confidential sale. She was eventually able to interest an undisclosed buyer. L&M, who had helped Hoffman acquire major contemporary art works in the past, acted as agent for the undisclosed buyer, while Greenberg Van Doren Gallery ("Greenberg") acted as Hoffman's agent.

Hoffman informed L&M that preservation of confidentiality was a critical component of any sale. The first agreement of sale, dated February 27, 2007, contained the following proviso: "It is the specified wish of the seller that the sale and terms of the sale remain confidential. Any breach in confidentiality prior to payment in full will be considered by the seller grounds for terminating this agreement. It is requested that confidentiality be maintained indefinitely." Am. Pet. ¶ 31.[3] Before the sale was

---

[3]Hoffman's operative pleading is an amended "petition" rather than an amended "complaint" because she filed it before the lawsuit was removed from state court.

finalized, however, another art world professional heard that the Rothko painting was for sale and contacted Hoffman. Hoffman was alarmed that a third party had discovered that the painting was for sale. When she learned from L&M's principal, Robert Mnuchin ("Mnuchin"), that his undisclosed buyer had told a third party about the sale, she decided not to go forward with the transaction.

The undisclosed buyer remained interested in negotiating with Hoffman, however, and his agent, L&M (through Mnuchin), expressly promised Hoffman that the Rothko painting would "'disappear' into his undisclosed buyer's 'very private' collection." *Id.* at ¶ 36. Hoffman remained unwilling to sell, and she refused to consent to the sale unless the undisclosed buyer made a written and binding commitment in the purchase agreement to "make maximum effort to keep all aspects of this transaction confidential . . . ." *Id.* at ¶ 37 (ellipsis in original). The undisclosed buyer agreed to this condition, and agents of Greenberg and L&M signed a letter agreement ("Letter Agreement") on April 24, 2007. *See* Martinez/Studio Capital June 30, 2010 App. 2.

The Letter Agreement specified that, among other requirements, the buyer would pay to the seller the net price of $17.6 million, make a confidential cash contribution of $500,000 to the Dallas Museum of Art, and (together with the seller and all agents involved) "make maximum effort to keep all aspects of this transaction confidential indefinitely." *Id.* "[T]he buyer [also]

agree[d] not to hang or display the work for six months following receipt of the painting." *Id.*

Hoffman later discovered that the undisclosed buyer was either Martinez or Studio Capital, a Belize company that Hoffman alleges is controlled by Martinez for the purpose of maintaining the secrecy of his purchases and sales in art. The sale was kept secret until, 35 months later, Martinez (or Studio Capital, acting under Martinez's direction) consigned the Rothko painting to public auction at Sotheby's. Numerous media sources reported on the sale of the Rothko painting, including one art blogger, who wrote the following:

> Three market sources have told me that the Rothko consigned for sale at Sotheby's comes from Mexican financier David Martinez.
>                         *   *   *
> If Martinez, or a related holding company, is the owner, it has been a hasty marriage.
>
> In 2007 the painting was exhibited at the Dallas Museum of Art in a *Fast Forward: Contemporary Collections for the Dallas Museum of Art*. The show included works owned by three major area collectors who have promised works to the museum: the Hoffman, Rose and Rachofsky collections.

Am. Pet. ¶ 45 (ellipsis in original). And Sotheby's website and catalog reported that the Rothko painting was exhibited at the Dallas Museum of Art as well.

Hoffman alleges that, based on this public information, the art community would have been able to deduce that she had sold the Rothko painting and that, in deliberately publicizing the sale,

Martinez, Studio Capital, and L&M breached the provision of the Letter Agreement that required "maximum effort to keep all aspects of this transaction confidential indefinitely." Hoffman asserts that, in exchange for confidentiality, she sacrificed a substantial premium when she sold the Rothko painting, and that she sold the painting for far less than she would have been able to obtain through a public sale.[4] According to Hoffman, Martinez was able to purchase the Rothko painting at a discount in exchange for taking on the burden of the confidentiality provision. Hoffman characterizes the alleged breach of contract by Martinez and Studio Capital in publicizing the painting's availability for purchase as "pocket[ing] the premium that [she] had forgone to protect her family's privacy." Am. Pet. ¶ 27. As evidence of Mnuchin's recognition that Martinez had dishonored the contract, she points to Mnuchin's communication to her after the alleged breach expressing concern for the work's public display. Hoffman sues L&M for breach of contract as a party to the Letter Agreement.

Hoffman sues Sotheby's and Meyer (the Worldwide Head of Contemporary Art and Principal Auctioneer for contemporary art at Sotheby's) for tortious interference with contract, and sues

_____

[4]Hoffman alleges that, according to Meyer (the Worldwide Head of Contemporary Art and Principal Auctioneer for contemporary art at Sotheby's), the Rothko painting would have sold at public auction for $30 to $40 million in April 2007, the same month that Hoffman sold it through a private sale for $17.6 million plus a $500,000 donation to the Dallas Museum of Art.

Sotheby's for unjust enrichment.  Hoffman alleges that Sotheby's and Meyer are liable for their roles in encouraging Martinez to breach the confidentiality provisions in the Letter Agreement.  She asserts that Meyer was under great pressure to obtain "brand-name masterpieces" for Sotheby's spring contemporary art sale and that Meyer had "long coveted" the opportunity to auction this particular Rothko painting.  Hoffman avers that Meyer persuaded Martinez to relinquish the Rothko painting for auction with full knowledge of Martinez's contract, and she alleges that Meyer continues to induce the breach of Martinez's contract.

Martinez and Studio Capital move under Rule 12(b)(6) to dismiss Hoffman's breach of contract claim.[5]  Meyer moves to dismiss Hoffman's action under Rule 12(b)(2) for lack of personal jurisdiction.  Sotheby's and Meyer also move to dismiss Hoffman's tortious interference and unjust enrichment claims under Rule 12(b)(6).  L&M joins and supplements the motions of the other defendants and seeks dismissal under Rule 12(b)(6).[6]

---

[5]Martinez and Studio Capital also move to dismiss Hoffman's request for injunctive relief and her veil-piercing claim against Martinez.  As noted, *see supra* note 1, Hoffman is no longer seeking injunctive relief.  Accordingly, the court need not address this ground of the motion.  Nor does the veil-piercing argument need to be addressed at this time because, at this stage of the litigation, the court must credit Hoffman's allegations that Martinez, not Studio Capital, was the purchaser of the painting.

[6]L&M's brief contains additional arguments in opposition to Hoffman's request for injunctive relief.  This request is moot and L&M's arguments need not be addressed.  *See supra* notes 1 and 5.

In deciding defendants' Rule 12(b)(6) motions, the court evaluates the sufficiency of Hoffman's amended petition by "accept[ing] 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)). To survive the motions, Hoffman must plead enough facts "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, ___ U.S. ___, 129 S.Ct. 1937, 1949 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.; see also Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level[.]"). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged——but it has not 'shown'——that the pleader is entitled to relief." *Iqbal*, 129 S.Ct. at 1950 (alteration omitted) (quoting Rule 8(a)(2)).

L&M, Martinez, and Studio Capital move to dismiss Hoffman's breach of contract claim.

A

Under Texas law, Hoffman's breach of contract claim requires proof of four elements: (1) the existence of a valid contract, (2) that Hoffman performed her duties under the contract, (3) that the party she is suing breached the contract, and (4) that Hoffman suffered damages as a result of the breach. *E.g., Lewis v. Bank of Am. NA*, 343 F.3d 540, 544-45 (5th Cir. 2003) (Texas law). The parties only dispute the third element: whether Hoffman has adequately pleaded that defendants breached a confidentiality provision in the Letter Agreement. The crux of the dispute centers on whether permitting publicity efforts in connection with the public auction of the Rothko painting constituted a breach of the provision in the Letter Agreement to "make maximum effort to keep all aspects of this transaction confidential indefinitely." Hoffman contends that "maximum effort" includes refraining from any action that generates sufficient publicity to threaten confidentiality, such as a public auction.[7] Defendants maintain that the Letter

---

[7]Although Hoffman alleges that "L&M, through Mnuchin, expressly promised that the Painting would 'disappear' into his undisclosed buyer's 'very private' collection," Am. Pet. ¶ 36, the harm that Hoffman alleges focuses on breach of the promise of confidentiality in the Letter Agreement. *See, e.g., id.* at ¶ 37 (alleging that oral assurance was not enough and that Hoffman insisted on confidentiality provision); *see generally id.* at ¶¶ 38-

Agreement should be interpreted to prevent defendants from disclosing aspects of the transaction but to permit selling the Rothko painting at public auction. They rely on three arguments in opposition to Hoffman's interpretation: her interpretation would be too vague to provide a measurable goal or guideline for determining when a breach had occurred; such an interpretation would be inconsistent with other provisions included in or omitted from the Letter Agreement; and her interpretation would constitute an unenforceable restraint on alienation.

Under Texas law, the court's primary concern when interpreting a contract is to ascertain the parties' intentions as expressed objectively in the contract. In doing so, the court must examine and consider the entire writing in an effort to harmonize and give effect to all contractual provisions, so that none will be rendered meaningless. Language should be given its plain and grammatical meaning unless it definitely appears that the parties' intention would thereby be defeated. Where the contract can be given a definite legal meaning or interpretation, it is not ambiguous, and

---

46, 58, and 61 (describing publicity-related harms resulting from the auction and alleging that Hoffman sacrificed a more lucrative selling price in exchange for a contractual confidentiality provision rather than focusing on any harms rooted directly in alienation itself). Because Hoffman does not appear to allege a claim based on the breach of Mnuchin's oral promise, the court limits its analysis to the question whether the publicity that accompanied the Sotheby's auction breached the provision of the Letter Agreement to "make maximum effort to keep all aspects of this transaction confidential indefinitely."

the court will construe it as a matter of law. A contractual provision is ambiguous when its meaning is uncertain and doubtful or if it is reasonably susceptible to more than one interpretation. Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole, in light of the circumstances present when the contract was entered. *Bank One, Tex., N.A. v. FDIC*, 16 F.Supp.2d 698, 707 (N.D. Tex. 1998) (Fitzwater, J.).

B

Defendants argue that Hoffman's interpretation of the confidentiality proviso is unenforceable as a matter of law because it is too vague to provide a measurable goal or guideline for determining when a breach has occurred. Hoffman maintains that the "maximum effort" requirement is akin to a promise under Texas law to use "best efforts."

1

When confronted with idiosyncratic contractual language expressing sentiments akin to doing all that one can or "all that is necessary" to complete a task, Texas courts often interpret such language as requiring "best efforts"——an expression with a more clearly established meaning and history. *See Huffington v. Upchurch*, 532 S.W.2d 576, 579 (Tex. 1976) (reading contract that required party to "give his attendance to, and to the utmost of his skill and power . . . exert himself for" as requiring exertion of

best efforts); *Blackwell v. Ship Channel Dev. Co.*, 264 S.W. 223, 225-26, 228 (Tex. 1924) (interpreting contract that required party to give "all necessary time to successfully conduct" sale of properties and "do all other things necessary to be done" in the selling as requiring party's "best efforts," but not to such unreasonable extremes as slandering competitors); *Maranatha Temple, Inc. v. Enter. Prods. Co.*, 893 S.W.2d 92, 104 (Tex. App. 1994, writ denied) (construing oral agreement to exercise a "good faith effort" to mean "best effort," as that term had been used in prior Texas case); *cf. Rushlake Hotels (USA), Inc. v. Hyatt Corp.*, 1994 WL 709129, at *2-3 (Tex. App. Dec. 22, 1994, no writ) (not designated for publication) (expressing no final opinion on whether promise to "employ all reasonable diligence" meant "best effort," but affirming, as a "fair reading," trial court's adoption of this interpretation).

Promises to exercise "best efforts" are enforceable in Texas only if they "set some kind of goal or guideline against which best efforts may be measured." *CKB & Assocs., Inc. v. Moore McCormack Petroleum, Inc.*, 809 S.W.2d 577, 581 (Tex. App. 1991, writ denied). Hoffman reasons, and defendants do not disagree, that, at a minimum, "[a]s a matter of law, no efforts cannot be best efforts." *CKB*, 809 S.W.2d at 582. But this principle is of little help because defendants' alleged conduct cannot be characterized as having undertaken "no efforts" to keep all aspects of the

transaction confidential indefinitely.  Hoffman concedes by the
allegations of her amended petition that the publicity material
related to the auction omitted mention of the current owner and of
the 2007 sale.  One art blogger reported, based on market sources,
that the Rothko painting "comes from" Martinez, but the blogger
could only speak speculatively as to who actually owned the
painting.  *See* Am. Pet. ¶ 45.  Thus even under Hoffman's version of
the facts, defendants appear to have taken some precautions in
cloaking the fact and details of the 2007 transaction, despite the
fact that a blogger speculated about the ownership based on when
and where the Rothko painting was last publicly displayed.

Hoffman maintains that "[a] party breaches its promise to make
'best efforts' to achieve a stated goal when it chooses a course of
conduct that does not promote the stated goal over one that would
have promoted it better."  P. Mem. in Opp. to L&M, et al. 12.  But
such an amorphous rule would be virtually limitless; it would lack
a  clear  principle  to  distinguish  impractical  measures  not
originally contemplated by the contracting parties from those that
are reasonably available alternatives.  Indeed, none of the cases
Hoffman cites states such an extreme test for "best efforts."  *See,
e.g.*, *CKB*, 809 S.W.2d at 582 ("When a party misses the guidelines,
courts measure the quality of its efforts by the circumstances of
the case, and by comparing the party's performance with that of an
average,  prudent,  comparable  operator."  (internal  citations

omitted)); *Aeronautical Indus. Dist. Lodge 91 v. United Techs.*
*Corp.*, 230 F.3d 569, 578 (2d Cir. 2000) (applying standard of
whether defendant had made "all reasonable efforts" to reach the
identified end); *Kevin M. Ehringer Enters. Inc. v. McData Servs.*
*Corp.*, 2010 WL 711818, at *7 (N.D. Tex. Feb. 25, 2010) (Lindsay,
J.) (concluding that term "best efforts" was not too vague because
"such a term would evoke in a reasonable individual the concepts of
due diligence and the absence of neglect in undertaking a duty").

The foregoing cases reflect that it is possible to give a
"best efforts" provision an objective meaning, and that, to be
enforceable, it need not specify exactly what actions are or are
not permitted. Whether the defendant's conduct qualifies as "best
efforts" to keep all aspects of the transaction confidential
indefinitely can be determined by assessing whether the defendant
made every reasonable effort to reach the identified end, measured
according to what an average, prudent, and comparable person would
or would not have done, under the same or similar circumstances, to
make every reasonable effort when exercising due diligence and in
the absence of neglect. The court thus rejects Hoffman's
interpretation of "maximum effort" as obligating defendants to act
only in a manner that best achieves the goal of maintaining
confidentiality. But the court also disagrees with defendants'
position that interpreting the confidentiality obligation to
require "best efforts" makes it "entirely unknowable in advance

what conduct is prohibited," Martinez/Studio Capital Reply 7-8, and that "the buyer would have no idea where its contractual obligations lie," *id.* at 8. Under the court's interpretation of the Letter Agreement, Hoffman is not able to "mak[e] up the meaning of the confidentiality provision as she goes along." *Id.* This is so because the "maximum effort" language, when interpreted in a manner consistent with Texas law concerning "best efforts," holds defendants to an objective standard based on norms of reasonableness in the industry. Defendants are required to make every reasonable effort to keep all aspects of the 2007 transaction confidential, measured according to what an average, prudent, and comparable person would or would not have done, under the same or similar circumstances, to make every reasonable effort when exercising due diligence and in the absence of neglect. *See CKB*, 809 S.W.2d at 582 (determining breach of "best efforts" provision by comparing efforts to that of an "average, prudent, comparable operator").

Defendants also present a slight variation of the foregoing argument, contending that, apart from definite guidelines, a "best efforts" contractual provision also needs to provide definite goals to be enforceable. They argue that the goal of "keep[ing] all aspects of th[e 2007] transaction confidential indefinitely" is not specific enough to be enforced. But the cases they cite do not support their position. *See, e.g.*, *Herrmann Holdings Ltd. v.*

*Lucent Techs. Inc.*, 302 F.3d 552, 560 (5th Cir. 2002) (repudiating, explicitly, the notion that "only goals which set forth a definite quantity are enforceable," and disagreeing that *CKB*——another case that defendants cite——requires definite quantities or time limits); *cf*. *York Group, Inc. v. York S., Inc.*, 2006 WL 2883363, at *3 (S.D. Tex. Oct. 10, 2006) (concluding that a distributor's promise to use "its best efforts to promote, sell, and serve" plaintiff's product provided no goal or guideline to satisfy the *CKB* standard, but also noting that plaintiff made no effort in the briefing to identify such a goal or guideline). On the contrary, Texas law only requires that, "[i]n order to be legally binding, a contract must be sufficiently definite in its terms *so that a court can understand what the promisor undertook*." *T.O. Stanley Boot Co., Inc. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992) (emphasis added) (citing *Bendalin v. Delgado*, 406 S.W.2d 897, 899 (Tex. 1966)); *see also Lamajak, Inc. v. Frazin*, 230 S.W.3d 786, 793 (Tex. App. 2007, no pet.) ("The contract must be certain and clear as to all essential terms or the contract will fail for indefiniteness."). Therefore, all that is required is that the essential terms of the promise are sufficiently defined for the court to evaluate the parties' obligations; Texas law does not categorically limit enforceable promises to those that, for example, commit to a time limit or a specific quantity of goods.

Unlike the promises found in Texas cases that were rejected as

indefinite, *see, e.g.*, *Lamajak*, 230 S.W.3d at 794 (oral promise to "help [plaintiff] do all this stuff"); *Knowles v. Wright*, 288 S.W.3d 136, 143 (Tex. App. 2009, pet. denied) (oral promise to "build a business enterprise"), and that did not describe the actions that such a promise would entail, the promise to "keep all aspects of th[e 2007] transaction confidential indefinitely" describes a clear, specific obligation that is not uncommonly the subject of a contract: the obligation to keep something secret. And the scope of the secret that must be kept is also clear: "all aspects" of the 2007 transaction. It is possible to measure whether a secret has been kept by evaluating the evidence to see who knows about the subject matter of the secret. Taken together, the "all aspects of th[e 2007] transaction" language provides a clear indication of the subject matter that must be kept confidential, and the "best efforts" standard provides an objective measure of whether a party has breached its contractual obligation to keep all aspects of the transaction confidential. The court therefore concludes that the "maximum effort" confidentiality provision provides a sufficiently definite goal or guideline to meet the standard for enforceability.

2

Having interpreted the requirements of the "maximum effort" provision and deeming it to be enforceable, the court now evaluates the allegations on which Hoffman bases her breach of contract claim

to determine whether she has stated a claim on which relief can be granted against Martinez and Studio Capital.

Hoffman is required at the Rule 12(b)(6) stage to plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S.Ct. at 1949. Hoffman has done so for Martinez and Studio Capital by alleging facts that, credited in her favor, plausibly establish each of the elements of the breach of contract claim.

She has identified a valid contract and the particular provision in question——the agreement to "make maximum effort to keep all aspects of this transaction confidential" indefinitely. Am. Pet. ¶ 37. She alleges that she performed her part of the contract by selling the Rothko painting to the then-unidentified buyer (either Martinez or Studio Capital) under the agreed-upon terms. *Id.* at ¶ 65.

She identifies the particular acts or omissions of Martinez or Studio Capital that she asserts breached the Letter Agreement: Martinez or Studio Capital, as a "shell company dominated and controlled by" Martinez as its "alter ego," *id.* at ¶ 17, consigned the painting for public auction at Sotheby's, *id.* at ¶ 41, resulting in significant media attention surrounding the sale. She quotes several media sources, including Sotheby's own promotional material, to demonstrate that Hoffman's prior ownership in 2007 of

the Rothko painting was common knowledge or easily discoverable using already public information. *See, e.g.*, *id.* at ¶¶ 43 and 45 (quoting from Sotheby's website, which reported the publicly displayed collection in which the painting was last seen, and providing an example of a third-party blogger who was able to piece together Hoffman's possible earlier ownership and to deduce Martinez's "hasty marriage" in recently acquiring the Rothko painting). Hoffman's allegations enable the court to draw the reasonable inference that Martinez or Studio Capital, acting for Martinez, breached the "maximum effort" requirement of the contract by not taking adequate precautions to keep the changed ownership of the Rothko painting private. Combined with the information that was already public——that the painting had been displayed as recently as April 2007 in the Dallas Museum of Art as a part of either the Hoffman, Rose, or Rachofsky collection, *id.* at ¶¶ 43 and 45——Martinez and Studio Capital's failure to keep the news of changed ownership secret contributed to an aspect of the 2007 transaction's being revealed to the public: the fact that such a sale had occurred. It is also plausible that, in causing the Rothko painting to become newsworthy by conducting a large publicity campaign or by choosing to sell by public auction, Martinez and/or Studio Capital helped disseminate details that would make it more probable that a well-informed member of the art community would be able to deduce from easily-available public

information that Hoffman had sold the painting sometime after when it was displayed at the Dallas Art Museum. On the whole, the facts alleged plausibly establish that Martinez and/or Studio Capital did not make every reasonable effort to keep all aspects of the 2007 transaction confidential, measured according to what an average, prudent, and comparable person (i.e., peers in the professional art buying community) would or would not have done, under the same or similar circumstances, to make every reasonable effort when exercising due diligence and in the absence of neglect.

Finally, Hoffman alleges that she has suffered damages as a direct and proximate result of defendants' conduct, *id.* at ¶ 66, alleging that she had been "outed," *id.* at ¶ 46, and that this disclosure of the existence of a transaction shortly after her husband's death was precisely the sort of disclosure and embarrassment that she had negotiated to avoid in the 2007 purchase agreement, *id.* at ¶ 44.

Considering these allegations in combination, Hoffman has alleged a plausible breach of contract claim against Martinez[8] and

---

[8]Defendants maintain that,

> [t]o the extent plaintiff is proceeding against Mr. Martinez on the theory that he was in fact the buyer of the Painting in 2007, and to the extent plaintiff's claims otherwise survive this motion, Mr. Martinez will move this Court at the appropriate time for dismissal based on the fact that he was not the buyer of the Painting in 2007.

Studio Capital.[9]

Hoffman has failed, however, to plead a plausible claim against L&M because she has not alleged any act by L&M that would constitute a breach of the Letter Agreement. All the allegations of the amended petition focus on the acts or omissions of other defendants; the only conduct of L&M that is alleged to be a breach is conclusory:

> "I feel simply terrible about the way events have evolved," Mnuchin stated, admitting that the transaction "required a special degree of confidentiality." "I regret the work is now publicly displayed to the world," Mnuchin said.
>
> But Mnuchin claimed it was not his fault: "Unfortunately, even in retrospect, I see no way I could have changed the course of events when informed that [Martinez] was selling at Sotheby's." That statement was untrue, since L&M had itself committed to use maximum effort to maintain confidentiality.

Am. Pet. ¶¶ 47-48. Hoffman alleges no specific act or omission of L&M that failed to comply with its obligations under the Letter Agreement. Mnuchin's expressions of regret and sympathy regarding Hoffman's circumstances do not amount to an admission of participation in any wrongdoing. The assertion that "L&M had

_____

Martinez/Studio Capital Reply 9. The court need not address this contention at this time.

[9]Considering this conclusion, the court need not reach the arguments that Hoffman presents based on an implied covenant of good faith and fair dealing.

itself committed to use maximum effort to maintain confidentiality"
relates to the nature of the agreement, not of the breach.

Hoffman also alleges that "L&M claimed it would have preferred
the Painting be sold privately." *Id*. at ¶ 49. But she does not
plead how L&M breached the Letter Agreement by not preventing the
sale at Sotheby's. Moreover, under the court's decision today, she
must plead a plausible claim that L&M failed to make every
reasonable effort to keep all aspects of the 2007 transaction
confidential, measured according to what an average, prudent, and
comparable person would or would not have done, under the same or
similar circumstances, when making every reasonable effort and when
exercising due diligence and in the absence of neglect. She has
therefore failed to state a breach of contract claim against L&M on
which relief can be granted.[10]

C

Defendants maintain that whatever meaning the court gives the
"maximum effort" provision must be limited by considerations of
structural consistency with the balance of the Letter Agreement.
Specifically, they contend that the "maximum effort" provision
should be interpreted as a bar against express disclosures of the
2007 transaction but should not be read to foreclose all public

---

[10]The court need not determine whether L&M breached an implied
covenant of good faith and fair dealing or whether such a duty
exists. Even assuming there is such a duty, Hoffman has failed to
allege a plausible claim that L&M breached such a duty.

sales. They note that the Letter Agreement contains no explicit prohibition of a sale (public or private), and they posit that Texas law forbids courts from "rewrit[ing] agreements to insert provisions parties could have included or to imply restraints for which they have not bargained." Martinez/Studio Capital Mot. 8 (alteration in original) (quoting *Addick Servs., Inc. v. GGP-Bridgeland, LP*, 596 F.3d 286, 297 (5th Cir. 2010)).

Defendants contend that if Hoffman had intended to prohibit public sales, she could have said so expressly rather than leave unaddressed the permissibility of such an important, lucrative method of sale. Defendants also maintain that Hoffman could not have intended to preclude all forms of display or sale that carry a risk of disclosing a change of ownership because another term of sale states: "In addition, the buyer agrees not to hang or display the work for six months following receipt of the painting." Martinez/Studio Capital June 30, 2010 App. 2. Defendants posit that this suggests that the buyer was authorized to display the work after six months, even if doing so would increase the risk of disclosing the change of ownership and the fact that a recent transaction had occurred.

Defendants' reasoning does not address the basis for Hoffman's breach of contract claim: that the particular manner by which the Rothko painting was resold—i.e., via a highly publicized auction—plausibly violates the contractual promise to exercise

"maximum effort" to maintain confidentiality of the 2007 sale transaction. *See, e.g.,* Am. Pet. ¶ 9 ("Martinez elected to sacrifice Plaintiff's privacy, embarking, through Sotheby's, on a high-profile marketing and publicity campaign that inevitably and swiftly exposed Plaintiff's sale."). Regardless of the fact that the Letter Agreement does not preclude reselling or displaying the Rothko painting, the contract obligates the parties "to make maximum effort to keep all aspects of this transaction confidential indefinitely." Under the terms of the Letter Agreement, the painting could have been displayed and resold in a way that did not disclose any aspect of the 2007 transaction.

Moreover, the sentence that prevents the buyer from hanging or displaying the work for six months can be harmonized with the preceding sentence that requires that all parties make "maximum effort to keep all aspects of this transaction confidential indefinitely." Read together, the second sentence provides a mechanism for ensuring the success of the obligations contained in the first sentence by precluding the buyer even from hanging or displaying the Rothko painting in his private collection for six months following receipt. Because another provision of the Letter Agreement allowed Hoffman to retain possession of the work on loan for any part of six months following receipt of payment, this meant that one full year could elapse following the sale before the work was hung or displayed even privately. The provision that allows

the painting to be displayed after six months can coexist with an ongoing obligation to keep the transaction itself confidential because there are many ways to display a painting (e.g., in a private collection with limited outside access) without disclosing any aspect of the transaction by which the painting was acquired.

Under the Letter Agreement, it is possible that the buyer of the Rothko painting could have resold, hung, or displayed the work in a manner consistent with making every reasonable effort to keep all aspects of the 2007 transaction confidential, measured according to what an average, prudent, and comparable person would or would not have done, under the same or similar circumstances, when making every reasonable effort and when exercising due diligence and in the absence of neglect. Therefore, the confidentiality provision of the Letter Agreement, when viewed in context with the entire contract, does not render any other provision superfluous. Defendants' structural inconsistency argument does not undermine Hoffman's breach of contract claim.

D

Defendants also raise a public policy argument, contending that the "maximum effort" provision cannot be read to prohibit the sale of the work at auction, noting that the Letter Agreement does not equate the "maximum effort" proviso with a permanent ban on sales. They posit that such a provision, if implied, would be unenforceable as an unreasonable restraint on alienation. Although

defendants maintain that the Letter Agreement unambiguously permits a public auction, they argue in the alternative that, "[i]f a contract may be construed in two ways, one of which validates the contract and the other of which invalidates it, [a court] must adopt the construction that validates the contract." Martinez/Studio Capital Mot. Dis. 11-12 (alteration in original; internal quotation marks omitted) (quoting *Hicks v. Castille*, 313 S.W.3d 874, 880 (Tex. App. 2010, pet. denied)). Defendants maintain that the court should disfavor any contractual interpretation that would impose a restraint on alienation. Hoffman agrees that the Letter Agreement does not ban sales outright, but she contends that the "maximum effort" clause can lawfully restrict some of defendants' resale options.

"In order for the clause to operate as an unreasonable restraint on alienation, [the court] must necessarily decide if a restraint exists." *Sonny Arnold, Inc. v. Sentry Sav. Ass'n*, 633 S.W.2d 811, 813 (Tex. 1982). If it does, the court must then determine whether the restraint is unreasonable. *See, e.g.*, *id.* at 814-15 (deciding that acceleration provision in deed of trust, even if it "operate[d] by indirection as a restraint," was not a prohibited type of restraint on alienation); *Munson v. Milton*, 948 S.W.2d 813, 817 (Tex. App. 1997, pet. denied) (concluding that restriction operated as restraint, but not as an unreasonable one).

Texas has adopted the Restatement of Property's definition of

"restraint on alienation":

> (1) A restraint on alienation, as that phrase
> is used in this Restatement, is an attempt by
> an otherwise effective conveyance or contract
> to cause a later conveyance
> (a) to be void; or
> (b) to impose contractual liability on the one
> who makes the later conveyance when such
> liability results from a breach of an
> agreement not to convey; or
> (c) to terminate or subject to termination all
> or part of the property interest conveyed.

*Sonny Arnold*, 633 S.W.2d at 813 n.2 (citing Restatement of Property

§ 404 (1944)).

Because the court has already held that the Letter Agreement

does not preclude reselling the Rothko painting, the court need

only decide whether the obligation to keep all aspects of the

transaction confidential indefinitely imposes an indirect

restriction on alienation. Courts do not determine whether there

is a restraint on alienation based on how explicit the restriction

is.[11] *See, e.g.*, *Proctor v. Foxmeyer Drug Co.*, 884 S.W.2d 853, 861-

---

[11]None of the cases defendants cite "involve alleged restraints
that were *explicitly* stated in the parties' agreement."
Martinez/Studio Capital Reply Br. 4 n.4. *Compare id. with Sonny
Arnold*, 633 S.W.2d at 815 (considering the possibility that
acceleration provision may at best "operate[] by indirection as a
restraint," but concluding that in any case it was not a restraint
of the type prohibited in the Restatement); *Munson*, 948 S.W.2d at
817 (involving restriction that expressly prohibited "business use"
of a property, rather than alienation *per se*, where restriction had
indirect effect of preventing renters from subleasing property for
profit); *Crestview, Ltd. v. Foremost Ins. Co.*, 621 S.W.2d 816, 823
(Tex. Civ. App. 1981, writ ref'd n.r.e.) (concluding that
"restraint" in due on sale acceleration clause was "indirect only"
and not a restraint). All of these cases involved clauses that *did
not* explicitly restrain alienation, but indirectly impeded

62 (Tex. App. 1994, no writ) (concluding that use restriction provision operated as indirect restraint on alienation, and deciding not to enforce restraint because it was unreasonable). As *Proctor*, *Munson*, and several other Texas cases indicate, indirect restraints can still count as restraints on alienation. *See, e.g.*, *Meduna v. Holder*, 2003 WL 22964270, at *4-5 (Tex. App. 2003, pet. denied) (characterizing deed provision as "indirect restraint on alienation" and concluding that restraint was unreasonable and, therefore, unenforceable); *Foster v. Bullard*, 496 S.W.2d 724, 735 (Tex. Civ. App. 1973, writ ref'd n.r.e.) (noting that limitation that took subject property out of commerce for long period of time could work as an "indirect restraint upon alienation," but declining to find such a restraint). A restriction does not have to be a "clearly spelled-out" purchase option to be found an indirect restraint on alienation. *See, e.g.*, *Randolph v. Terrell*, 768 S.W.2d 736, 738-39 (Tex. App. 1987, writ denied) (characterizing an acceleration clause as an indirect restraint on alienation and finding the restraint unreasonable); *Munson*, 948 S.W.2d at 817 (characterizing a "business use" restriction as a restraint on alienation but finding the restraint reasonable).[12]

_____

alienation as a natural consequence of whatever was explicitly required by the clause.

[12]Defendants acknowledge in their final reply brief that indirect restraints may be permissible "in some cases," but they maintain that "implicit" restraints are never permissible. Martinez/Studio Capital Final Reply Br. 4. Defendants provide no

Thus the question here is whether the "maximum effort" provision places an express or indirect restraint on alienation. Where a potential promissory restraint on alienation exists, Texas courts "prefer a construction of a possible restraint so that there is no such result." *Crestview, Ltd. v. Foremost Ins. Co.*, 621 S.W.2d 816, 826 (Tex. Civ. App. 1981, writ ref'd n.r.e.). The present case, however, does not present a situation where the court must decide between two equally viable interpretations of an ambiguous clause; under the court's determination of the confidentiality provision as a matter of law, the provision does not have the effect of indirectly restraining alienation. Unlike cases such as *Proctor*, where the purchase options or acceleration provisions imposed such a heavy burden as to operate as a *de facto*

---

explanation of how to distinguish between "implicit" and "indirect" restrictions, except to argue conclusorily that "indirect" restrictions are based on "explicit" contractual language while "implied" restrictions are somehow not based on the explicit language. None of the cases cited by defendant mentions this "indirect" versus "implicit" distinction, and many of the "indirect" restrictions discussed in these cases seem no more explicit in their restriction of sales than the confidentiality provision in the instant case. *See, e.g.*, *Munson*, 948 S.W.2d at 817 (characterizing a "business use" restriction as an indirect restriction on sale, but finding it enforceable). The court therefore declines to address this distinction. Even if the court were to accept defendants' assertion that the "maximum effort" provision cannot be read as an "implicit" restriction of future sales, the conclusion would still run contrary to defendants' argument that the "maximum effort" provision is unenforceable as an unreasonable restraint on alienation: there would be no unreasonable restraint on alienation because, by defendants' own argument, there is no unreasonable explicit or implicit restraint on alienation.

bar on future sales, the requirements of the Letter Agreement do not burden future sales to the point of effectively foreclosing them. Defendants posit that even proposing a private sale to a single well-informed individual in the art world would constitute a breach. But Martinez/Studio Capital could have sold the Rothko painting at an anonymous private sale, much like the one arranged between Hoffman and Martinez/Studio Capital, without disclosing any aspect of the 2007 transaction sale.

The court therefore concludes that the "maximum effort" provision was not intended, and does not function, as a restriction on alienation. As with other contractual obligations, a confidentiality provision may burden the buyer's ability to resell what he has purchased, but the court is unable to conclude that the "maximum effort" provision qualifies under the Restatement definition as a "restraint on alienation." The "maximum effort" provision did not preclude Martinez/Studio Capital from reselling the Rothko painting; it simply required that they exercise their maximum efforts to keep all aspects of the 2007 transaction confidential indefinitely.

E

Accordingly, for the reasons stated, the court dismisses Hoffman's breach of contract claim against L&M but declines to dismiss her claim against Martinez and Studio Capital.

IV

Hoffman alleges a claim against Meyer and Sotheby's for tortious interference with contract. Meyer moves to dismiss this claim under Rule 12(b)(2) for lack of personal jurisdiction.

A

The determination whether a federal district court has *in personam* jurisdiction over a nonresident defendant is bipartite. The court first decides whether the long-arm statute of the state in which it sits confers personal jurisdiction over the defendant. If it does, the court then resolves whether the exercise of jurisdiction is consistent with due process under the United States Constitution. *See Mink v. AAAA Dev. LLC*, 190 F.3d 333, 335 (5th Cir. 1999). Because the Texas long-arm statute extends to the limits of due process, the court need only consider whether exercising jurisdiction over Meyer would be consistent with the Due Process Clause of the Fourteenth Amendment. *See id.; Alpine View Co. v. Atlas Copco AB*, 205 F.3d 208, 214 (5th Cir. 2000).

"The Due Process Clause of the Fourteenth Amendment permits the exercise of personal jurisdiction over a nonresident defendant when (1) that defendant has purposefully availed himself of the benefits and protections of the forum state by establishing 'minimum contacts' with the forum state; and (2) the exercise of jurisdiction over that defendant does not offend 'traditional notions of fair play and substantial justice.' To comport with due

process, the defendant's conduct in connection with the forum state must be such that he 'should reasonably anticipate being haled into court' in the forum state." *Latshaw v. Johnston*, 167 F.3d 208, 211 (5th Cir. 1999) (footnotes omitted). To determine whether exercising jurisdiction would satisfy traditional notions of fair play and substantial justice, the court examines (1) the defendant's burden, (2) the forum state's interests, (3) the plaintiff's interest in convenient and effective relief, (4) the judicial system's interest in efficient resolution of controversies, and (5) the states' shared interest in furthering fundamental social policies. *Ruston Gas Turbines, Inc. v. Donaldson Co.*, 9 F.3d 415, 421 (5th Cir. 1993).

A defendant's contacts with the forum may support either specific or general jurisdiction over the defendant. *Mink*, 190 F.3d at 336. "Specific jurisdiction exists when the nonresident defendant's contacts with the forum state arise from, or are directly related to, the cause of action. General jurisdiction exists when a defendant's contacts with the forum state are unrelated to the cause of action but are 'continuous and systematic.'" *Id.* (citations omitted).

"When a court rules on a motion to dismiss for lack of personal jurisdiction without holding an evidentiary hearing, it must accept as true the uncontroverted allegations in the complaint and resolve in favor of the plaintiff any factual conflicts posed

by the affidavits. Therefore, in a no-hearing situation, a plaintiff satisfies his burden by presenting a *prima facie* case for personal jurisdiction." *Latshaw*, 167 F.3d at 211 (footnotes omitted).

B

Hoffman alleges that Meyer, a New York resident, tortiously interfered with the Letter Agreement by persuading the buyer of the Rothko painting to auction it publicly at Sotheby's. Hoffman asserts that Meyer, as Sotheby's Worldwide Head of Contemporary Art, was desperate to obtain "brand-name masterpieces" for the May auction and had also been following the Rothko painting over the past 15 years. She avers that Meyer persuaded Martinez to sell the Rothko painting by informing him that Sotheby's would price it at a low estimate with the expectation that it would sell for much more. And she asserts that Meyer has "ways of precipitating an acquisition when the phone hasn't rung" to support the premise that Meyer played a role in inducing a breach of the Letter Agreement.

Meyer admits that he participated on behalf of Sotheby's in negotiating a consignment for the auction of the Rothko painting, but he denies that any of the meetings, communications, or other conduct connected with the negotiations or auction took place in Texas. Hoffman does not dispute Meyer's allegation that most of the negotiations, as well as the auction, occurred in New York.

Hoffman maintains in her amended petition that the court can

exercise personal jurisdiction over "Defendants" based on their "continuous and systematic contacts with Texas," their having "employed agents in Texas," and their "enter[ing] into contracts with Texas citizens." Am. Pet. ¶ 18. Hoffman does not allege, however, that Meyer employed an agent in Texas or made a contract with a Texas resident, and she does not attempt to characterize Meyer's contacts with the state of Texas as "continuous and systematic."[13] Rather, according to Hoffman's response brief, the basis for exercising personal jurisdiction over Meyer is that he committed a tort in Texas by tortiously interfering with Hoffman's contract while knowing that Hoffman, as a Texas resident, would feel the effects of his conduct in Texas. Meyer disputes that the locus of the alleged tort is in Texas, and he urges the court to dismiss Hoffman's action against him for lack of *in personam* jurisdiction.

C

Hoffman contends that Meyer has established sufficient contacts with Texas for the court to exercise specific jurisdiction because she is the lone victim of the tort, she resides in Texas, and she suffered harm in Texas. Because the tort on which Hoffman

_____

[13]The existence of "continuous and systematic contacts" is relevant in determining whether a court has general jurisdiction, but Hoffman does not posit that the court can exercise general jurisdiction over Meyer. In response to Meyer's motion, Hoffman addresses only specific jurisdiction. The court concludes that it need not address whether it can exercise *in personam* jurisdiction over Meyer based on general jurisdiction.

relies to establish personal jurisdiction arose from acts that occurred out-of-state——i.e., Meyer's communications with Martinez and Martinez's subsequent decision to sell the Rothko painting via a highly publicized auction in New York——the court must analyze whether the effects of Meyer's actions had a sufficient impact in Texas to support a finding of personal jurisdiction. *See Allred v. Moore & Peterson*, 117 F.3d 278, 286-87 (5th Cir. 1997) ("[T]he effects of an alleged intentional tort are to be assessed as a part of the analysis of the defendant's relevant contacts with the forum." (internal quotation marks omitted)).

Under *Calder v. Jones*, 465 U.S. 783 (1984), an individual injured in one state need not go to the state of defendant's conduct to seek redress if the defendant knowingly caused the injury in plaintiff's state. *Id*. at 790; *see also Clemens v. McNamee*, 615 F.3d 374, 386 (5th Cir. 2010) ("Even an act done outside the state that has consequences or effects within the state will suffice as a basis for jurisdiction in a suit arising from those consequences if the effects are seriously harmful and were intended or highly likely to follow from the nonresident defendant's conduct." (quoting *Guidry v. U.S. Tobacco Co.*, 188 F.3d 619, 628 (5th Cir. 1999)); *Union Carbide Corp. v. UGI Corp.*, 731 F. 2d 1186, 1189 (5th Cir. 1984) ("[T]he district court properly grounded jurisdiction on those activities implicated in this suit——the out-of-state acts giving rise to [the plaintiff]'s

alleged injury in Texas.").

It is undisputed that Hoffman is a Texas resident. In Texas she allegedly enjoys a certain reputation as a businesswoman, philanthropist, and patroness of the arts, having amassed a world-renowned collection of modern art and having served as a "past Chair and a present Trustee of the Dallas Museum of Art." Am. Pet. ¶ 11. The Rothko painting was previously displayed in this museum and recognized as a part of the Hoffman collection, and her ownership of the painting in 2007 was allegedly well-known. Hoffman has also made a prima facie showing that Meyer knew that Hoffman was a Texas resident since, by Meyer's own admission, he visited Hoffman in Texas in May 2009. *See* Meyer June 30, 2010 App. 3. She has also made a prima facie showing that Meyer knew of Hoffman's reputation in the art world, having worked with her as a client.

If the court were to consider in isolation the "effects" test of *Calder* and its interpretation under *Guidry*, it could conclude that Hoffman has established Meyer's minimum contacts for purposes of exercising specific jurisdiction. Consistent with *Calder*, Hoffman suffered harm in Texas and Meyer knowingly caused such harm. Consonant with *Guidry*, the effects within Texas of Meyer's out-of-state interference were seriously harmful to Hoffman and were highly likely to follow from Meyer's successful attempts to persuade Martinez to sell the Rothko painting at public auction.

But "the 'effects' test is but one facet of the ordinary

minimum contacts analysis, to be considered as part of the full range of the defendant's contacts with the forum," and "the plaintiff's residence in the forum, and suffering of harm there, will not alone support jurisdiction under *Calder*." *Revell v. Lidov*, 317 F.3d 467, 473 (5th Cir. 2002); *see also Mullins v. TestAmerica Inc.*, 564 F.3d 386, 402 (5th Cir. 2009) (determining, for the purposes of *Calder*'s effects test, whether "the alleged tortfeasor expressly aimed his out-of-state conduct at the forum state by examining the nexus between the forum and the injured contractual relationship"); *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 869 (5th Cir. 2001) (requiring some level of purposeful availment beyond the fortuity that plaintiff resides there and the mere foreseeability of defendant's actions causing injury in Texas).

Considering the "full range" of Meyer's contacts with the state of Texas, the court concludes that Hoffman has failed to make a prima facie showing of a "strong nexus" between Texas and her tortious interference claim against Meyer. Accepting the truth of Hoffman's allegations, she has failed to make a prima facie showing that Meyer expressly aimed his actions at Texas. *See Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 212 (5th Cir. 1999) ("Foreseeable injury alone is not sufficient to confer specific jurisdiction, absent the direction of specific acts toward the forum."). According to the record, his actions only had impact in

Texas in the fortuitous sense that Hoffman happens to reside here. Hoffman's alleged injury was not particularly centered on her reputation or business interests *in Texas*; the injury alleged is based on harm to her reputation everywhere. This case is therefore distinguishable from cases such as *Calder*, 465 U.S. at 790 (defendant's magazine circulation was highest in forum state and plaintiff's career was based in forum state); *Central Freight Lines, Inc. v. APA Transport Corp.*, 322 F.3d 376, 384 (5th Cir. 2003) (plaintiff's business relationship was centered on Texas and defendant caused harm primarily in Texas); and *Eagle Metal Products, LLC v. Keymark Enterprises, LLC*, 651 F.Supp.2d 577, 595 (N.D. Tex. 2009) (Lynn, J.) (plaintiff's primary location of business and focal point of injury occurred in Texas), where the court sitting in plaintiff's state of residence exercised jurisdiction because defendant's actions had special impact in that state, aside from plaintiff's mere residence. *See Southmark Corp. v. Life Investors, Inc.*, 851 F.2d 763, 773 (5th Cir. 1988) (refusing to exercise jurisdiction where, even if sole plaintiff was Texas resident, the "brunt" of the injury would not be felt there). Aside from Hoffman's residence in Texas, Hoffman provides no reason why Texas has a particular nexus with her claim against Meyer for tortious interference with contract. Although the Letter Agreement involved a painting that was kept in Texas at one time and a provision of the contract required the buyer to make a

donation to the Dallas Museum of Art, these facts have no connection to Meyer's allegedly tortious conduct. The allegedly injurious acts——Meyer's interactions with Martinez in negotiating and publicizing a sale through a Sotheby's auction and indirect effect on Martinez's commitment to honor the Letter Agreement——all occurred outside of Texas, and long after Hoffman had sold the painting and the payment had been made to the Dallas Museum of Art.

Hoffman alleges that she has been damaged by the effects of the confidentiality breach throughout the art community; she makes no assertions about whether these harms were centered on Texas or particularly severe in this state. *See Clemens*, 615 F.3d at 379-80 (contrasting Clemens' case, which involved alleged defamation that contained no reference to Texas or Texas activities and where statements were not "made in Texas or directed to Texas residents any more than residents of any state," with *Calder*, in which the plaintiff's entertainment career was centered in forum state, the libelous article's sources were drawn from forum state, libel centered on plaintiff's activities in forum state, and publication's largest audience was in forum state); *Fielding v. Hubert Burda Media Inc.*, 415 F.3d 419, 426 (5th Cir. 2005) (declining to find personal jurisdiction where clear focus of defamation tort was on activities that occurred in foreign country, even though plaintiffs alleged particular harm to their reputation among family and friends residing in Texas). And the "actual

injury"——the actions alleged to be invasions of Hoffman's legally protected interest in keeping her contract free of interference——occurred largely in New York. *See Jobe v. ATR Mktg., Inc.*, 87 F.3d 751, 753 (5th Cir. 1996) ("In determining where the injury occurred for jurisdictional purposes, actual injury must be distinguished from its resultant consequences . . . . [O]ur precedent holds that consequences stemming from the actual tort injury do not confer personal jurisdiction at the site or sites where such consequences happen to occur.").

Even when taking into account Hoffman's state of residence, the effects of Meyer's allegedly intentional actions under *Calder*, and other incidental contractual connections to Texas, Hoffman has failed to make a prima facie showing that Meyer "purposely availed" himself of the benefits and protections of Texas so as to create a reasonable anticipation of being haled into court in Texas. *See Clemens*, 615 F.3d at 378 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985)); *Mullins*, 564 F.3d at 400 ("The 'effects' test in *Calder* does not supplant the need to demonstrate minimum contacts that constitute purposeful availment[.]"). Even if Hoffman has made a prima facie showing that Meyer's actions negatively impacted her reputation in the art community in Texas and elsewhere, she has not shown that any of Meyer's actions was expressly directed at Texas or even aimed with the purpose of interfering with the Letter Agreement. Hoffman has therefore

failed to establish that Meyer purposefully availed himself of the benefits and protections of Texas by establishing minimum contacts with Texas. The court need not address whether exercising personal jurisdiction over Meyer would offend "traditional notions of fair play and substantial justice."

The court grants Meyer's Rule 12(b)(2) motion to dismiss and dismisses Hoffman's action against him without prejudice by judgment filed today.

V

Sotheby's moves to dismiss Hoffman's tortious interference with contract claim on the ground that Hoffman has failed to state a claim on which relief can be granted.

A

The parties present arguments based on New York and Texas law, but they essentially agree that both states require substantially similar elements.[14] Without relevant differences in the substantive

---

[14]New York requires (1) the existence of a valid contract between the plaintiff and a third party, (2) the defendant's knowledge of the contract, (3) defendant's intentional procurement of the third party's breach without justification, (4) actual breach, and (5) damages. *See, e.g., Lama Holding Co. v. Smith Barney, Inc.*, 668 N.E.2d 1370, 1375 (N.Y. 1996). Texas does not require actual breach, *see, e.g., Fluor Enterprises, Inc. v. Conex International Corp.*, 273 S.W.3d 426, 446 (Tex. App. 2008, pet. denied); *Tippett v. Hart*, 497 S.W.2d 606, 611 (Tex. Civ. App. 1973, writ ref'd n.r.e.) (holding that interfering with performance of contract is actionable interference of contract, regardless whether actual breach is induced), but otherwise has similar elements. *See, e.g., COC Servs., Ltd. v. CompUSA, Inc.*, 150 S.W.3d 654, 670 (Tex. App. 2004, pet. denied) (defining elements as (1) the existence of a contract subject to interference, (2) a willful and intentional

laws, the court need not undertake a choice of law analysis. *See R.R. Mgmt. Co. v. CFS La. Midstream Co.*, 428 F.3d 214, 222 (5th Cir. 2005).

The parties' dispute centers on whether Hoffman has sufficiently pleaded Sotheby's knowledge of and intentional interference with the Letter Agreement and whether Sotheby's caused the breach. Hoffman contends that it is enough simply to plead expressly that Sotheby's, "[w]ith knowledge of the contract . . . intentionally and willfully interfered, and continue[s] to interfere, with the contract without justification, and [its] interference induce[d] and continues to induce Defendant Martinez's breach of the Contract," Am. Pet. ¶ 68, and that "Sotheby's decided, and remains determined, to procure the breach of L&M's, Martinez's and Studio Capital's obligations under the Contract," *id.* at ¶ 57.[15] Hoffman also relies on alleged circumstances that could have pressured Sotheby's and its agents to initiate negotiations with Martinez, such as Sotheby's recent difficulty in competing with Christie's for the more prestigious consignments and Meyer's *modus operandi* in preferring to seek out difficult acquisitions before the seller initiates contact. Sotheby's

_____

act of interference, (3) proximate cause of damage, and (4) actual damage or loss).

[15]Hoffman also purports to possess "unequivocal evidence" of Sotheby's knowledge of the contract no later than March 25, 2010, but she does not explain what she means by this, and she does not mention such "evidence" anywhere in the pleadings.

maintains that Hoffman's declarations of knowledge and willful interference are conclusory "recitals of the elements" and demands that Hoffman allege specific facts to support the accusation of intentional and willful interference. It also challenges Hoffman's assertion that it caused the breach, noting that "a party must be more than a willing participant" to state a claim for tortious interference with contract and that it is not enough for a defendant merely to "reap[] the advantages of a broken contract after the contracting party had withdrawn from the commitment on his own volition." Sotheby's Mot. Dis. 8-9 (quoting *Mary Kay, Inc. v. Weber*, 601 F.Supp.2d 839, 862 (N.D. Tex. 2009) (Fish, J.)).

B

Hoffman's allegations about the knowledge of the Letter Agreement and intent of Sotheby's, and regarding proximate cause are conclusory and are insufficient to state a plausible claim for tortious interference with contract. It is not enough to allege that a defendant had "knowledge" of a contract or "intentionally" interfered because this is nothing more than a recital of some of the required elements for a claim of tortious interference with contract. "[A] complaint [does not] suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 557). Just as in *Twombly* the Court did not automatically credit plaintiffs' generalized assertions of conspiracy, and in *Iqbal* the Court did

not credit plaintiff's assertions that defendants "knew of, condoned, and willfully and maliciously" subjected him to harsh conditions, *id.* at 1951, it is insufficient for Hoffman merely to allege intent. *See, e.g.*, *Wolf Concept S.A.R.L. v. Eber Bros. Wine & Liquor Corp.,* 736 F.Supp.2d 661, 670 (W.D.N.Y. 2010) (characterizing statement that defendant "intentionally and maliciously procured, or participated in the procurement of, the breach of the [agreement]" as "nothing more than 'a formulaic recitation of the elements of [the] cause of action'"); *Strujan v. Teachers Coll. Columbia Univ.*, 2010 WL 3466301, at *9 (S.D.N.Y. Aug. 11, 2010) (deeming allegations of discriminatory intent conclusory where facts alleged could have been caused by nondiscriminatory reasons); *Emmons v. City Univ. of N.Y.*, 715 F.Supp.2d 394, 425 (E.D.N.Y. 2010) (concluding that rote listing of intentions alleging "bad faith, self-interest, malice, and personal animosity" conclusory and inadequate to support a plausible tortious interference with contract claim); *M-I LLC v. Stelly*, 733 F.Supp.2d 759, 775 (S.D. Tex. 2010) (noting that merely alleging that party entered into contract with knowledge of other party's other contractual obligations was not the same as inducing a breach); *Hamilton v. Starcon Int'l, Inc.*, 2009 WL 6443115, at *6 (S.D. Tex. Dec. 8, 2009) (holding allegations that defendant willfully interfered to be inadequate because plaintiff needed to

"show" intentional wrongdoing).[16]

The parties dispute whether Sotheby's knew about the confidentiality provisions of the Letter Agreement, and Hoffman does not allege sufficient facts to establish that Sotheby in fact knew. But even if she had, "[m]erely entering into a contract with a party with the knowledge of that party's contractual obligations to someone else is not the same as inducing a breach." *Amigo Broad., LP v. Spanish Broad. Sys., Inc.*, 521 F.3d 472, 493 (5th Cir. 2008) (citing *Davis v. HydPro, Inc.*, 839 S.W.2d 137, 139 (Tex. App. 1992, writ denied)); *see also Lama Holding Co. v. Smith Barney Inc.*, 668 N.E.2d 1370, 1375 (N.Y. 1996) (requiring knowledge of contract *and* intentional procurement of third-party breach without justification as elements of tortious interference claim).

Several of Hoffman's allegations about the intentions of Sotheby's are conclusory. It is not enough simply to allege that "Sotheby's and Meyer intentionally and willfully interfered, and continue to interfere, with the Contract without justification[.]" Am. Pet. ¶ 68. The only fact that Hoffman alleges to support this

---

[16]Hoffman cites *Merrill Lynch, Pierce, Fenner & Smith, P.C. v. Greystone Servicing Corp.*, 2007 WL 2729935, at *15 (N.D. Tex. Sept. 18, 2007) (Solis, J.), and *Elina Adoption Services, Inc. v. Carolina Adoption Services, Inc.*, 2008 WL 4005738, at *7 (M.D.N.C. Aug. 25, 2008), to argue that it is sufficient simply to allege that defendant "knowingly and willfully induced" the contractual breach, without alleging specific facts. The Supreme Court has since clarified, however, that "a complaint [does not] suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 557).

conclusion comes from Mnuchin's assertion that Meyer "seduced" Martinez into selling the painting with Sotheby's by telling Martinez that Sotheby's would price the Rothko painting at a low estimate with the expectation that it would sell for much more. *See id.* at ¶ 50. Aside from this third party's speculation, however, there is nothing in the amended petition that plausibly pleads the elements of intent and causation. The remaining factual allegations say nothing about whether Sotheby's (or Meyer, acting on behalf of Sotheby's) was the party doing the persuading.

Even accepting Hoffman's other pertinent allegations as true——i.e., that Meyer was under great pressure to produce brand-name masterpieces for the spring auction, that Sotheby's welcomed the opportunity to serve as Martinez's auction house for the Rothko painting, that Meyer often solicits consignments before the telephone has rung, and that Sotheby's publicized various aspects of the Rothko painting in preparation for the auction——these allegations do not make a plausible showing that *in this particular instance* Sotheby's initiated contact with Martinez rather than the other way around.

Hoffman's allegation that Sotheby's interfered with the Letter Agreement by continuing to publicize the auction after discovering Martinez's obligations fails for similar reasons. Even assuming the truth of Hoffman's allegations concerning when Sotheby's learned about the confidentiality agreement, Hoffman cannot plead

a plausible claim that Sotheby's "interfered" unless Hoffman alleges facts about Martinez or Studio Capital's unwillingness to publicize the auction prior to Sotheby's intervention.  Even if Sotheby's and Meyer played an "extremely active role" in promoting the auction, they could still be merely "willing participant[s]" who "reaped the advantages of a broken contract after the contracting party had withdrawn from the commitment on his own volition," *Mary Kay*, 601 F.Supp.2d at 862, unless there is some indication that Martinez had not wanted to publicize the auction prior to the urging of Sotheby's.[17]

The court therefore dismisses the tortious interference claim against Sotheby's.

VI

Hoffman's final claim against Sotheby's is for unjust enrichment.  Whether characterized as a claim for unjust enrichment under New York law, or as, for example, a claim for money had and received under Texas law,[18] this claim must also be dismissed.

---

[17]The court need not resolve whether Sotheby's was acting within the scope of its agency or on precisely which date Sotheby's learned of Martinez's or Studio Capital's contractual obligations. Regardless how the court resolves such questions, the outcome would be the same: without allegations regarding whether Sotheby's had affected Martinez's or Studio Capital's course of action in any way, there can be no plausible interference claim.

[18]Unjust enrichment is not an independent cause of action under Texas law.  *Redwood Resort Props., LLC v. Holmes Co.*, 2006 WL 3531422, at *9 (N.D. Tex. Nov. 27, 2006) (Fitzwater, J.) (dismissing unjust enrichment claim and holding that it is not an independent cause of action) (citing *Doss v. Homecoming Fin.*

In its motion, Sotheby's points to the conclusory nature of Hoffman's claim as alleged in ¶¶ 71 and 72 of her amended petition. Regardless of the fact that, in pleading this claim, Hoffman incorporates by reference the preceding paragraphs of her amended petition, *see* Am. Pet. ¶ 70, and notwithstanding the explanation of this claim contained in her brief, her amended petition itself is conclusory and does not state a plausible claim. In ¶ 71 she alleges: "Defendant Sotheby's will be unjustly enriched by the auction of the Painting." And in ¶ 72 she asserts: "Once in receipt of these proceeds, Defendant Sotheby's will be subject to an equitable duty to convey these proceeds to Plaintiff because it would be unjustly enriched if it were permitted to retain them."

---

*Network, Inc.*, 210 S.W.3d 706, 709 n.4 (Tex. App. 2006, pet. denied)); *see also Bank of Saipan v. CNG Fin. Corp.*, 380 F.3d 836, 840 (5th Cir. 2004) ("Money had and received is an equitable doctrine applied to prevent unjust enrichment." (quoting *Miller-Rogaska, Inc. v. Bank One, Tex., N.A.*, 931 S.W.2d 655, 662 (Tex. App. 1996, no pet.))); *Merrill Lynch, Pierce, Fenner & Smith, P.C. v. Greystone Servicing Corp.*, 2007 WL 2729935, at *12 (N.D. Tex. Sept. 18, 2007) (Solis, J.) (explaining that "[a]nother basis for recovering under the theory of unjust enrichment is when a claim for 'money had and received' has been established"); *Wood v. Gateway, Inc.*, 2003 WL 23109832, at *12 (N.D. Tex. Dec. 12, 2003) (Cummings, J.) (dismissing unjust enrichment claim as not an independent cause of action). Moreover, Texas courts of appeals have consistently held that unjust enrichment is not an independent cause of action, but is instead a theory upon which an action for restitution may rest. *See, e.g.*, *Argyle Indep. Sch. Dist. v. Wolf*, 234 S.W.3d 229, 246-47 (Tex. App. 2007, no pet.); *Friberg-Cooper Water Supply Corp. v. Elledge*, 197 S.W.3d 826, 831-32 (Tex. App. 2006, pet. granted) (treating unjust enrichment claim as a claim for money had and received), *rev'd on other grounds*, 240 S.W.3d 869 (Tex. 2007); *Mowbray v. Avery*, 76 S.W.3d 663, 680 (Tex. App. 2002, pet. denied).

Her amended petition is simply too bare bones to state a plausible claim.

Accordingly, Hoffman's unjust enrichment claim against Sotheby's is dismissed.

## VII

Although the court is dismissing certain of Hoffman's claims, it will permit Hoffman to replead. Courts often grant plaintiffs one opportunity to replead, unless it appears that the plaintiff cannot cure the initial deficiencies in the pleading. *See In re Am. Airlines, Inc., Privacy Litig.*, 370 F.Supp.2d 552, 567-68 (N.D. Tex. 2005) (Fitzwater, J.) ("[D]istrict courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal." (internal quotation marks and citation omitted)). Because there is no indication that Hoffman cannot, or is unwilling to, cure the defects that the court has identified, the court grants her 30 days from the date this memorandum opinion and order is filed to file an amended complaint.

*    *    *

For the reasons stated, the court grants in part and denies in part the June 30, 2010 motion to dismiss of Martinez and Studio Capital; grants the June 30, 2010 motion to dismiss of L&M; grants

the June 30, 2010 Rule 12(b)(2) motion to dismiss of Meyer and does not reach his Rule 12(b)(6) motion to dismiss; and grants the June 30, 2010 motion to dismiss of Sotheby's.  The court grants Hoffman 30 days from the date this memorandum opinion and order is filed to file an amended complaint.  By Rule 54(b) final judgment filed today, Hoffman's action against Meyer is dismissed without prejudice for lack of personal jurisdiction.

**SO ORDERED.**

March 7, 2011.

_____
SIDNEY A. FITZWATER
CHIEF JUDGE