IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

MARGUERITE HOFFMAN,                §
                                  §
                     Plaintiff,   §
                                  §  Civil Action No. 3:10-CV-0953-D
VS.                               §
                                  §  *This is the publicly-available version of a
L&M ARTS, et al.,                 §  sealed memorandum opinion  and contains
                                  §  redactions in accordance with the protective
                                  §  order filed in this case.
                     Defendants.  §

MEMORANDUM OPINION
AND ORDER

        In this lawsuit arising from the sale at public auction of the 1961 Mark Rothko oil

painting, Untitled (the "Rothko painting"), plaintiff Marguerite Hoffman ("Hoffman") moves

for partial summary judgment, and defendants L&M Arts ("L&M"), Studio Capital, Inc.

("Studio Capital"), and David Martinez ("Martinez") move for summary judgment and to

exclude the testimony of Victor Wiener ("Wiener"), Hoffman's damages expert.  For the

reasons that follow, the court denies the motions.

I

        The court's prior memorandum opinions and orders in this case set forth many of the

relevant background facts.[1]  The court will add to the background facts and procedural

_____

        [1]See Hoffman v. L&M Arts, 2012 WL 4321739 (N.D. Tex. Sept. 21, 2012) (Fitzwater,
C.J.) ("Hoffman III"); Hoffman v. L&M Arts, 2011 WL 3567419 (N.D. Tex. Aug. 15, 2011)
(Fitzwater, C.J.); Hoffman v. L&M Arts, 774 F.Supp.2d 826 (N.D. Tex. 2011) (Fitzwater,
C.J.).

history pertinent to this decision.[2]

A

Hoffman, a Dallas resident and patroness of the arts, once owned the Rothko painting. Prior to the events leading up to this lawsuit, Hoffman and her late husband, and two other Dallas couples, bequeathed their entire art collections to the Dallas Museum of Art ("DMA"). At that time, the Hoffmans' collection included the Rothko painting.  In recognition of the three couples' gifts, the DMA held a highly publicized exhibition entitled, *Flash Forward: Contemporary Collections for the Dallas Museum of Art* ("Flash Forward Exhibit").  The Rothko painting was included among the works of art exhibited in the first phase of the Flash Forward Exhibit, which ran from November 2006 through April 2007.  The catalogue and online description of the exhibit highlighted the Rothko painting, describing it as "a stunning masterpiece in orange and red," P. 7-13-12 Br. 8,  and featuring a widely-reproduced

---

[2]Both sides have moved for summary judgment.  As the court has stated in cases like *AMX Corp. v. Pilote Films*,

> [b]ecause both parties have filed motions for summary judgment, the court will principally recount only the evidence that is undisputed.  If it is necessary to set out evidence that is contested, the court will do so favorably to the party who is the summary judgment nonmovant in the context of that evidence. In this way it will comply with the standard that governs resolution of summary judgment motions.

*AMX Corp. v. Pilote Films*, 2007 WL 1695120, at *1 n.2 (N.D. Tex. June 5, 2007) (Fitzwater, J.) (citing *U.S. Bank Nat'l Ass'n v. Safeguard Ins. Co.*, 422 F. Supp.2d 698, 701 n.2 (N.D. Tex. 2006) (Fitzwater, J.)), *modified in part on other grounds*, 2007 WL 2254943 (N.D. Tex. Aug. 7, 2007) (Fitzwater, J .).

photograph of Hoffman and her husband standing in front of the painting.  P. 7-13-12 App. 266.  Hoffman maintains that as a result, her ownership of the Rothko painting in 2007 was well known.

In 2006, while the Flash Forward Exhibit was in preparation, Hoffman's husband died.  Following her husband's untimely death, Hoffman found herself in need of liquidity to manage the family business and fulfill various commitments, and she decided to sell the Rothko painting.  Although the sale was permitted under the terms of the DMA bequest, Hoffman decided to sell the painting privately, and only on the condition of complete and guaranteed confidentiality among any parties involved, because she did not want to generate speculation about her financial condition, and she wanted to safeguard her privacy and that of her daughters during a time of grief.

To arrange a private sale, Hoffman, through her agent, John Van Doren ("Van Doren"), contacted L&M.  L&M's principal, Robert Mnuchin ("Mnuchin"), was the agent from whom Hoffman and her husband had originally purchased the Rothko painting.  Hoffman, through Van Doren, made clear to L&M that preservation of confidentiality would be a critical component of any sale.  Mnuchin expressed an understanding of Hoffman's reasons for maintaining confidentiality.

Mnuchin and his partner at L&M, Dominique Lévy, identified Studio Capital as a potential buyer.   [Redacted]

Although L&M did not disclose the buyer's identity, Mnuchin assured Van Doren that the buyer was "very private."  *Id.* at 74.

The parties negotiated a sale price of $19 million, with $17.6 million net to Hoffman and $700,000 commission to each agent.  In February 2007 Van Doren, on behalf of Hoffman, and L&M, on behalf of the buyer, entered into a Letter Agreement to sell the Rothko painting to L&M's undisclosed principal (the "February Agreement").  The February Agreement stated: "[i]t is the specified wish of the seller that the sale and terms of the sale remain confidential.  Any breach in confidentiality prior to payment in full will be considered by the seller grounds for terminating this agreement.  It is requested that confidentiality be maintained indefinitely."  *Id.* at 272.

To obtain advice regarding the purchase of the Rothko painting, Martinez discussed the possible acquisition with Brett Gorvy, Head of Christie's Contemporary Art Department, and Tobias Meyer ("Meyer"), Worldwide Head of Sotheby's Contemporary Art Department. Before the sale was finalized, however, an art professional from Christie's contacted Hoffman to discuss the fact that she was selling the Rothko painting.  Hoffman was alarmed that a third party had discovered that the painting was for sale.  When she learned from Mnuchin that his undisclosed buyer had revealed the imminent purchase of the Rothko painting to the head of contemporary art at Christie's, Hoffman decided not to go forward with the transaction.

Martinez and Studio Capital remained interested, however, in negotiating with Hoffman, and, according to Hoffman, L&M (through Mnuchin) expressly promised that the Rothko painting would "'disappear' into the 'very private' European collection of the individual collector L&M represented."  P. 7-13-12 Br. 16.  In April 2007 Hoffman and the

- 4 -

undisclosed buyer, through their agents, entered into a letter agreement (the "Letter Agreement") that specified the terms of the sale of the Rothko painting. One provision of the Letter Agreement specified that "[a]ll parties agree to make maximum effort to keep all aspects of this transaction confidential indefinitely. In addition, the buyer agrees not to hang or display the work for six months following receipt of the painting." P. 7-13-12 App. 278. The Letter Agreement also provided, among other requirements, that the buyer would pay the seller the net price of $17.6 million and make a confidential cash contribution to the DMA. *Id.* Before finalizing the Letter Agreement, L&M sent Studio Capital and Martinez an invoice, dated April 18, 2007 (the "April 18 Invoice"), that provided that "[a]ll parties are committed to keeping the terms of this transaction strictly confidential." L&M 8-3-12 App. 281.

Hoffman maintains that she performed her obligation to make maximum effort to keep all aspects of the transaction confidential indefinitely. When people asked why the Rothko painting was not on display in her home, she replied that she "did a new installation," a phrase she uses to explain why a particular picture is not hanging at any given time. P. 7-13-12 App. 52. Apart from her confidential business advisors, attorney, and accountant, Hoffman informed only two people of the sale of the Rothko painting: Howard Rachofsky ("Rachofsky") and Deedie Rose ("Rose"). She disclosed the sale to them because they had joined in the Hoffmans' bequest to the DMA, and she "felt like [she] had a moral, ethical obligation, to let them know that [she] sold the picture." *Id.* at 50. Rachofsky and Rose agreed to hold the information in confidence.

After purchasing the painting, Studio Capital kept it in storage . [Redacted]       By 2009, L&M had become aware that another, more expensive painting by Mark Rothko (the "Korean Rothko") might be available, and it offered the painting to Martinez.  Martinez believed the Korean Rothko might be a suitable addition to Studio Capital's collection, but the purchase would necessitate the sale of another painting.  Accordingly, Martinez authorized L&M to sell the Rothko painting privately, but L&M was unsuccessful.

In early 2010, Meyer raised with Martinez the subject of the Rothko painting, and he suggested that Martinez auction the painting at Sotheby's.  Thereafter, both the Rothko painting and the Korean Rothko were transported to L&M's New York gallery where, according to Hoffman, Meyer and Mnuchin discussed the best strategy for presenting the Rothko painting at auction, including what estimate of value should be given in the catalogue.  Hoffman maintains that, during this meeting, none of the defendants informed Meyer of the Letter Agreement or its confidentiality provision.  The following week, Studio Capital consigned the Rothko painting to Sotheby's for public auction.

In March 2010, after Studio Capital signed the consignment agreement, Mnuchin contacted Van Doren to explain that he was the bearer of "difficult" news.  *Id.* at 76.  According to Mnuchin, Meyer had "seduced" the undisclosed owner into selling the Rothko painting at Sotheby's May auction.  *Id.* at 77.  In a letter to Hoffman, Mnuchin expressed his sympathy, stating, "even in retrospect I see no way that I could have changed the course of events when informed that [Studio Capital] was selling at Sotheby's.  The decision had been made, including a contract."  *Id.* at 285.  Mnuchin promised, however, to "do everything in

[his] power to make sure that the Robert & Marguerite Hoffman Collection not be listed in the provenance and that the picture will be for sale from, 'a distinguished European collection.'" *Id.* Mnuchin then called Meyer to make this request.

Hoffman maintains that, to promote the auction of the Rothko painting, Sotheby's "embarked on a major marketing blitz" between March and May 2010. P. 7-13-12 Br. 27. Sotheby's issued a press release announcing the planned public auction of the Rothko painting, and, following the initial press release, numerous media sources published stories about the auction, many of which were accompanied by a large color photograph of the Rothko painting.  In addition, Sotheby's website and catalogue posted a large color photograph of the Rothko painting and stated that it had been exhibited in the Flash Forward Exhibit in 2007, directing readers to the specific pages in the Fast Forward Exhibit catalogue that showed the Hoffmans standing in front of the Rothko painting.  The publicity attracted the attention of numerous media sources, including one Internet blogger, who speculated that "[i]f Martinez, or a related holding company, is the owner, it has been a hasty marriage," since the Rothko painting had been exhibited in the Flash Forward Exhibit in 2007 as part of an exhibition that included works owned by three major area collectors, including the Hoffmans. P. 7-13-12 App. 404-05.

The Rothko painting was auctioned by Sotheby's on May 12, 2010.  It sold for $31,442,500, a price more than $13 million in excess of what Hoffman had received for the painting when she sold it privately in 2007.

B

Hoffman filed the instant lawsuit in Texas state court against Martinez and Studio
Capital for breach of contract.  She amended her petition to add a claim against L&M for
breach of contract and to add claims against Sotheby's and Meyer.  After the case was
removed to this court, the court dismissed the action against Meyer for lack of personal
jurisdiction and dismissed the claims against Sotheby's and L&M under Fed. R. Civ. P.
12(b)(6).  *Hoffman v. L&M Arts*, 774 F.Supp.2d 826, 845, 848-49 (N.D. Tex. 2011)
(Fitzwater, C.J.) ("*Hoffman I*").  The court declined to dismiss Hoffman's breach of contract
action against Martinez and Studio Capital.  The court concluded, in pertinent part, that

> the facts alleged plausibly establish that Martinez and/or Studio
> Capital did not make every reasonable effort to keep all aspects
> of the 2007 transaction confidential, measured according to what
> an average, prudent, and comparable person (i.e., peers in the
> professional art buying community) would or would not have
> done, under the same or similar circumstances, to make every
> reasonable effort when exercising due diligence and in the
> absence of neglect.

*Id.* at 836.  The court also permitted Hoffman to file an amended complaint.  *Id.* at 849.

Hoffman then filed a second amended complaint asserting breach of contract claims
against Martinez, Studio Capital, and L&M.  L&M moved to dismiss under Rule 12(b)(6),
and Martinez moved for judgment on the pleadings.  The court denied the motions.  *See
Hoffman v. L&M Arts*, 2011 WL 3567419, at *3 (N.D. Tex. Aug. 15, 2011) (Fitzwater, C.J.)
("*Hoffman II*").  The court held that Hoffman had plausibly pleaded a breach of contract
claim against L&M for breaching the "maximum effort" confidentiality provision of the

- 8 -

Letter Agreement. *Id.* at *7. In response to L&M's argument that it was not bound by the terms of the Letter Agreement, the court concluded that, "[i]f L&M had not disclosed the identity of its principal by the time Martinez and/or Studio Capital decided to dispose of the Rothko painting at public auction, L&M can still be held liable for violating the Letter Agreement." *Id.* at *8.

Hoffman now moves for partial summary judgment establishing that L&M, Studio Capital, and Martinez each breached the Letter Agreement. L&M, Studio Capital, and Martinez move for summary judgment, contending that Hoffman cannot establish a genuine issue of material fact on the question of breach or of damages.[3] They also move to exclude the expert report and proposed testimony of Hoffman's damages expert.

## II

When a party moves for summary judgment on a claim on which the opposing party will bear the burden of proof at trial, the moving party can meet her or its summary judgment obligation by pointing the court to the absence of admissible evidence to support the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party does so, the opposing party must go beyond her or its pleadings and designate specific facts showing there is a genuine issue for trial. *See id.* at 324; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam). An issue is genuine if the

---

[3]After defendants filed their summary judgment motions, the court granted Hoffman's June 7, 2012 motion for leave to file a third amended complaint. In that pleading, Hoffman asserts a new claim against L&M for fraudulent inducement. *Hoffman III*, 2012 WL 4321739, at *5. The fraudulent inducement claim is not at issue in the present motions.

evidence is such that a reasonable jury could return a verdict in the opposing party's favor. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  The opposing party's failure to produce proof as to any essential element of a claim renders all other facts immaterial.  *See Trugreen Landcare, L.L.C. v. Scott*, 512 F.Supp.2d 613, 623 (N.D. Tex. 2007) (Fitzwater, J.).  Summary judgment is mandatory if the opposing party fails to meet this burden.  *Little*, 37 F.3d at 1076.

When a party moves for summary judgment on a claim on which she or it will have the burden of proof at trial, the party "must establish 'beyond peradventure all of the essential elements of the claim[.]'"  *Bank One, Tex., N.A. v. Prudential Ins. Co. of Am.*, 878 F. Supp. 943, 962 (N.D. Tex. 1995) (Fitzwater, J.) (quoting *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986)).  This means that the moving party must demonstrate that there are no genuine and material fact disputes and that the party is entitled to summary judgment as a matter of law.  *See Martin v. Alamo Cmty. Coll. Dist.*, 353 F.3d 409, 412 (5th Cir. 2003). "The court has noted that the 'beyond peradventure' standard is 'heavy.'"  *Carolina Cas. Ins. Co. v. Sowell*, 603 F.Supp.2d 914, 923-24 (N.D. Tex. 2009) (Fitzwater, C.J.) (quoting *Cont'l Cas. Co. v. St. Paul Fire & Marine Ins. Co.*, 2007 WL 2403656, at *10 (N.D. Tex. Aug. 23, 2007) (Fitzwater, J.)).

III

The court begins by addressing the parties' arguments concerning whether Hoffman

can or has established the "breach" element of her breach of contract claim.[4]

A

Defendants contend they are entitled to summary judgment because there is no

evidence that they breached the Letter Agreement.  They maintain that there is no proof that

L&M affirmatively misrepresented to Sotheby's or to anyone else that there was no

obligation to keep all aspects of the transaction confidential indefinitely; that L&M's failure

to share the full contents of the Letter Agreement with its principals (Martinez and Studio

Capital) cannot establish a breach of contract because, as a matter of law, L&M's

communications with its principals cannot form the basis of a cause of action by Hoffman,

a third-party; and that, even if Studio Capital had been informed of the verbatim wording of

the Letter Agreement, the evidence is undisputed that Studio Capital received the April 18

Invoice, and Martinez testified that he saw no difference between the language of the April

18 Invoice and that of the Letter Agreement.

---

[4]"Hoffman's breach of contract claim requires proof of four elements: (1) the existence of a valid contract, (2) that Hoffman performed her duties under the contract, (3) that the party she is suing breached the contract, and (4) that Hoffman suffered damages as a result of the breach." *Hoffman I*, 774 F.Supp.2d at 832 (citing *Lewis v. Bank of Am. NA*, 343 F.3d 540, 544-45 (5th Cir. 2003) (Texas law)).  Defendants maintain that New York law controls, but they acknowledge that the elements are the same under Texas or New York law. *See, e.g.,* Studio Capital 7-13-12 Br. 22-23 & 22 n.17.  Hoffman agrees that the court need not resolve this conflict-of-law issue, but she posits that Texas law governs. *See* P. 8-17-12 Br. 6 n.1.

Defendants also posit that they could not have breached the Letter Agreement by selling the Rothko painting at public auction because there is no evidence of any intent in the Letter Agreement to restrict the buyer's ability to resell the painting through a public auction. They cite the opinions of their experts, Ben Heller ("Heller") and David Nash, who opine that a confidentiality provision such as the one at issue here would not be understood within the art industry to prohibit resale or to limit the buyer to a private resale, but would instead be commonly understood only to restrict the parties from revealing the details of the transaction. Defendants maintain that, because the Letter Agreement cannot be interpreted to prohibit the parties from reselling the Rothko painting by public auction, their actions in doing so could not have breached the Letter Agreement.

Hoffman opposes defendants' motion, contending that there is at least a genuine fact issue whether defendants "'made every reasonable effort to reach the identified end, measured according to what an average, prudent, and comparable person would or would not have done, under the same or similar circumstances, to make every reasonable effort when exercising due diligence and in the absence of neglect.'" P. 8-17-12 Br. 8 (quoting *Hoffman I*, 774 F.Supp.2d at 834). She contends that L&M breached the Letter Agreement by sending Studio Capital and Martinez an invoice that mischaracterized the Letter Agreement's confidentiality provision, and (once Martinez disclosed to Meyer that Studio Capital owned the Rothko painting) by failing to inform Sotheby's and Meyer about the confidentiality provision. Hoffman posits that L&M breached the Letter Agreement by facilitating the public auction of the Rothko painting by, *inter alia*, arranging for the Rothko painting and

the Korean Rothko to be displayed side-by-side in one of its exhibit rooms, and by engaging in strategy discussions with Meyer and Martinez regarding the public auction of the Rothko painting.

Hoffman also points to specific acts or failures to act by Studio Capital and Martinez that she contends breached the confidentiality provision of the Letter Agreement: telling Sotheby's that Studio Capital owned the Rothko painting, and failing to inform Sotheby's that they were bound to keep "all aspects" of the transaction confidential indefinitely, including the fact of the sale; and failing to affirmatively impose "restrictions" on Sotheby's, such as the requirement that Sotheby's "use the words private collection, but essentially eliminate all reference to the activity in Fast Forward, text photograph, you name it," as defendants' expert, Heller, suggested he would have done had he been the seller in Studio Capital's situation. *Id.* at 17 (quoting P. 8-3-12 App. 148-49).

In response to the contention that the public auction could not have breached the Letter Agreement because the agreement did not restrict resale, Hoffman points to *Hoffman I*, arguing that the court has already held that, even if the Letter Agreement did not preclude resale, the public auction could constitute a breach. She also posits that the Letter Agreement restricts resale because the confidentiality provision continues "indefinitely," not merely "until resale." *Id.* at 18. Hoffman contends "there is an issue of fact a[s] to whether an average, prudent person who had obliged himself to specific confidentiality terms would have auctioned the painting at one of the world's most high profile auctions in order to maximize profit." *Id.* at 19. While conceding that each and every disclosure of the fact of

- 13 -

the sale would not necessarily breach the Letter Agreement, Hoffman contends that "the

manner in which Defendants resold the [Rothko painting] in this case is less than what an

average, prudent person who had obligated [himself] to specific confidentiality terms would

have done." *Id.* at 20.

B

In *Hoffman I* the court interpreted the unambiguous terms of the confidentiality

provision of the Letter Agreement as a matter of law.  As interpreted in *Hoffman I*, this

provision obligated the parties to

> make every reasonable effort to keep all aspects of the 2007
> transaction confidential, measured according to what an average,
> prudent, and comparable person would or would not have done,
> under the same or similar circumstances, to make every
> reasonable effort when exercising due diligence and in the
> absence of neglect.

*Hoffman I*, 774 F.Supp.2d at 834.   The court also concluded that, although the Letter

Agreement did not prohibit defendants from reselling the Rothko painting, it did impose

restrictions on how they could do so.

> Regardless of the fact that the Letter Agreement does not
> preclude reselling or displaying the Rothko painting, the
> contract obligates the parties "to make maximum effort to keep
> all aspects of this transaction confidential indefinitely."  Under
> the terms of the Letter Agreement, the painting could have been
> displayed and resold in a way that did not disclose any aspect of
> the 2007 transaction.

*Id.* at 838.  And the court has already held that a breach of the Letter Agreement would occur

if defendants did not "tak[e] adequate precautions to keep the changed ownership of the

- 14 -

Rothko painting private." *Id.* at 836.  The court declines to revisit questions of contract

interpretation that it resolved in *Hoffman I.*

C

The court now turns to defendants' summary judgment motions.  Defendants point to

the absence of evidence that they breached the Letter Agreement.  The court must therefore

decide whether Hoffman has adduced sufficient evidence to permit a reasonable jury to find

that defendants failed to

> make every reasonable effort to keep all aspects of the 2007
> transaction confidential, measured according to what an average,
> prudent, and comparable person would or would not have done,
> under the same or similar circumstances, to make every
> reasonable effort when exercising due diligence and in the
> absence of neglect.

*Id.* at 834.  "When this court denies rather than grants summary judgment, it typically does

not set out in detail the evidence that creates a genuine issue of material fact."  *Valcho v.*

*Dall. Cnty. Hosp. Dist.*, 658 F.Supp.2d 802, 812 n.8 (N.D. Tex. 2009) (Fitzwater, C.J.)

(citing *Swicegood v. Med. Protective Co.*, 2003 WL 22234928, at * 17 n.25 (N.D. Tex. Sept.

19, 2003) (Fitzwater, J.)).  The court will therefore focus on pertinent examples.

Hoffman has adduced evidence that, although L&M provided Martinez and Studio

Capital the April 18 Invoice, which stated that "[a]ll parties are committed to keeping *the*

*terms of this transaction* strictly confidential," L&M 8-3-12 App. 281 (emphasis added),

L&M did not provide Martinez or Studio Capital a copy of the Letter Agreement's

confidentiality provision, which requires that the parties make "maximum effort to keep *all*

- 15 -

*aspects of this transaction* confidential indefinitely," P. 7-13-12 App. 278 (emphasis added). A reasonable jury could find that, by informing Martinez and Studio Capital that they were required to keep "the terms" of the transaction confidential, but failing to inform them that they were required to keep "all aspects" of the transaction confidential, L&M did not "make every reasonable effort to keep *all aspects* of the 2007 transaction confidential." *Hoffman I*, 774 F.Supp.2d at 834 (emphasis added). This is because "an average, prudent, and comparable art agent, faced with the same negotiating history, Letter Agreement, and obligation to exert 'maximum effort' to preserve confidentiality," might reasonably have "ensured that it represented to its principal and to others in a position to compromise this confidentiality that the parties' confidentiality obligations applied to the existence of the transaction [itself,] as well as to its terms." *Hoffman II*, 2011 WL 3567419, at *6. Indeed, the court has already held that "if L&M engaged in acts or omissions after April 24, 2007 that advised others of their obligations using the paraphrase found in the [April 18 Invoice], it can be plausibly inferred that L&M breached the 'maximum effort' clause of the Letter Agreement." *Id.* Hoffman has produced sufficient evidence to enable a reasonable jury to find that L&M did not completely disclose the confidentiality obligations of the Letter Agreement. Accordingly, a fact issue exists as to whether the actions of L&M were consistent with what an average, prudent, and comparable person would or would not have done, under the same or similar circumstances, when exercising due diligence and in the absence of neglect.

Hoffman has also presented evidence that, at the very least, L&M knew that Sotheby's

and Meyer were aware that Hoffman no longer owned the Rothko painting, and that

Sotheby's and Meyer were planning to attempt to sell the painting through a public auction,

yet said nothing to Meyer or anyone else at Sotheby's about the confidentiality provision of

the Letter Agreement.  Defendants argue that L&M was not obligated to make any such

disclosure because the terms of the Letter Agreement were themselves confidential.  The

court disagrees.  A reasonable jury could find that L&M's failure to inform Sotheby's and

Meyer about the existence and terms of the confidentiality provision of the Letter Agreement

was inconsistent with what an average, prudent, and comparable person would have done,

under the same or similar circumstances, to make every reasonable effort when exercising

due diligence and in the absence of neglect to keep all aspects of the 2007 transaction

confidential.

Finally, it is undisputed that Studio Capital sold the Rothko painting through a public

auction.  The court has already held that the Letter Agreement did not prohibit the resale of

the painting.  But, even if the painting were resold, the parties were obligated to "make every

reasonable effort to keep *all aspects* of the 2007 transaction confidential."  *Hoffman I*, 774

F.Supp.2d at 834 (emphasis added).  A reasonable jury could find that selling the painting

at a public auction at a well known and highly respected auction house was inconsistent with

what an average, prudent, and comparable person would have done, when exercising due

diligence and in the absence of neglect, to keep confidential all aspects of the 2007

transaction.  A reasonable jury could also find that an average, prudent, and comparable

person, when exercising due diligence and in the absence of neglect, would have ensured that

a sale at public auction was conducted only under certain restrictions—including, for example, requiring that the promotional materials not include pictures of the Rothko painting or references to the Flash Forward Exhibit at the DMA—to ensure that all aspects of the 2007 transaction, including the fact of the sale itself, were kept confidential.

In sum, Hoffman has met her burden of producing evidence that raises a genuine issue of material fact on the question whether defendants breached the confidentiality provision of the Letter Agreement.  Accordingly, the court denies defendants' motions for summary judgment to the extent based on Hoffman's alleged failure to introduce sufficient evidence of a breach of contract.

D

The court turns next to Hoffman's motion for partial summary judgment, in which she contends she has established defendants' liability for breach of the Letter Agreement. Although the court has determined that Hoffman has created a genuine issue of material fact on the question of breach, she has not met her burden under the "heavy" beyond peradventure standard.  She has failed to show that a reasonable jury could not find that defendants' actions were those of what an "average, prudent, and comparable person would or would not have done, under the same or similar circumstances, to make every reasonable effort when exercising due diligence and in the absence of neglect."  *Id.* at 834.[5]

---

[5]Because the court is denying summary judgment, it will "not set out in detail the evidence that creates a genuine issue of material fact." *Valcho*, 658 F.Supp.2d at 812 n.8. Hoffman cannot meet her "heavy" burden under the beyond peradventure standard, so the court finds it unnecessary even to cite examples of disputed fact issues.

Accordingly, the court denies Hoffman's motion for partial summary judgment.

IV

Defendants also move for summary judgment based on the contention that Hoffman first breached the confidentiality provision of the Letter Agreement.

A

Defendants rely on evidence that Hoffman disclosed the fact of the sale of the Rothko painting to two prominent members of the Dallas art community: Rachofsky and Rose. They argue that Hoffman cannot maintain a claim for breach of a contract that she herself breached long before defendants allegedly did so.

Hoffman responds that she performed her confidentiality obligations under the Letter Agreement. She points to evidence that she withheld the fact of the sale even from her daughters; that when others asked her why the Rothko painting was not on display in her home, she replied that she had "done a new installation," a phrase she uses to explain why a particular picture is not hanging at any given time, P. 8-3-12 App. 15-18; that, apart from her confidential business advisors, attorney, and accountant, she told two individuals (Rachofsky and Rose) that she had sold the Rothko painting; that "[t]he reason she told them was because they were close friends who had joined the Hoffmans in bequeathing their collections to the [DMA]—at [her] request—and she felt 'a moral, ethical obligation, to let them know that [she had] sold the picture,'" P. 8-17-12 Br. 5 (quoting P. 8-3-12 App. 13-14); that Rachofsky and Rose agreed to hold the information in confidence, and there is no evidence they did not; that her "conduct i[n] sharing this information with her close collector

confidants is not inconsistent with making maximum effort to keep all aspects of the Transaction confidential indefinitely," *id.* at 6; and that her disclosure did not excuse defendants' breach because, to the extent the disclosure might constitute a breach, it was at most an immaterial one and made in good faith.

B

The Letter Agreement provides, in relevant part, that "[*a*]*ll parties agree* to make maximum effort to keep all aspects of this transaction confidential indefinitely." P. 7-13-12 App. 278. Hoffman and defendants therefore shouldered the same obligation. But although, as a general matter, "'a party to a contract who is himself in default cannot maintain a suit for its breach,'" *Dobbins v. Redden*, 785 S.W.2d 377, 378 (Tex. 1990) (per curiam) (citations omitted), the court cannot say at the summary judgment stage, as a matter of law, that Hoffman breached the Letter Agreement. As with defendants' conduct, Hoffman's acts or omissions are measured according to what an average, prudent, and comparable person would or would not have done, under the same or similar circumstances, to make every reasonable effort when exercising due diligence and in the absence of neglect. A reasonable jury could find that such a person would have disclosed the fact of the sale to two close friends, in confidence, where the close friends had jointly bequeathed their own art collections to a museum at the person's request, and the person felt a moral and ethical obligation to disclose that she had sold a painting that had been included in her bequest. The

court therefore denies defendants' motion for summary judgment on this basis.[6]

## V

Defendants maintain that they are entitled to summary judgment dismissing Hoffman's breach of contract claim on the ground that there is no triable fact issue on damages.

## A

In her third amended complaint, Hoffman alleges that defendants' "material breach of the Contract has deprived Plaintiff of the benefit of the bargain she entered into in April 2007." 3d Am. Compl. ¶ 127. Defendants maintain that Hoffman's breach of contract claim fails because there is no evidence of economic damages. They point to evidence that, before the 2007 sale, Hoffman never received an appraisal of more than $12 million for the Rothko painting. They argue that there is no proof that the sale price of $17.6 million was discounted or that the actual value of the painting in April 2007 was any higher than the agreed-upon purchase price of $17.6 million. Defendants also contend that there is no such concept as an "auction premium" that Hoffman would allegedly have forfeited in order to sell the Rothko painting privately. Finally, defendants posit that because Hoffman testified that she never

---

[6]Because the court concludes that a genuine issue of material fact exists as to whether Hoffman breached the Letter Agreement, it does not reach the questions whether, if Hoffman breached the Letter Agreement by informing Rachofsky and Rose about the sale of the Rothko painting, the breach would be "immaterial" and therefore would not excuse defendants from further performance, or whether Hoffman's alleged breach would instead prevent her from establishing her own performance under the Letter Agreement, thus discharging defendants from further performance.

would have sold the Rothko painting at public auction in 2007, "[s]he cannot claim damages because she did not do something which the evidence shows she never would have done in the first place."  Studio Capital 7-13-12 Br. 43.  In sum, defendants maintain there is "utterly no evidence that the inclusion of the confidentiality provision had any effect at all on the price Plaintiff received for the [Rothko painting], and she therefore has no evidence of any economic damages."  *Id.* at 43-44.[7]

Hoffman responds that she is not limited to "benefit-of-the-bargain" damages on her breach of contract claim but can also recover restitution damages (both legal and equitable) as well as rescission damages.  She contends there is substantial evidence that, had she sold

_____

[7]Defendants do not argue that Hoffman's damages theory is *legally* defective, i.e., that this measure of damages is unavailable as a matter of law in an action for breach of contract. They maintain instead that the theory is *factually* deficient.  *See, e.g.*, Studio Capital 7-13-12 Br. 37 ("Discovery has demonstrated without contradiction that the confidentiality provision had no effect on the price [of] the 2007 Sale.  Plaintiff therefore has no evidence supporting economic damages."), 42 ("Discovery has shown conclusively that there is no such thing as an 'auction premium,' and Plaintiff has provided no evidence suggesting there is."), & 43-44 ("Thus, there is utterly no evidence that the inclusion of the confidentiality provision had any effect at all on the price Plaintiff received for the Painting, and she therefore has no evidence of any economic damages.  Her seller's remorse at the fact that the market moved up after her sale does not permit her to appropriate that appreciation for herself, when there is no evidence that she did not get the full value of the Painting when she sold it."); L&M 7-13-12 Br. 18-19 ("But, because Hoffman testified unequivocally (and consistently with her own allegations) that she would never have sold the Painting at public auction, Wiener's expert opinion is counterfactual and based on speculation and conjecture contrary to the summary judgment evidence."), 19 ("As Hoffman's damages are based on the counterfactual speculation that Hoffman would have sold the Painting at auction, her damages are pure speculation or conjecture."), & 20 ("Setting aside the fact that Wiener's opinion is entirely based on the false premise that Hoffman would have sold the Painting at public auction in 2007, Wiener in fact makes clear that there is no such concept as an 'auction premium' that Hoffman would have allegedly forfeited in order to sell the Painting privately.").

the Rothko painting at public auction in 2007, she would have gotten more for the painting than she did by selling it through a private sale, regardless whether there is an "auction premium."  Hoffman cites the opinion of her expert, Wiener, that the value of the Rothko painting, if it sold at public auction on or around April 24, 2007, would have been in the range of $30 to $40 million.  She also relies on Meyer's estimate that the Rothko painting would have "fetched between $30 and $40 million in 2007," and his testimony that, after the May 15, 2007 sale of another Rothko painting (the "Rockefeller Rothko"), the Rothko market was "'at its hottest.'"  P. 8-17-12 Br. 29 (citation omitted).  Hoffman contends that this evidence would enable a reasonable jury to find that she would have received more for the painting at public auction in 2007 than she did via the private sale to defendants.

B

The question whether Hoffman can raise a genuine issue of material fact on damages depends largely on whether she can prove that the Rothko painting would have sold for more than $17.6 million had it been offered at public auction in April 2007.  The court must therefore decide whether Wiener's expert opinion about the value of the Rothko painting, if sold at public auction on or around April 24, 2007, is admissible.  Defendants challenge Wiener's expert report and proposed testimony.

1

In formulating his opinion, Wiener notes the painting's size, color, and "remarkable condition."  P. 8-3-12 App. 322.  He then quotes Meyer's statement in 2010 that "'[t]hree years ago [the Rothko painting] would have been proposed at between 30 and 40 million[ ].'"

*Id.* at 323 (quoting Paola Messana, *Cautious Optimism Marks New York's Latest Slate of Art Auctions*, The Daily Star, May 3, 2010).   He then "concur[s]" with Meyer's estimate, substantiating his opinion by considering 2007 and 2008 auction sale prices for similar works by the same artist.   *Id.*   Wiener notes that, on May 15, 2007, just three weeks after Hoffman sold the Rothko painting,

> a Sotheby's auction fetched $72,840,000 for a Rothko painting that is smaller than the Subject Property.   Six months later, on November 13, 2007, a Christie's auction fetched $34,201,000 for a Rothko painting that is smaller than the Subject Property; this sale price was approximately $6.7 million above the median estimate.   And the following year, on May 13, 2008, a Rothko painting of approximately the same size as the Subject Property sold for $50,441,000 . . . .   Although five public auctions of comparable Rothko paintings fetched less than $34 million in 2007 . . . [t]he average public auction price for comparable Rothkos in 2007 and 2008 was approximately $31.3 million.

*Id.*

    Defendants move to exclude Wiener's expert report and proposed testimony.   They argue, *inter alia*, that his valuation methodology is unreliable because his reliance on auction sales subsequent to the valuation date is misleading.   Defendants challenge Wiener's failure to consider sales prices for Rothko paintings sold before April 24, 2007 or to explain why he did not take such sales into consideration.   They argue that the sale of the Rockefeller Rothko after April 24, 2007 "completely recalibrated the market for Rothko paintings sold thereafter, greatly increasing the prices collectors were willing to pay for Rothko paintings."   Ds. 7-13-12 Mot. to Exclude 7.   Accordingly, defendants posit that selective reliance only on Rothko sales that took place after the valuation date is misleading.   Defendants also

maintain that Wiener's failure to account for two appraisals of the Rothko painting before April 24, 2007, and his failure to provide an explanation for his decision to not consider these appraisals, renders his opinion unreliable and inadmissible.  Finally, defendants argue that Wiener's purported methodology does not meet his own standards or those of an expert in the field.  They cite the Uniform Standards of Professional Appraisal Practice ("USPAP") and contend that, although data subsequent to the effective date (here, April 24, 2007) may be considered as a confirmation of trends, Wiener impermissibly bases his entire valuation on this type of data.

Hoffman responds that defendants' arguments relate more to the weight to be given to Wiener's testimony than to its admissibility.  She maintains that defendants' challenges to the most appropriate comparable transactions—pre-2007 transactions or post-2007 transactions—should be resolved by the jury and not through a *Daubert* motion.  Hoffman also posits that Wiener did consider pre-April 2007 sale prices and took that information into account when formulating his opinions.  Defendants apparently did not question Wiener regarding that information at his deposition, but had they done so, Hoffman argues, he would have explained that he does not believe these pre-April 2007 works are comparable because, in 2006 and 2007, the post-war and contemporary art markets were experiencing dramatic strength that would not be reflected in almost all earlier sales.  Moreover, when David Rockefeller announced in March 2007 that he would be consigning his Rothko to auction, this had a dramatic effect on the Rothko market even before the Rockefeller Rothko was sold in May of that year.  In sum, Hoffman argues, "this is simply a dispute over what the 'more

appropriate' set of comparables is for the purposes of valuing the [Rothko painting] . . . not a question of whether Wiener's methodology was 'reliable' within the meaning of *Daubert*." P. 8-3-12 Resp. to Mot. to Exclude 10.

Hoffman next argues that Wiener did review the other appraisals of the Rothko painting, but "he did not put much stock in these valuations because, in part, they contained no analysis supporting the stated conclusions and provided no way to test the assumptions on which they rested." *Id.* at 13. Hoffman argues that although it is not required that an expert on valuation follow either the USPAP or AAA guidelines, Wiener's methodology is consistent with recognized appraisal techniques. Specifically, she contends that it is clear on the face of Wiener's report that he used the "fair market value" as the type of valuation and "market data comparison" as his valuation approach. Finally, Hoffman posits that Wiener's use of auction sale data subsequent to the valuation date was appropriate under the USPAP because, given the evidence that the modern art market was experiencing robust growth in 2006 and 2007 and that the value of Rothko paintings was following that growth trend, Wiener was fully justified under the USPAP in relying on post-valuation date comparables in valuing the Rothko painting as of April 2007.

2

The court decides defendants' motion to exclude in its role as a gatekeeper regulating the admissibility of expert testimony. *See, e.g.*, *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002) ("Rule 702 charges trial courts to act as 'gate-keepers'"). To be admissible under Fed. R. Evid. 702, expert testimony must be both relevant and reliable. *See,*

*e.g.*, *id.* ("In short, expert testimony is admissible only if it is both relevant and reliable."). "Reliability is determined by assessing 'whether the reasoning or methodology underlying the testimony is scientifically valid.'" *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007) (quoting *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 592-93 (1993)). An expert must also be qualified. "Before a district court may allow a witness to testify as an expert, it must be assured that the proffered witness is qualified to testify by virtue of his 'knowledge, skill, experience, training, or education.'" *United States v. Cooks*, 589 F.3d 173, 179 (5th Cir. 2009) (quoting Rule 702). "A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." *Id.* (citing *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999)).

"Relevance depends upon 'whether [the expert's] reasoning or methodology properly can be applied to the facts in issue.'" *Knight*, 482 F.3d at 352 (quoting *Daubert*, 509 U.S. at 593). To be relevant, "expert testimony [must] 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Pipitone*, 288 F.3d at 245 (quoting *Daubert*, 509 U.S. at 591). The burden is on the proponent of the expert testimony to establish its admissibility by a preponderance of the evidence. *Daubert*, 509 U.S. at 592 & 592 n.10.

Defendants do not contest Wiener's qualifications to testify as an expert. They instead challenge both the reliability and relevance of his conclusions based on Wiener's decision to rely on post-April 2007 sales transactions in forming his valuation opinion. "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the [trier of fact's]

consideration." *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. Wiener's methodology—in which he used the "fair market value" as the type of valuation and "market data comparison" as his valuation approach—is neither unreliable nor irrelevant. Because Hoffman has established that Wiener's testimony is reliable and relevant, the court denies defendants' motion to exclude.

C

Hoffman has presented sufficient evidence to permit a reasonable jury to find that the Rothko painting would have sold for a price greater than $17.6 million had it been offered at public auction. Hoffman relies on the expert report of Wiener, in which he opines that the value of the Rothko painting, if it sold at public auction on or around April 24, 2007, would have been in the range of $30 to $40 million. She also relies on deposition testimony from Meyer that, after the May 15, 2007 sale of the Rockefeller Rothko, the Rothko market was "'at its hottest.'" P. 8-17-12 Br. 29 (citation omitted). Hoffman also cites the fact that the Rockefeller Rothko, which sold for a record-breaking $86.9 million only weeks after her private April 2007 sale, and "[t]he two pictures share the same pulsating red color; the same medium; the same scale." *Id.* at 30. Finally, she points to evidence that, on May 16, 2007, Mnuchin received $26.92 million for a Rothko at public auction, which was above the $20 to $25 million estimate.

As alleged in her third amended complaint, Hoffman's damages theory is that, by

limiting herself to a private sale, she forewent the higher price she could have obtained for the Rothko painting had she sold it at public auction. According to Hoffman, in April 2007 the Rothko painting would have sold at public auction for a price higher than $17.6 million. Instead of selling the painting for this price, she opted to limit herself to a private sale at a lower price—$17.6 million—with the promise of maximum efforts to maintain confidentiality. Hoffman therefore maintains that the "value" of the confidentiality provision in the Letter Agreement can be quantified based on the difference between the price for which she could have sold the Rothko painting at public auction and the allegedly discounted amount for which she actually sold the Rothko painting privately. *See*, *e.g.,* P. 8-17-12 Br. 28 ("The price at which she could have sold the painting at auction is a quantification of the monetary consideration that she sacrificed to obtain other forms of consideration—namely, the extremely stringent confidentiality provision."). Under this reasoning, to restore Hoffman to the same economic position she would have been in had the contract been performed as promised (assuming, *arguendo*, that the contract was breached), Hoffman would be entitled to the difference between $17.6 million and what the painting would have sold for at public auction on or around April 24, 2007.

Defendants argue that Hoffman's evidence fails to raise a genuine issue of material fact that, on April 24, 2007, the Rothko painting was worth more than the $17.6 million purchase price. The court disagrees. A reasonable jury could find, based on the evidence discussed above, that if Hoffman had sold the Rothko painting at a public auction on April 24, 2007, she would have obtained more than $17.6 million for the painting. That she had

no actual intention to sell the Rothko painting at public auction is immaterial.  This method is simply a way of quantifying what she paid for strict confidentiality, i.e., the benefit of the bargain under the terms of the Letter Agreement.  If Hoffman establishes at trial that she could have sold the Rothko painting at auction and received a higher price than at a private sale, a reasonable jury could find that this proves the value of the confidentiality provision of the Letter Agreement, and it supports an award of damages for breach of contract.

D

Because the court concludes Hoffman has raised a genuine issue of material fact on the question of her entitlement to traditional breach-of-contract damages, it need not address defendants' argument that, under Texas law, Hoffman cannot recover damages for "embarrassment" or other mental anguish that she allegedly suffered as a result of defendants' breach of contract, or that, even if she were entitled to these damages, there is no evidence that she in fact suffered reputational harm.  It is enough that a jury could return a damages verdict for Hoffman on at least one of her damages theories.  To prevail on defendants' summary judgment motions on her breach of contract claim, she is not required to prove her entitlement to damages under all asserted damages theories.

\*   \*   \*

For the foregoing reasons, the court denies Hoffman's July 13, 2012 motion for partial summary judgment, denies Studio and Martinez's July 13, 2012 motion for summary judgment, denies L&M's July 13, 2012 motion for summary judgment, and denies defendants' July 13, 2012 motion to exclude the expert testimony of Wiener.

**SO ORDERED.**

January 28, 2013.

_____
SIDNEY A. FITZWATER
CHIEF JUDGE