IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

MARGUERITE HOFFMAN,      §
     §
     **Plaintiff,**      §
     §
v.      §   NO. 3:10-cv-953
     §
**L&M ARTS, DAVID MARTINEZ and**      §
**STUDIO CAPITAL, INC.,**      §
     §
     **Defendants.**      §

## PLAINTIFF'S THIRD AMENDED COMPLAINT
## PUBLIC, REDACTED VERSION

COMES NOW Plaintiff Marguerite Hoffman and files this her Third Amended Complaint, the amendments being based on evidence gathered in the course of pretrial discovery, and for grounds therefor would show the Court the following:

1.     This lawsuit seeks relief for injuries Plaintiff suffered in connection with Defendants' public auction in 2010 of a celebrated painting by Mark Rothko, *Untitled* (the "Red Rothko"), in direct violation of the contractual commitments Defendants had made to Plaintiff when they purchased the Red Rothko from her in a private sale three years earlier in 2007 (the "Transaction").

2.     The 2010 public auction and the publicity it generated broke the unequivocal contractual commitment of Defendant L&M Arts ("L&M") "to make maximum effort to keep all aspects of this transaction confidential indefinitely." L&M made that promise in a written contract dated April 24, 2007 (the "Contract") because Plaintiff, then the Red Rothko's owner, was unwilling to sell in the absence of such a

commitment.   L&M entered into the Contract expressly "on behalf of" an undisclosed principal, whose identity was withheld from Plaintiff at the time but in the course of this litigation disclosed as Defendant Studio Capital, Inc. and/or an individual affiliated with Studio Capital, Defendant David Martinez.

3.     To induce Plaintiff to enter into the Contract, Defendant L&M committed fraud.  L&M's principal Robert Mnuchin, whom Plaintiff trusted as an eminent art dealer and friend of many years, professed to appreciate Plaintiff's concern to preserve the confidentiality of the fact she was selling the Red Rothko.  To allay her concern, he deliberately misrepresented the character and identity of the undisclosed principal for whom he was acting as agent.  Aware that Plaintiff was unwilling to sell to anyone other than an individual, Mnuchin assured Plaintiff that she was selling to a "very private individual.  In fact the ultimate buyer was not an individual at all.   Defendant Studio Capital, which actually came to acquire the Red Rothko through L&M, is a company that buys, owns and sells art, and ███████████████████████████████ ██████████.

4.     L&M also misrepresented its relationship to the undisclosed buyer.  Both Mnuchin and his partner Dominique Levy withheld the Contract from Studio Capital and Martinez, including the promise of confidentiality it contained.   L&M represented to Plaintiff that the undisclosed buyer had been apprised of her concerns, falsely stating that the Red Rothko would "disappear" into the "individual's" European collection, not to resurface.

5.     Mnuchin and Levy persisted for three years in withholding from Martinez and Studio Capital the existence of the Contract, including its confidentiality clause. Meanwhile, on behalf of ███████████, L&M marketed another, even more expensive Rothko to Studio Capital ████████████████████ ████████████ (the "Korean Rothko").  As part of its selling effort, L&M came up with a plan with Martinez whereby Studio Capital would sell the Red Rothko in order to raise capital to buy the Korean Rothko from L&M.

6.     In furtherance of this plan, in March of 2010, Defendants invited the principal auctioneer of Sotheby's Auction House, Tobias Meyer, to meet with them at L&M's Manhattan gallery space.  During the meeting, Mnuchin went over with Meyer a strategy for selling the Red Rothko at public auction.   The Red Rothko, Meyer explained, had broad commercial appeal because of its brilliant color and superb condition.  This made it an ideal piece to sell at public auction.  To broaden the appeal still more, Meyer explained to Mnuchin that the Red Rothko would be "estimated" at a low price, the better to draw in more bidders.

7.     Once again, Mnuchin and Levy kept their clients Martinez and Studio Capital in the dark about the Contract and the confidentiality provision, which, three years after the fact, L&M as agent still had not disclosed to its clients as principals.

8.     L&M kept the Contract secret from Sotheby's as well.  Neither Mnuchin nor Levy told Sotheby's that Plaintiff had forgone the very same commercial benefits of a public auction when she sold the Red Rothko three years earlier in a strictly confidential sale.   Neither Mnuchin nor L&M told Sotheby's that the parties had

committed to keep the Transaction confidential indefinitely.   Neither Mnuchin nor Levy brought up the inevitable consequence of the Sotheby's publicity blitz: public disclosure of the Transaction in the media.

9.      Within days of the meeting at L&M, Martinez consigned the Red Rothko to Sotheby's, Mnuchin had it shipped across town to the auction house for sale in May, and Sotheby's lent Studio Capital money to buy ▮▮▮▮▮▮▮▮▮▮▮.   L&M sold ▮ ▮▮▮▮▮▮▮▮ to Studio Capital for ▮▮▮▮▮▮▮▮▮▮▮▮▮.

10.     It was only after these arrangements had been made that Mnuchin contacted Plaintiff's agent, John Van Doren ("Van Doren") of the Greenberg Van Doren Gallery ("Greenberg Van Doren"), to break what he called the "difficult news" that the Red Rothko was to be auctioned publicly.   The undisclosed buyer, Mnuchin said, "needed to raise capital," and had been "seduced" by Tobias Meyer into selling the Red Rothko at public auction.

11.     "I completely understood that this transaction required a special degree of confidentiality," Mnuchin admitted.   Then came a battery of lies: "Unfortunately, even in retrospect I see no way that I could have changed the course of events when informed that he [the undisclosed owner of the Red Rothko, which Mnuchin again falsely described as "an individual"] was selling at Sotheby's.   The decision had been made, including a contract."

12.     "I regret the work is now publicly displayed to the world," Mnuchin continued, having days before ensured that the work would be publicly displayed to the world.   "I feel simply terrible about the way events have evolved."

13.     Naturally, Mnuchin did not mention the fact that he had never told the undisclosed buyer about the Contract.  He did not disclose how the auction would enable L&M to pocket another huge commission at Plaintiff's expense and in breach of L&M's promises to her.  He did not bring up ███████████ at all, or L&M's role in selling it to Studio Capital, or that the purchase of ███████████ was the reason Martinez needed to "raise capital."  Mnuchin likewise omitted that days previously he himself had met with the so-called "seducer," Tobias Meyer, to discuss auctioning the Red Rothko -- before "the decision had been made, including a contract" -- and that Mnuchin himself had just shipped the Red Rothko to Sotheby's from his own gallery.

## THE PARTIES

14.     Plaintiff Marguerite Hoffman is a businesswoman, philanthropist and patron of the arts.  She is past Chair and a present Trustee of the Dallas Museum of Art (the "Dallas Museum").  She also serves as a director of Public Radio International, Inc., Dignitas International, the Center for Curatorial Studies at Bard College, and American Friends of the Tate, and serves as a member of the International Council for the Museum of Modern Art and Women Moving Millions.  She lives in Dallas.

15.     Defendant L&M is a Delaware limited liability company that describes itself as "one of the most important galleries in the world."  Its principals are Dominique Levy and Robert Mnuchin.  L&M operates galleries at 45 East 78th Street in Manhattan and 660 Venice Boulevard in Venice, California.

16.     L&M, Mnuchin and Levy also conduct business through DL Fine Art SA ("DLFA Geneva"), a Swiss société anonyme with offices at Rue de Jargonnant 2,

Geneva, Switzerland.   DLFA Geneva engages in art-related transactions and represents and advises buyers and sellers of works of art, including defendants Studio Capital and Martinez. ██████████████████████████████████.

17.     Defendant David Martinez is an art collector, as well as the founder and managing partner of Fintech Advisory, a firm that specializes in corporate and country debt.   Martinez maintains an office at Fintech Advisory in Manhattan at 375 Park Avenue.  In addition to a residence in London, Martinez maintains an apartment in the Time Warner Center in Manhattan.

18.     Defendant Studio Capital is a company organized and existing under the laws of Belize, with its registered office at 35A Regent Street, Jasmine Court, Suite 101, P.O. Box 1777, Belize City, Belize. ████████████████████████
████████████████████████████████████████████
████████████ ██████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████.

19.     Studio Capital and L&M have admitted that L&M acted as agent for Studio Capital in connection with Plaintiff's sale of the Red Rothko.

20.     Studio Capital is an "International Business Company" organized under the Belize International Business Companies Act of 1990.  Its registered office is a post office box and ████████████. A three-member board of directors runs its affairs: Denise Josephine Lopez, Esther Nadine Aguet, and Diretora Corporate Services S.A.

("Diretora").   Diretora, another Belize IBC, is ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████

     21.    Kendris and Diretora are administered by the same individuals, André

Sporri and Nathalie Sutter.  Mr. Sporri, in addition to serving as a director of Diretora, is

the Chief Financial Officer of Kendris, a member of Kendris's Board of Directors, and

head of Kendris's Finance & Controlling Committee.  Ms. Sutter, in addition to serving

as a director of Diretora, is head of Kendris's art management department, a member of

Kendris's Executive Committee, and head of Kendris's Basel office.  ██████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████

     22.    Non-party Sotheby's, Inc. ("Sotheby's") is a New York corporation that

engages in art auctions and private sales, with its principal place of business in

Manhattan at 1334 York Avenue.  Sotheby's describes itself as "one of the world's two

largest auctioneers of authenticated fine and decorative art . . . . In 2011, Sotheby's

accounted for approximately $5 billion, or 51%, of the total aggregate auction sales of

the two major auction houses within the global auction market."

23.     Non-party Tobias Meyer has been Sotheby's Worldwide Head of Contemporary Art since 1997.  He is the Principal Auctioneer for Sotheby's sales of contemporary art.  According to Sotheby's website, Meyer "is deeply connected to the world's most powerful and active postwar art collectors in the United States and Europe." As one of the most recognized figures in the contemporary art world, Meyer has been closely involved with the sales of many of the most iconic 20th-century works. Under the direction of Mr. Meyer, Sotheby's has produced some of the highest auction prices ever paid for postwar art, including Mark Rothko's White Center (Yellow, Pink and Lavender on Rose) for $72.8 million in May 2007.  Sotheby's was well known to Defendants for its expertise in exploiting its connections and state-of-the-art promotional techniques to maximize the publicity surrounding its auctions, especially for the high-end marquee items it sells, such as the Red Rothko.

## JURISDICTION AND VENUE

24.     This Court has diversity jurisdiction under 28 U.S.C. § 1332 because Plaintiff is a citizen of Texas and Defendants are citizens or subjects of domestic or foreign states other than Texas and the amount in controversy exceeds the sum or value of $75,000.

25.     Venue is proper in this Court under 28 U.S.C. § 1391 because, among other things, jurisdiction is founded on diversity of citizenship and all Defendants are subject to personal jurisdiction in this judicial district.

26.     Defendants L&M, Martinez and Studio Capital have made general appearances through counsel in this action and do not dispute this Court's in personam jurisdiction.

## ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

27.     In 2007, Plaintiff's ownership of the Red Rothko was well known. The Red Rothko was exhibited from November 2006 until April 2007 in an exhibition entitled, "Fast Forward: Contemporary Collections for the Dallas Museum of Art." "Fast Forward" was an exhibition highlighting works from three private Dallas collections, including Plaintiff's, whose owners had all announced bequests of their art collections to the Dallas Museum. The catalogue and online description of the exhibition highlighted the Red Rothko, "a stunning masterpiece in orange and red." Press coverage of the exhibition likewise focused on the Red Rothko.

28.     The exhibition was intended to show the general public how the Dallas Museum's collection would be enhanced after the collectors' deaths. Plaintiff's irrevocable bequest to the Dallas Museum made clear that Plaintiff would bequeath the artwork in Plaintiff's collection at the time of her death and did not obligate Plaintiff to bequeath specific pieces. During her lifetime, Plaintiff has complete control over the pieces in her collection and can modify the collection as she desires. The bequest was amplified by a $20 million cash pledge to the Dallas Museum to be made at Plaintiff's death.

29.     Early in 2007, Plaintiff decided to sell the Red Rothko. The difficult decision came in the wake of her husband Robert Hoffman's untimely death in August

2006, which had been preceded by the death of Robert Hoffman's father and business partner of 25 years, six weeks before.   Plaintiff found it necessary to address unexpected issues including (a) the ownership and control of their family operating businesses, including a regional vending company and group of restaurants, and (b) ensuring that she would have the ability to fulfill various commitments she and her husband had made, including her pledge to the Dallas Museum as well as other charitable organizations.   These potentially required more liquidity than she had available, and the sale of the Red Rothko was designed to provide that liquidity.

30.   Because she did not want the sale to generate speculation about her financial condition, and to safeguard her privacy as well as that of her three daughters during a time of grief, Plaintiff decided to sell the Red Rothko privately and only on the condition of complete and guaranteed confidentiality among any parties involved. Plaintiff believed that selling a high-value, greatly admired and beloved painting from her collection relatively quickly after the death of her husband and his father would subject the family to a type of scrutiny and speculation that would be embarrassing and potentially harmful to her family, her businesses and the museum that she cared about.

31.   The decision to limit herself to a private sale was not without cost to Plaintiff, because of the premium a well-publicized auction can produce for such an iconic work.   Sotheby's and its Principal Auctioneer, Tobias Meyer, for example, enjoy vaunted reputations for obtaining dramatic premiums from the public sale of major Rothko paintings.

32.    Generally speaking, the broader the appeal of a work of art, the more success it will have at auction.  The Red Rothko in particular was likely to command a higher price at auction than in a private sale, because even within the rarefied atmosphere of the market for important paintings by Mark Rothko, the Red Rothko possesses exceptionally broad commercial appeal due to its brilliant color, large size, stunning condition, and impeccable provenance.  Its appeal was therefore not exclusive to only a small group of collectors.

33.    For Plaintiff, therefore, securing the benefit of a private sale meant sacrificing the substantial premium Plaintiff could have realized from the public sale of the Red Rothko.  She herself could have sold the Red Rothko at public auction, taking advantage of the publicity to obtain a higher price.  But she decided not to sell the work publicly, opting instead for a private, confidential sale to avoid disclosing to the public that she was selling the Red Rothko.

34.    To further ensure the privacy of the sale, Plaintiff relied on intermediaries whose reputations for rectitude and discretion she believed were impeccable.  One of these was defendant L&M and, in particular, its principal Robert Mnuchin.  L&M acted as agent for Martinez and Studio Capital as undisclosed principals.

35.    Plaintiff decided to rely on Mnuchin because, apart from his eminence in the art world, he was a trusted friend.  It was from Mnuchin that she and her husband had bought the Red Rothko in the first instance.  Mnuchin had hosted a birthday celebration in her honor at his home in 2006.  Over the years, Plaintiff had acquired

many major contemporary art works through and from L&M, including works by Franz Kline, Philip Guston, Willem de Kooning, and Joseph Cornell.

36.     The restriction Plaintiff placed on herself equally diminished the price that L&M, Martinez, and/or Studio Capital had to pay to acquire the Red Rothko.   L&M, Martinez, and/or Studio Capital thereby obtained a corresponding financial benefit by purchasing privately, rather than at public auction.

37.     But to obtain that benefit, L&M, Martinez, and/or Studio Capital agreed to incur a cost: In the purchase contract, they explicitly agreed to make maximum effort to keep all aspects of this transaction confidential indefinitely.   This meant they could not turn around, sell the Red Rothko at public auction, then pocket the premium that Plaintiff had forgone to protect her privacy.

38.     Plaintiff, through her agent Van Doren, made clear to L&M that preservation of confidentiality would need to be a critical component of any sale.

39.     Mnuchin professed to understand Plaintiff's reasons for maintaining confidentiality.   Mnuchin was aware that the Red Rothko was widely known to be owned by Plaintiff, and that it had been prominently displayed in the Dallas Museum, and also in a widely circulated photograph of the Hoffmans standing in front of it.   Mnuchin understood, and said he understood, that this was clearly a very prominent picture, and that Plaintiff wanted to maintain the confidentiality of any change in its ownership. Mnuchin testified that he kept his partner Dominique Levy apprised of all his discussions with Greenberg Van Doren.

40.     L&M, through Mnuchin, told Greenberg Van Doren that it would undertake to identify a single individual to approach.  But this was not what Mnuchin and Levy in fact did.  Instead, they approached a company with multiple stakeholders.  Had Plaintiff known this was what L&M contemplated, she would have forbidden it, because selling to anyone other than a serious individual collector was inimical to her requirement that the Transaction remain confidential.

41.     Over a period of years and numerous consummated transactions, L&M had arranged sales and purchases of art to and from Defendants Studio Capital and Martinez. ███████████████████████████████████████████
███████████████████████████████████████

42.     ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████  ██████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████

43.     Had L&M disclosed this fact instead of hiding it from Plaintiff, Plaintiff would not have proceeded with the sale.  Martinez testifies that from the outset he

informed L&M that the purchase, if consummated, would be made by Studio Capital, not for his individual account.  But rather than informing Martinez that Plaintiff was unwilling to sell to anyone other than a serious individual collector, L&M elected to conceal Martinez's disclosure from Plaintiff.

44.     In due course, Mnuchin notified Plaintiff that L&M had identified a buyer. Although L&M did not disclose his identity, Mnuchin assured Van Doren that he was a "very private individual," "not an American," who was building a serious and very private collection in Europe.

45.     At no time did L&M disclose that the undisclosed buyer might be anything other than an individual.  At no time did L&M disclose that the undisclosed buyer might be an art investment fund or other legal entity.

46.     Martinez's and Studio Capital's principal relationship at L&M was not with Mnuchin; it was with L&M's other principal, Dominique Levy.  In fact, ██████████ ███████████████████  To enhance the appearance that the undisclosed buyer was an individual, and one who valued discretion, Levy told Van Doren that she and her client would fly to Dallas in his private jet to view the Red Rothko, where it then hung in the Dallas Museum.

47.     On February 27, 2007, Greenberg Van Doren on behalf of Plaintiff and L&M Arts "on behalf of the buyer" entered into a contract to sell the Red Rothko to L&M's undisclosed principal (the "February Agreement").

48.     To ensure confidentiality, the February Agreement stated:

It is the specified wish of the seller that the sale and terms of the sale remain confidential.  Any breach in confidentiality prior to payment in full

will be considered by the seller grounds for terminating this agreement.  It
is requested that confidentiality be maintained indefinitely.

49.     When Plaintiff entered into the February Agreement, she understood that
L&M was entering into the February Agreement on behalf of the undisclosed buyer.
Plaintiff's understanding was based on L&M's representation that it was entering into
the February Agreement on the undisclosed buyer's behalf.  She understood that L&M
was keeping, and would continue to keep, the undisclosed buyer aware of her concerns
and of the commitments the undisclosed buyer was making in the February Agreement.

50.     L&M's representations to that effect were false in multiple respects.

51.     Although L&M was authorized to act and was acting as their agent, neither
Martinez nor Studio Capital had been advised that L&M was entering into the February
Agreement.  On the contrary, when L&M entered into the February Agreement, neither
Martinez nor Studio Capital had yet approved the purchase of the Red Rothko.  L&M
had not made and did not make Studio Capital or Martinez aware of the confidentiality
commitment contained in the February Agreement.

52.     L&M's deceptions continued after execution of the February Agreement.
Levy obtained and reviewed a copy of the February Agreement shortly after its
execution.  She then prepared a "proposal" to Studio Capital for purchase of the Red
Rothko.  Intentionally or through negligence, L&M's proposal to Studio Capital failed to
disclose that L&M had already committed to the purchase on Studio Capital's behalf.
Intentionally or through negligence, L&M's proposal to Studio Capital failed to make any
reference to the need for confidentiality, or to the existence of a confidentiality obligation
in the February Agreement, or indeed to the existence of the February Agreement.

L&M did not make Studio Capital or Martinez aware of the February Agreement for more than three years, and not before March 15, 2010.

53.    In case the materiality of Plaintiff's desire for confidentiality was not clear enough, she made it clearer still through events that transpired in the following weeks.

54.    In April 2007, L&M still had not informed Martinez of the confidentiality agreement to which L&M had bound him.  Martinez proceeded to disclose his imminent purchase of the Red Rothko to two art world professionals in order to obtain their views on the commercial wisdom of such a purchase.  The persons he chose were the head of contemporary art at Christie's Auction House, and Tobias Meyer, the Principal Auctioneer of Contemporary Art at Sotheby's.  These two men control the public auction of art at the world's two leading auction houses.  It would be difficult to locate two individuals to whom this disclosure was more inimical to Plaintiff's rights under the February Agreement.

55.    Both auctioneers knew that the Red Rothko belonged to Plaintiff, moreover, and both immediately understood it was for sale by her -- exactly the information Plaintiff wanted to keep confidential.

56.    One part of Martinez's breach immediately came to light.  A professional from Christie's contacted Plaintiff about the sale.  The purpose of Christie's call was to stress to Plaintiff that if she would allow an auction house such as Christie's to market the Red Rothko she would secure a higher price than could be secured through the private transaction she was pursuing.

57.    Because the fact that she was selling the Red Rothko was exactly what Plaintiff did not want publicly disclosed, Van Doren reached out to Mnuchin to determine what had gone wrong.  Mnuchin said he did not know but would find out.

58.    In due course, Mnuchin acknowledged that his undisclosed buyer had contacted a senior officer at Christie's about the Red Rothko, and that the "individual" Mnuchin represented was very "embarrassed" that this breach of the agreement had been discovered by Plaintiff.  L&M failed to disclose to Plaintiff the fact that Sotheby's had also been consulted, information that was not to come to light until 2012.  The fact that a single person at a major auction house had been told the Red Rothko was for sale constituted a material breach of Plaintiff's confidentiality and of the February Agreement.  Plaintiff decided not to go forward with the sale.

59.    But Defendants L&M, Martinez, and Studio Capital were determined to persuade Plaintiff to change her mind, notwithstanding their breach of the February Agreement.

60.    So L&M, through Mnuchin, expressly promised that the Red Rothko would "disappear" into the "very private" European collection of the individual collector L&M represented.   Once again, Mnuchin stressed the individual collector's respect for confidentiality.

61.    In fact, L&M was aware by this time that the Red Rothko was likely to enter the Studio Capital collection.  Studio Capital systematically purchases, owns and sells paintings with an aim to creating a well-balanced portfolio of art.  It thus is about as far as could be from the "very private individual" into whose collection pictures

"disappear," never to be seen again, that L&M represented to Plaintiff was the buyer of the Red Rothko.

62.     While Plaintiff was reassured by L&M's representation, standing alone it was not enough to persuade Plaintiff.  She agreed to sell the Red Rothko only when L&M and the undisclosed buyer made another promise: an unequivocal written and binding commitment in a new purchase agreement (the Contract that is the subject of this suit) to "make maximum effort to keep all aspects of this transaction confidential . . . ."

63.     The new promise to maintain confidentiality was to continue "indefinitely."

64.     L&M failed to disclose that it had not shared the February Agreement with Studio Capital or Martinez.  Had L&M disclosed this fact, Plaintiff would not have entered into the Contract.

65.     The confidentiality provision was a material part of the agreement going to the essence of the Contract.   L&M, Martinez, and/or Studio Capital made that commitment to induce Plaintiff to sell the Red Rothko, because they knew that Plaintiff was unwilling to sell it to them unless they did so.

66.     With that promise in hand, Plaintiff was prepared to go forward, subject to additional provisos, including one requiring that an additional $500,000 be paid directly to the Dallas Museum, and anonymously.  Defendants agreed.

67.     On April 24, 2007, Plaintiff entered into the Contract with L&M, Martinez, and/or Studio Capital for sale of the Red Rothko for a net price of $17,600,000.  The Contract obligated L&M, Martinez, and/or Studio Capital to "make maximum effort to

keep all aspects of this transaction confidential indefinitely." Plaintiff retained "the right not to proceed with the transaction if she, and she alone, determines the veil of silence has been penetrated by 2 May 2007." A true and correct copy of the Contract is annexed hereto as Exhibit A.

68.     When Plaintiff entered into the Contract, she understood that L&M was entering into the Contract on behalf of and with the knowledge of the undisclosed buyer, an individual.  Plaintiff's understanding was based on L&M's representation that it was entering into the Contract on the undisclosed buyer's behalf.  She understood that L&M was keeping, and would continue to keep, the undisclosed buyer aware of her concerns and of the commitments the undisclosed buyer was making in the Contract.

69.     L&M's representations to that effect were false in multiple respects.

70.     Although L&M was authorized to act and was acting as their agent, neither Martinez nor Studio Capital had been advised that L&M was entering into the Contact. L&M had not made and did not make Studio Capital or Martinez aware of the confidentiality commitment contained in the Contract.  Indeed, L&M did not make Studio Capital or Martinez aware of the Contract for more than three years, and not before March 15, 2010.

71.     L&M failed to disclose that the undisclosed buyer was not an individual.

72.     L&M failed to tell Plaintiff about the disclosure that had been made to Tobias Meyer -- the same disclosure that had been made to Christie's -- even though the disclosure to Meyer constituted separate and independent grounds for not proceeding with the sale.

73.     L&M failed to disclose to Plaintiff that it had never shared the February Agreement or the Contract with the undisclosed buyer.

74.     The Contract's words required Defendants to at least make every reasonable effort to keep all aspects of the Transaction confidential, measured according to what an average, prudent, and comparable person would or would not have done, under the same or similar circumstances, to make every reasonable effort when exercising due diligence and in the absence of neglect.

75.     Defendants were in breach of the Contract from inception.

76.     The invoice that L&M sent to Studio Capital materially distorted the Contract's confidentiality requirement.

77.     In the invoice, L&M failed to disclose the Contract's express requirement that the parties make maximum effort to keep all aspects of the Transaction confidential indefinitely.   Instead, L&M affirmatively misrepresented the terms of the Contract, describing a significantly weaker confidentiality clause, and stating merely that "the terms" of the Transaction were confidential.

78.     As set forth in more detail below, the significance of L&M's material distortion of the Contract's key provision in 2007 was to grow over time, because until the commencement of this action, including in 2010, L&M continued to insist that the Contract did not require Defendants to keep all aspects of the Transaction confidential indefinitely.

79.     On the contrary, at all times until the commencement of this action, L&M falsely asserted that Defendants had no obligation to keep all aspects of the Transaction confidential indefinitely.

80.     And, at all times until the commencement of this action, L&M omitted to disclose -- to Sotheby's and Meyer, among others -- that Defendants were required to keep all aspects of the Transaction confidential indefinitely.

81.     Whether L&M's inaccurate statements and misleading omissions were deliberately false, reckless, or merely negligent, they breached L&M's obligation to make maximum effort to keep all aspects of the Transaction confidential, measured according to what an average, prudent, and comparable person would or would not have done, under the same or similar circumstances, when exercising due diligence and in the absence of neglect.

82.     L&M's mismanagement of these critical disclosures is exemplified in the sworn testimony of its two principals.  For example, Ms. Levy testified that before March 2010 she had seen neither the Contract nor the February Agreement, and that Mnuchin had not informed her that L&M had entered into a contract to buy the painting on behalf of Studio Capital.  Mnuchin, by contrast, insisted that with regard to both agreements and "in every step of the way, Dominique Levy was aware of every discussion" L&M was having with Plaintiff's agent Van Doren, and "every term that we were working on or including."

83.     L&M's transmittal of an invoice to the buyer with a confidentiality clause that misstated the buyer's strict confidentiality obligations was less than what an

average, prudent, and comparable selling agent would have done under the same circumstances when exercising due diligence and in the absence of neglect to make "maximum effort" to maintain all aspects of the Transaction confidential indefinitely. The average, prudent person who had obliged himself and his principal to specific confidentiality terms would have clearly provided those specific terms to his principal in writing.

84.   That wasn't the only distortion in the invoice.  Mnuchin and Greenberg Van Doren had agreed that the sale price of the Red Rothko would be $19,000,000.  Of that amount, $17,600,000 would be wired to Plaintiff, and the remaining $1,400,000 would be divided evenly between Greenberg Van Doren and L&M, representing a commission of approximately seven percent for each dealer.

85.   Mnuchin had suggested that L&M and Greenberg Van Doren split the commission of $1,400,000, which Mnuchin characterized as beneath industry standards, because the two galleries were serving Plaintiff, in Mnuchin's words, in a near "fiduciary" capacity.  Van Doren shared this information with Plaintiff.  Without disclosing the fact to Van Doren or Plaintiff, however, L&M charged the undisclosed buyer an additional $250,000 for the Red Rothko.  L&M thereby increased its buy-side commission by more than 35 percent.  The invoice required the purchaser to pay $19,250,000, an amount $250,000 higher than Mnuchin had represented to Plaintiff.

86.   L&M meanwhile continued to withhold the Contract from Martinez and Studio Capital.  On October 25, 2007, Studio Capital emailed L&M, requesting details of the shipment of the Red Rothko.  L&M's Director of Exhibitions, Leila Saadai, asked

Levy if she should tell Studio Capital "about the donation having to be given before shipment." On November 5, 2007, Studio Capital emailed Saadai, requesting a copy of the relevant agreement for Studio Capital's files. The "relevant agreement," Saadai understood, was the Contract. She emailed Levy for permission:

> The only document I have that refers to this donation is a copy of an agreement between Greenberg Van Doren and L&M signed by John and Bob. Should I send Nathalie a copy of that??

Based on discovery to date, it appears that L&M withheld this email from production in this litigation until March 2, 2012. No response from Levy has been produced. The Contract apparently was never sent to Studio Capital. Martinez did not even see the Contract until the day before his deposition on March 1, 2012.

87.    During the course of Studio Capital's ownership of the Red Rothko, Martinez and Studio Capital disclosed the fact of Studio Capital's ownership to several individuals, including Peter Marino, Nathalie Sutter, André Sporri, ███████, ███████, ███████, Jill Hedin, ███████, ███████, Lavinia Calza, ███████, ███████, and ███████████████. None of these persons was made aware of the confidentiality provision in the Contract.

88.    After completion of the 2007 transaction with Plaintiff on behalf of Martinez and Studio Capital, L&M continued with its consistent pattern of seeking to facilitate and profit from art transactions on behalf of Martinez and Studio Capital and acting as the disclosed or undisclosed agent of Martinez and Studio Capital in those transactions.

89.    Once the Red Rothko had entered the collection of Studio Capital, it was warehoused in ███████. After a number of months passed, L&M became aware that

another, even more expensive, ████████████████ might be available and in early 2009 offered it to Martinez.  Martinez's initial reaction, however, was that while ██ ████████████ might in fact be a suitable addition to Studio Capital's collection, in all probability, its purchase would necessitate the sale of either the Red Rothko or a second Rothko owned by Studio Capital ████████████████.  Martinez authorized L&M to sell the Red Rothko privately, but eventually concluded that he stood to make more money by selling it at public auction.

90.   On February 25, 2010, L&M entered into a consignment agreement with Studio Capital pursuant to which the Red Rothko was transported from Basel to L&M's gallery in New York.  The consignment agreement provided that L&M was authorized to sell the Red Rothko privately, ████████████████████.  This proved impossible.

91.   L&M arranged for ████████████ to be delivered to the gallery as well. The Red Rothko and ████████████ were then mounted in a private exhibit room at L&M where, during a 10-day period at the beginning of March 2010, they were viewed by Mnuchin, Levy, Martinez, and Tobias Meyer of Sotheby's.

92.   It was during this period that the final decision was made by Martinez and Studio Capital to purchase ████████████ and to consign the Red Rothko to Sotheby's for auction, thereby precipitating this litigation.  L&M well understood that a public auction would be accompanied by a publicity blitz that would expose the fact that Plaintiff had sold the Red Rothko.

93.    Meyer had long coveted the opportunity to auction the Red Rothko in particular, admitting in April 2010 that "I've known this painting for 15 years and followed it over those years . . . ." Mark Brown, "Ghost of Warhol: Sotheby's to auction late self-portrait," The Guardian (London), Apr. 16, 2010, at 14.

94.    Martinez, Mnuchin, and Levy summoned Meyer to a meeting at L&M. They did not disclose the Contract or its confidentiality provision to Meyer.

95.    At the L&M meeting, Meyer explained why he believed the Red Rothko could do well at auction, and that he believed it would restore the Rothko market to its previous peak of 2007.

96.    Meyer has stated publicly that the Red Rothko would have sold at public auction for $30 to $40 million in April of 2007, which is exactly when Plaintiff sold it privately for many millions of dollars less. Paola Messana, "NY auctions to signal return of good times: art dealers," Agence France-Presse (English), May 2, 2010.

97.    Meyer's opinion was borne out on May 8, 2012 when Christie's sold another red Rothko for $86.9 million, setting a new world auction record for sales of art created since world War II -- by any artist, including not only Rothko, but Jackson Pollock, Willem De Kooning, and Picasso.  The Red Rothko at issue in this case was painted in 1961, the same as the one that set the world record.  Indeed, the Red Rothko at issue in this case was the very next painting Rothko made after painting the one that set the world record.  The two pictures share the same pulsating red color; the same medium; the same scale.

98.   During their meeting at L&M, Meyer and Mnuchin discussed the best strategy for presenting the Red Rothko, including what "estimate" of value it should be given in the catalog.  The strategic approach they adopted was to state a low estimate, on the theory that the lower the estimate that the consignor is willing to accept, the broader the appeal at auction.  So a very broadly appealing work of art such as the Red Rothko might generate the highest return by drawing in bidders through a low estimate.

99.   On Wednesday, March 10, 2010, Studio Capital consigned the Red Rothko to Sotheby's for public auction.  Per the terms of the consignment, Sotheby's guaranteed that Studio Capital would receive at least $20 million from the sale of the Red Rothko.  Sotheby's also provided Studio Capital with a loan of ███████ in connection with the consignment.  Again, at the time of the consignment, Defendants withheld the information regarding the Contract and the confidentiality provision. Defendants concealed their obligations from Sotheby's in order to avoid the possibility that Sotheby's would not cooperate in Defendants' breach of the Contract.  In short, Martinez and/or Studio Capital, assisted by L&M, breached their written promise in order to receive a cash bonanza.

100.   On Friday, March 12, 2010, Mnuchin caused the Red Rothko to be shipped from L&M to Sotheby's.

101.   Most striking is what did not happen during this 10-day period: L&M did not suggest in any way to Martinez, Studio Capital or Sotheby's that a public auction of the Red Rothko might be a breach of the Contract.  L&M did not suggest to Martinez or Studio Capital that, if they felt it necessary to auction the Red Rothko because L&M had

failed in all its efforts to locate a private purchaser at an acceptable price, they contact Plaintiff to resolve the conflict between their desire to auction the Red Rothko and their contractual promise.  L&M did not suggest to Martinez or Studio Capital that the Red Rothko be offered back to Plaintiff or the Dallas Museum.  In short, L&M did absolutely nothing to cause Defendants to honor their contractual agreement with Plaintiff or make any effort to avoid the contractual breach and the resulting litigation.  Whether L&M's inaction was motivated by fear of the consequences of exposing their earlier duplicity or fear of undermining the likelihood of securing the huge commission they would receive upon sale of ███████████, the result was that at the last juncture at which L&M could have avoided breaking their promise to Plaintiff, they chose to make no effort to do so.  Rather, L&M encouraged Martinez and Studio Capital to engage in conduct that ensured a breach.

102.   Rather than honoring the confidentiality they had promised to Plaintiff as part of the consideration for the sale, Defendants elected to sacrifice Plaintiff's privacy, embarking, through Sotheby's, on a high-profile marketing and publicity campaign that inevitably and swiftly exposed Plaintiff's sale.

103.   It was only on March 15, 2010, after Studio Capital had signed a consignment agreement for the auction of the Red Rothko at Sotheby's and obtained a guarantee of $20 million, that L&M elected to contact Plaintiff.  Mnuchin did not contact Plaintiff directly.  He called Plaintiff's agent, Van Doren, and explained that he was the bearer of "difficult" news.  Mnuchin proceeded to completely misrepresent L&M's role in the events leading up to the decision to auction the Red Rothko.  The undisclosed

owner of the Red Rothko, he claimed, needed to raise capital.   Tobias Meyer of Sotheby's had approached the undisclosed owner, Mnuchin continued.   According to Mnuchin, Meyer had "seduced" the undisclosed owner into selling the Red Rothko at Sotheby's May auction.

104.   Naturally, Mnuchin did not bring up ███████████, or L&M's role in selling it to Martinez and Studio Capital, or that the purchase of ████████████ was the reason Martinez needed to "raise capital," or that Mnuchin himself had met with the so-called "seducer," Tobias Meyer, five days previously to discuss selling the Red Rothko, or that Mnuchin himself had shipped the Red Rothko to Sotheby's from his own gallery three days earlier, or the money L&M was going to make from the sale.

105.   On Tuesday, March 16, 2010, L&M invoiced Studio Capital ████████ for ████████████.

106.   Three days later, on March 19, 2010, Mnuchin sent Plaintiff a letter replete with lies and false sympathy.   By this point, Mnuchin had learned through Van Doren how his "difficult news" had devastated Plaintiff.   "Unfortunately, even in retrospect I see no way that I could have changed the course of events when informed that he [the undisclosed owner of the Red Rothko, whom Mnuchin falsely described as "an individual"] was selling at Sotheby's.   The decision had been made, including a contract."

107.   Parroting the inaccurate words of the invoice that L&M had prepared three years earlier, and once again misrepresenting the text of the Contract, Mnuchin claimed

that the terms of the Contract were merely "that all parties are committed to keep the terms of this transaction strictly confidential."

108.    "I feel simply terrible about the way events have evolved," Mnuchin said. The Transaction, he admitted, "required a special degree of confidentiality." He concluded with a sentiment that he had not shared with Martinez or Sotheby's or Meyer or Levy.   "I regret the work is now publicly displayed to the world," Mnuchin said, concealing his role in orchestrating that very public display.

109.    Despite Mnuchin's expressions of sympathy and regret, L&M had already breached its obligation under the Contract: first, by misstating and/or failing to inform Martinez and/or Studio Capital of the full extent of their confidentiality obligations under the Contract; and second, by failing to notify Sotheby's that "all aspects" of the Transaction were to be kept confidential indefinitely.

110.    As a result of Defendants' failure to perform their obligations under the Contract, Sotheby's embarked on a major marketing blitz.   On March 19, 2010, Bloomberg News announced that Sotheby's had "landed a splashy 1961 red Mark Rothko painting, estimated to fetch $18 million to $25 million.   The nearly 8-foot tall painting with two reddish rectangles, is likely to be the May 12 sale's projected top lot." Other media sources ran with the news, including Lindsay Pollock's "Art Market Views" that very day, and the Pittsburgh Tribune-Review on March 20th.

111.    On March 25, 2010, Sotheby's issued a press release announcing the planned public auction of the Red Rothko on May 12, 2010.

112.   After the initial press release, Sotheby's publicity machine continued at full speed, resulting in extensive press coverage between March 25, 2010 and the auction, and continuing thereafter.

113.   On April 2, 2010, numerous media sources, including National Public Radio and ABC News, published stories about the auction, many of which were accompanied by a large color photograph of the Red Rothko.

114.   To promote the auction, the Sotheby's website posted a large color photo of the Red Rothko and stated that it was exhibited in "Fast Forward: Contemporary Collections for the Dallas Museum of Fine Arts" in 2007.  In a similar vein, the Sotheby's catalogue stated that the Red Rothko was exhibited as follows: *"Dallas Museum of Art, Fast Forward: Contemporary Collections for the Dallas Museum of Art*, February - April 2007."

115.   Within Plaintiff's local community, these announcements precipitated precisely the disclosure she had been determined to avoid.  Avoiding that disclosure had been a material and negotiated -- indeed renegotiated -- component of the Transaction.

116.   The Sotheby's publicity machine was so effective that before long the wider world knew as well.  Internet art blogger Lindsay Pollock reported on April 19th:

> Three market sources have told me that the Rothko consigned for sale at Sotheby's comes from Mexican financier David Martinez.

\*\*\*

> If Martinez, or a related holding company, is the owner, it has been a hasty marriage.

> In 2007 the painting was exhibited at the Dallas Museum of Art in a Fast
> Forward: Contemporary Collections for the Dallas Museum of Art.  The
> show included works owned by three major area collectors who have
> promised works to the museum: the Hoffman, Rose and Rachofsky
> collections.

Lindsay Pollock, Art Market Views, http://www.lindsaypollock.com/news/sothebys-mystery¬seller-disposes-of-red-rothko/ (April 19, 2010).

117.   Plaintiff contacted Defendants and offered to rescind the Transaction. She committed to return the money she had received from the sale in 2007 and to commit the Red Rothko immediately to the Dallas Museum.  Defendants refused.

118.   The Red Rothko was auctioned by Sotheby's on May 12, 2010.  It sold for $31,442,500, a price more than $13 million in excess of what Plaintiff had received in a private sale.

119.   The goal and purpose of the auction was to procure for Studio Capital the premium from a public sale that Plaintiff decided to forgo when she contractually elected to engage in what she believed was, and would remain, a private and confidential sale. Plaintiff sacrificed that premium as consideration for preserving her privacy. Defendants, with the Red Rothko in hand, decided not to honor their end of the bargain, and Studio Capital and Martinez cashed in at Plaintiff's expense.

120.   Martinez, it bears emphasis, respects privacy, so long as it is his own. Indeed, he is willing to dissemble to preserve it.  In April 2010, he attempted to mislead the public into believing he was not the seller of the Red Rothko.  See Lindsay Pollock, Art Market Views, http://www.lindsaypollock.com/news/sothebys-mystery-seller-disposes¬of-red-rothko/ (April 19, 2010).

**PLAINTIFF'S THIRD AMENDED COMPLAINT**
**PUBLIC, REDACTED VERSION – Page 31**

121.   Such denials are Martinez's modus operandi.   As one French court recently found, in a case involving Martinez's art-buying activities with L&M, "*Il y a lieu par ailleurs de constater que l'identité de l'acquéreur de la sculpture est apparemment dissimulée par l'interposition de la société STUDIO CAPITAL, société dont le siège est à Belize, paradis fiscal garantissant l'anonymat des associés.*" Tribunal de grande instance [T.G.I.] [ordinary court of original jurisdiction] Paris, req. ch., Nov. 6, 2007, 07/12847, obs. F. Picard (Fr.).   Translation: "It should also be noted that the identity of the buyer of the sculpture is apparently disguised by the interposition of STUDIO CAPITAL, a company headquartered in Belize, a tax haven guaranteeing the anonymity of shareholders."

122.   Prior to the extensive publicity and auction, Plaintiff searched for ways to remedy the breach, but her efforts were met with contempt on the part of Defendants. Levy, in a call to Van Doren, threatened Plaintiff with public embarrassment unless she agreed to be silent, suggesting that Plaintiff's sale of the Red Rothko in 2007 was itself a breach of her bequest to the Dallas Museum, which of course it was not.   Mnuchin relayed other threats to Van Doren, stating, "I am nice 95% of the time, but the other 5% I take no prisoners," and stating that he did not want to drag Van Doren "into this, but I will do what I have to do to protect myself." And, while refusing Plaintiff's request to permit her to proceed anonymously in this litigation, Defendants persistently hid behind Martinez's corporate disguises.  Giving new meaning to the phrase "shell game," they insisted that it was not Martinez himself who purchased the Red Rothko from Plaintiff, while refusing to divulge which of his corporate shells he was using this time.

## FIRST CAUSE OF ACTION -- BREACH OF CONTRACT AGAINST
## DEFENDANTS L&M, MARTINEZ, AND STUDIO CAPITAL

123.   Plaintiff incorporates herein by reference all preceding paragraphs of this Complaint as if fully set forth hereinafter.

124.   Defendants L&M, Martinez, and/or Studio Capital breached material express provisions of the Contract as well as the covenant of good faith and fair dealing implied in the Contract by failing to do what comparable parties would have done to make every reasonable effort to keep all aspects of the Transaction confidential indefinitely.

125.   Defendants L&M, Martinez, and/or Studio Capital breached the "maximum effort" requirement of the Contract by not taking adequate precautions to keep the changed ownership of the Red Rothko private.

126.   In causing the Red Rothko to become newsworthy by permitting a large publicity campaign and by choosing to sell by public auction, L&M, Martinez, and/or Studio Capital helped disseminate details that would make it more probable that a well-informed member of the art community would be able to deduce from easily available public information that Plaintiff had sold the Red Rothko sometime after when it was displayed at the Dallas Museum.

127.   Defendants' material breach of the Contract has deprived Plaintiff of the benefit of the bargain she entered into in April 2007.

128.   Plaintiff has fully performed all conditions, covenants, and promises required to be performed on her part pursuant to the terms and conditions of the Contract.

129.   As a direct and proximate result of their breach, Plaintiff has been made to suffer and continues to suffer damages in an amount in excess of the jurisdictional minimum of this Court.

130.   L&M, as the agent of an undisclosed principal, is directly liable for performance of the Contract.

131.   Studio Capital and Martinez, as undisclosed principals under the Contract, are responsible for their breach thereof, whether or not they knew of the specific contractual agreement made on their behalf by L&M.

132.   Plaintiff is entitled to recover her costs and attorneys fees.  See Tex. Civ. Prac. & Rem. Code §31.008.

### SECOND CAUSE OF ACTION -- FRAUDULENT INDUCEMENT AGAINST DEFENDANT L&M

133.   Plaintiff incorporates by reference all of the allegations above.

134.   L&M fraudulently misrepresented material facts to and concealed material facts from Plaintiff.

135.   L&M fraudulently induced Plaintiff to enter into the February Agreement and the Contract by misrepresenting and concealing material facts, including that L&M had made the undisclosed buyer aware of her concerns and of the terms of both contracts, that the undisclosed buyer was an individual and not an institution, and that the Red Rothko would "disappear" into that individual's very private European collection.

136.   L&M concealed these material facts from and made these material misrepresentations to Plaintiff with knowledge that the representations were false when made, or with reckless disregard for their truth, and with the intent that Plaintiff would

act on them.   Plaintiff reasonably relied on these material misrepresentations and omissions in executing the February Agreement and the Contract.

137.   Neither the February Agreement nor the Contract contains any clause in which Plaintiff waives reliance on the representations made by L&M because, in fact, Plaintiff was relying on them.

138.   Had L&M not engaged in fraud, Plaintiff would not have sold the Red Rothko to Defendants and would have been able to obtain for herself a superior price at public auction.

139.   As a direct and proximate result of L&M's material misrepresentations and omissions, Plaintiff suffered damages, including recessionary damages, in excess of this Court's jurisdictional limits.

140.   As a direct and proximate result of L&M's material misrepresentations and omissions, L&M wrongfully profited at Plaintiff's expense.

141.   Plaintiff also seeks exemplary damages for L&M's fraudulent misrepresentations and omissions.   See Tex. Civ. Prac. & Rem. Code § 41.003.

## DEMAND FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that, upon final hearing hereof Plaintiff be awarded judgment for the damages she has suffered. Plaintiff additionally prays for attorney's fees, costs of court, prejudgment and post judgment interest, and all actual out-of-pocket damages, as well as all other and further relief, whether general, or special, at law or in equity, to which Plaintiff may show herself to be entitled.

Dated: February 6, 2013

SHACKELFORD, MELTON & MCKINLEY
LLP

By:    /s/ Bart Wulff
        Bart Wulff
        State Bar No. 22086100
        3333 Lee Parkway, Tenth Floor
        Dallas, TX  75219
        BWULFF@shacklaw.net
        Tel: (214) 780-1400
        Fax:  (214) 780-1401

WILLKIE FARR & GALLAGHER LLP

        Roger Netzer
        Mary Eaton
        787 Seventh Avenue
        New York, NY  10019-6099
        rnetzer@willkie.com
        Tel: (212) 728-8000
        Fax: (212) 728-8111

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

The undersigned certifies that a true copy of the foregoing Third Amended Complaint is being served electronically via ECF on all counsel of record on the 7th day of February 2013.

By:    /s/ Bart Wulff
        Bart Wulff

FROM :L&M ARTS                    FAX NO. :212 861-7858          Apr. 26 2007 05:05PM P2

# GREENBERG VAN DOREN | GALLERY

24 April 2007

This letter will serve as an agreement between Greenberg Van Doren Gallery on behalf of the seller and L&M Arts on behalf of the buyer for the sale of the following:

Mark Rothko
*Untitled*, 1961
Oil on canvas
93 1/8 x 80 1/8 inches
Signed and dated on the reverse

Terms of sale:

1. The net price to the seller will be $17.6 million.  This will be paid on or before 4 May 2007 which is the closing date for this transaction.  Title will pass to the buyer upon receipt of payment in full.  L&M Arts guarantees this payment.

2. Seller shall be entitled to hang the work in her home on loan for any part of six months following the receipt of payment in full.  The work will be insured during this period by the buyer.

3. Upon release of the painting, all expenses for crating, shipping, transportation, etc. will be shared by Greenberg Van Doren Gallery and L&M Arts.

4. All parties agree to make maximum effort to keep all aspects of this transaction confidential indefinitely.  In addition, the buyer agrees not to hang or display the work for six months following receipt of the painting.

5. Buyer agrees to make a confidential cash contribution to the Dallas Museum of Art in the amount of $500,000.  This contribution shall be made anonymously and on behalf of any entity the seller chooses.  This contribution will be made at the time the seller releases the work to the buyer.

6. The seller has the right not to proceed with this transaction if she, and she alone, determines the veil of silence has been penetrated by 2 May 2007.

Signed and agreed:

John Van Doren                              Robert Mnuchin
Greenberg Van Doren Gallery                 L&M Arts

1549 WASHINGTON AVENUE | ST. LOUIS, MO 63103
) 314.361.7600 | 1314.361.7743



**EXHIBIT**

*A*

PL000001