IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

MARGUERITE HOFFMAN,                    §
                                       §
                        Plaintiff,     §
                                       §   Civil Action No. 3:10-CV-0953-D
VS.                                    §
                                       §
L&M ARTS, et al.,                      §
                                       §
                        Defendants.    §

MEMORANDUM OPINION
AND ORDER

Plaintiff Marguerite Hoffman ("Hoffman") brought this lawsuit against defendants

L&M Arts ("L&M"), David Martinez ("Martinez"), and Studio Capital, Inc. ("Studio

Capital"), arising from the sale at public auction of the 1961 Mark Rothko oil painting,

Untitled (the "Rothko painting"), which she alleged breached the confidentiality clause of

the letter agreement under which she had sold the painting several years earlier.  The parties

tried Hoffman's breach of contract claim and defendants' waiver defenses to a jury, which

found in Hoffman's favor.  The jury awarded compensatory damages under two measures

of damages, one of which Hoffman elected to recover under the court's directive.  After the

court entered the judgment, defendants filed the instant renewed Fed. R. Civ. P. 50(b)

motions for judgment as a matter of law.  Because the court concludes that a reasonable jury

could not have found that L&M had actual or apparent authority to enter into a binding

contract on behalf of Martinez and Studio Capital, the court grants their motion and dismisses

this action against them with prejudice.  Because the court concludes that a reasonable jury

could have found in Hoffman's favor against L&M on her breach of contract claim, but that she is not entitled to recover under the measure of damages that she elected, the court grants L&M's motion in part and denies it in part. For procedural reasons, the court concludes that it must dismiss Hoffman's action against L&M so that she can file a timely successive motion to alter or amend the judgment, thereby enabling the court to award her damages by second amended judgment under an alternative measure of damages. The court is filing today an amended judgment in accordance with the rulings that follow.[1]

# I

This case is the subject of several prior opinions,[2] with which the parties are well familiar. Accordingly, although the court will begin by summarizing certain background facts, the jury verdict, and defendants' pertinent contentions in support of their Rule 50(b) motions, it will primarily recount the pertinent facts and procedural history in the context of its specific rulings below.

Hoffman sold the Rothko painting in April 2007 under the terms of a letter agreement dated April 24, 2007 (the "Letter Agreement") that provided that "[t]his letter will serve as

---

[1]Some of the pertinent briefing has been filed under seal. The court has determined that this memorandum opinion and order need not be sealed.

[2]*See, e.g., Hoffman v. L & M Arts*, 2013 WL 4511473 (N.D. Tex. Aug. 26, 2013) (Fitzwater, C.J.); *Hoffman v. L & M Arts*, 2013 WL 432771 (N.D. Tex. Jan. 28, 2013) (Fitzwater, C.J.); *Hoffman v. L & M Arts*, 2012 WL 4321739 (N.D. Tex. Sept. 21, 2012) (Fitzwater, C.J.); *Hoffman v. L & M Arts*, 2011 WL 3567419 (N.D. Tex. Aug. 15, 2011) (Fitzwater, C.J.); *Hoffman v. L & M Arts*, 774 F.Supp.2d 826 (N.D. Tex. 2011) (Fitzwater, C.J.).

an agreement between Greenberg Van Doren Gallery on behalf of the seller and L&M Arts on behalf of the buyer for the sale of [the Rothko painting]." L&M Ex. 28. John Van Doren ("Van Doren") of Greenberg Van Doren Gallery and Robert Mnuchin ("Mnuchin") of L&M signed the letter, which contained the following confidentiality clause that is at the center of this lawsuit: "[a]ll parties agree to make maximum effort to keep all aspects of this transaction confidential indefinitely.  In addition, the buyer agrees not to hang or display the work for six months following receipt of the painting." *Id.*

Hoffman had attempted through Van Doren to sell the Rothko painting before.  After Van Doren contacted Mnuchin about a possible sale, Mnuchin and his partner at L&M, Dominique Lévy ("Lévy"), identified Studio Capital as a potential buyer.  L&M did not disclose Studio Capital's identity.  The parties negotiated a price of $19 million, with $17.6 million to be paid to Hoffman and a $700,000 commission to be paid to each agent.  On February 27, 2007 Van Doren, on behalf of Hoffman, and L&M, on behalf of the buyer, entered into a letter agreement to sell the Rothko painting to L&M's undisclosed principal (the "February Agreement").  The February Agreement included this provision: "[i]t is the specified wish of the seller that the sale and terms of the sale remain confidential.  Any breach in confidentiality prior to payment in full will be considered by the seller grounds for terminating this agreement.  It is requested that confidentiality be maintained indefinitely." P. Ex. 21.

Before the February sale was finalized, an art professional contacted Hoffman to discuss the fact that she was selling the Rothko painting.  Hoffman was alarmed that a third

party had discovered that the painting was for sale, and she decided not to proceed with the transaction.  The buyer remained interested in making the purchase, however, and the negotiations for the sale of the Rothko painting were revived.

In April 2007 Hoffman agreed to sell the painting for the original net price of $17.6 million, with the additional requirement that the buyer make a confidential cash contribution to the Dallas Museum of Art ("DMA").  Unlike the February Agreement, which included a clause that referred to the seller's "*wish . . . that the sale and terms of the sale* remain confidential" and the "*request*[] that confidentiality be maintained indefinitely," *id.* (emphasis added), the Letter Agreement contained the clause under which all parties agreed "to make maximum effort to keep all aspects of this transaction confidential indefinitely," L&M Ex. 28.

Following the April 2007 sale, L&M invoiced Martinez and Studio Capital for the Rothko painting.  Studio Capital kept the painting in storage, and it eventually consigned it to Sotheby's in 2010.  Sotheby's auctioned the Rothko painting on May 12, 2010, and it sold for $31,442,500, a price more than $13 million in excess of what Hoffman had received when she sold it privately in 2007.

Hoffman sought to prove at trial that L&M, Martinez, and Studio Capital breached the confidentiality clause of the Letter Agreement and that she was damaged as a result because, when she sold the Rothko painting privately, she did so at a substantial discount in exchange for the promise of strict confidentiality, forfeiting the additional millions of dollars that the painting would have brought if sold at public auction.  The jury found that Hoffman

- 4 -

proved her breach of contract claim against L&M, Martinez, and Studio Capital,[3] although it had a more modest view of the extent of her compensatory damages. Regarding Hoffman's requests for damages, the jury found as follows: "[t]he difference, if any, between the sum of money for which Hoffman sold the painting in the transaction in question and what she could have sold the painting for at public auction on or around April 24, 2007," Ct. Charge Question No. 3(A), was "$500,000"; "[t]he difference, if any, between the value of the benefits Hoffman conveyed under the contract to the defendant in question and the value of the benefits she received in exchange," *id.* Question No. 3(B), was "0" as to L&M and "0" as to Studio Capital/Martinez[4]; and "[t]he value of the benefits that the defendant in question received in connection with the transaction" was "$450,000" for L&M and "$750,000" for Studio Capital/Martinez, *id.* Question No. 3(C).

After the jury returned its verdict, the court directed Hoffman to elect her remedy as between the two measures of damages that the jury had answered in her favor. In a letter to the court,[5] Hoffman maintained that she was entitled to recover the aggregate amount of damages that the jury had found in answer to Question No. 3(A) and (C), i.e., $1.7 million.

---

[3]The jury also found that defendants had not proved their waiver defenses, which were premised on the assertion that Hoffman had waived defendants' failure to comply with the confidentiality clause of the Letter Agreement.

[4]The parties agreed that the court's charge could designate Studio Capital and Martinez as a single entity.

[5]Hoffman's January 3, 2014 letter to the court was not filed of record. By order filed today, the court is directing that the letter be made part of the record as an exhibit to the order.

Alternatively, she requested that the court award the sum of $1.2 million that the jury had found in answer to Question No. 3(C).  In a memorandum decision, the court rejected Hoffman's position that she was entitled to the aggregate amount of compensatory damages that the jury had found in response to Question No. 3(A) and (C); instead, it entered judgment in Hoffman's favor in the amount of her alternative request for $450,000 from L&M and $750,000 from Studio Capital and Martinez.[6]

L&M, Studio Capital, and Martinez moved at all pertinent times during trial and after the verdict for judgment as a matter of law.  They now renew their Rule 50(b) motions. Studio Capital and Martinez move for judgment on several grounds, but the court need only reach one: that a reasonable jury could not have found that L&M was their agent and that they were bound by the Letter Agreement.[7]  L&M moves for judgment as a matter of law on the following grounds: (1) Hoffman elected a legally barred disgorgement remedy; (2) she failed to prove her breach of contract claim because there was insufficient evidence of a breach; and (3) she failed to prove her breach of contract claim because there was insufficient evidence of causation.

---

[6]The court stated that Hoffman could challenge this decision by such means as a timely motion to alter or amend the judgment.  The court also noted that it was awarding other relief available under Texas law for breach of contract, and that a party could challenge the awarding of this relief by such means as a timely motion to alter or amend the judgment, or, in the case of attorney's fees and nontaxable expenses, in the context of Hoffman's anticipated motion for attorney's fees and nontaxable expenses.

[7]The court does not suggest that the other grounds on which Studio Capital and Martinez rely have merit.  In fact, there are grounds that, if reached, the court would reject. *See, e.g., infra* note 14.

- 6 -

II

"A motion for judgment as a matter of law 'challenges the legal sufficiency of the evidence to support the verdict.'" *Jacobs v. Tapscott*, 516 F.Supp.2d 639, 643 (N.D. Tex. 2007) (Fitzwater, J.) (quoting *Hodges v. Mack Trucks, Inc.*, 474 F.3d 188, 195 (5th Cir. 2006)), *aff'd*, 277 Fed. Appx. 483 (5th Cir. 2008).

> Judgment as a matter of law is appropriate with respect to an issue if there is no legally sufficient evidentiary basis for a reasonable jury to find for a party on that issue. This occurs when the facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary verdict. In considering a Rule 50 motion, the court must review all of the evidence in the record, drawing all reasonable inferences in favor of the nonmoving party; the court may not make credibility determinations or weigh the evidence, as those are jury functions. In reviewing the record as a whole, the court must disregard all evidence favorable to the moving party that the jury is not required to believe. That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.

*Id.* (quoting *Brennan's Inc. v. Dickie Brennan & Co.*, 376 F.3d 356, 362 (5th Cir. 2004). The court will "'uphold a jury verdict unless the facts and inferences point so strongly and so overwhelmingly in favor of one party that reasonable [jurors] could not arrive at any verdict to the contrary.'" *Goodner v. Hyundai Motor Co.*, 650 F.3d 1034, 1039 (5th Cir. 2011) (quoting *Cousin v. Trans Union Corp.*, 246 F.3d 359, 366 (5th Cir. 2001)). "In other words, the 'jury verdict must be upheld unless there is no legally sufficient evidentiary basis for a reasonable jury to find as the jury did.'" *Id.* at 1039-40 (quoting *Foradori v. Harris*, 523 F.3d

477, 485 (5th Cir. 2008)).

In this removed diversity case, the court will apply Texas substantive law and federal procedure.  In the briefing, Hoffman relies only on Texas law, and defendants rely on both Texas and New York law.  Although defendants maintain, as they did in their pretrial choice of law briefing, that New York law governs, they appear to do so only because they contend Hoffman cannot recover attorney's fees under New York law on her breach of contract claim. Because there is no indication that the outcome of defendants' motions for judgment as a matter of law would be different if decided under New York law, the court will rely on Texas law in deciding them.  If the court later agrees with L&M that New York law applies and that Hoffman cannot recover attorney's fees on her breach of contract claim, that decision will not be incongruous with today's, because in that context the choice of law question will be determinative of the outcome and must be resolved.[8]

---

[8]Hoffman's application for attorney's fees remains pending.  *See infra* note 27.  On February 14, 2014 the court granted defendants' motion to bifurcate fee proceedings, permitting them in their responses to Hoffman's February 13, 2014 motion for attorney's fees and related nontaxable expenses to address only whether such fees and costs are recoverable. This bifurcation procedure will enable the court to determine the choice of law in the context of whether Hoffman can recover attorney's fees and related nontaxable expenses from L&M, depending on whether Texas or New York law applies.

III

The court turns first to the renewed motion of Studio Capital and Martinez for judgment as a matter of law.

A

Studio Capital and Martinez contend that "Defendants are entitled to judgment as a matter of law because [Hoffman] did not present any evidence at trial from which the jury could have reasonably found that L&M acted as Defendants' agent in entering into the Letter Agreement." Studio Capital/Martinez Br. 3-4. They maintain that there is no evidence that they ever communicated to L&M or to Hoffman any intent to confer any authority on L&M to enter into the Letter Agreement on their behalf, and that the undisputed evidence is that this did not occur.

Studio Capital and Martinez did not sign the Letter Agreement, and neither was identified in the contract as a party. The court instructed the jury in the court's charge that

> although Hoffman, Studio Capital, and Martinez are not
> identified as parties in the letter agreement, you can find that
> they are contractually bound by the letter agreement if Hoffman
> proves by a preponderance of the evidence that . . . L&M Arts
> acted on behalf of Studio Capital and Martinez with actual or
> apparent authority when entering into the letter agreement.

Ct. Charge at 7-8. By finding that Studio Capital and Martinez breached the Letter Agreement, the jury implicitly found that L&M acted either with actual or apparent authority to bind Studio Capital and Martinez when it entered into the Letter Agreement. Studio Capital and Martinez are only entitled to a judgment as a matter of law if the evidence was

- 9 -

insufficient for a reasonable jury to find that L&M acted with actual or apparent authority.

B

Under Texas law, "[a]n agent's authority to act on behalf of a principal depends on some communication by the principal either to the agent (actual or express authority) or to the third party (apparent or implied authority)." *Gaines v. Kelly*, 235 S.W.3d 179, 182 (Tex. 2007). Absent actual or apparent authority, an agent cannot bind a principal. *Huynh v. Nguyen*, 180 S.W.3d 608, 622 (Tex. App. 2005, no pet.).

"Actual authority usually denotes the authority a principal (1) intentionally confers upon an agent, (2) intentionally allows the agent to believe he possesses, or (3) by want of due care allows the agent to believe he possesses." *United Residential Props., L.P. v. Theis*, 378 S.W.3d 552, 564 (Tex. App. 2012, no pet.) (citation and internal quotation marks omitted). "'Actual authority is created through written or spoken words or conduct of the principal communicated to the agent.'" *Id.* (quoting *Walker Ins. Servs. v. Bottle Rock Power Corp.*, 108 S.W.3d 538, 549-50 (Tex. App. 2003, no pet.)). The existence of an agency relationship based on actual authority "may be implied from the conduct of the parties or from the facts and circumstances surrounding the transaction in question[, but] cannot be based merely on the words or deeds of the agent." *CNOOC Se. Asia Ltd. v. Paladin Res. (SUNDA) Ltd.*, 222 S.W.3d 889, 899 (Tex. App. 2007, pet. denied) (citing *Walker Ins. Servs.*, 108 S.W.3d at 550).

Actual authority includes both express and implied authority. *2616 S. Loop L.L.C. v.*

*Health Source Home Care, Inc.*, 201 S.W.3d 349, 356 (Tex. App. 2006, no pet.); *Spring Garden 79U, Inc. v. Stewart Title Co.*, 874 S.W.2d 945, 948 (Tex. App. 1994, no pet.). Express authority is delegated to an agent by words of the principal that expressly and directly authorize the agent to do an act or series of acts on behalf of the principal. *Crooks v. M1 Real Estate Partners, Ltd.*, 238 S.W.3d 474, 483 (Tex. App. 2007, pet. denied). "Implied authority is the authority to do whatever is reasonably necessary and proper to carry out the agent's express powers." *Id.* (citing *Spring Garden 79U*, 874 S.W.2d at 948). "Implied agency therefore exists only as an adjunct to express actual authority; an agent that does not have express authority cannot have implied authority." *Reliant Energy Servs., Inc. v. Cotton Valley Compression, L.L.C.*, 336 S.W.3d 764, 783 (Tex. App. 2011, no pet.) (citation omitted); *see also Spring Garden 79U*, 874 S.W.2d at 948.

Apparent authority "is based on the doctrine of estoppel, and one seeking to charge the principal through apparent authority of an agent must establish conduct by the principal that would lead a reasonably prudent person to believe that the agent has the authority that he purports to exercise." *Biggs v. U.S. Fire Ins. Co.*, 611 S.W.2d 624, 629 (Tex. 1981) (citing *Sw. Title Ins. Co. v. Northland Building Corp.*, 552 S.W.2d 425, 428 (Tex. 1977); *Douglass v. Panama, Inc.*, 504 S.W.2d 776, 778-79 (Tex. 1974); *Chastain v. Cooper & Reed*, 257 S.W.2d 422, 427 (Tex. 1953)). To determine an agent's apparent authority, the court examines the conduct of the principal and the reasonableness of the third party's assumptions regarding the agency's authority. *Gaines*, 235 S.W.3d. at 183. "[O]nly the conduct of the principal is relevant." *Id.* at 182 (citing *NationsBank, N.A. v. Dilling*, 922 S.W.2d 950, 953

(Tex. 1996) (per curiam)); *see also United Residential Props.*, 378 S.W.3d at 564 ("Apparent authority is based on estoppel, and only the conduct of the principal in leading a third party to believe that the agent has authority may be considered." (citations and internal quotation marks omitted)).   "Declarations of the alleged agent, without more, are incompetent to establish either the existence of the alleged agency or the scope of the alleged agent's authority." *Gaines*, 235 S.W.3d at 183-84 (citing *Sw. Title Ins. Co.*, 552 S.W.2d at 428); *see also Huynh*, 180 S.W.3d at 623 ("Only the conduct of the principal may be considered; representations made by the agent of his authority have no effect.").

C

The court considers first whether there was legally sufficient evidence for a reasonable jury to have found that Studio Capital and Martinez conferred actual authority on L&M to enter into the Letter Agreement on their behalf.

1

Studio Capital and Martinez argue that L&M did not act as their agent, but, consistent with art industry practice, acted as an intermediary, purchasing the Rothko painting from Hoffman and then reselling it to them.   They cite the trial testimony of Martinez, Mnuchin, and Lévy, each of whom testified that L&M was not authorized to sign the Letter Agreement on behalf of Studio Capital or Martinez.   Studio Capital and Martinez also rely on undisputed evidence that L&M did not show the Letter Agreement to Martinez and that he was unaware that L&M had signed the Letter Agreement on his behalf.

- 12 -

Hoffman responds that the following evidence was presented concerning L&M's actual authority: Martinez averred in his answer to Hoffman's second amended complaint that "L&M acted as agent for Studio Capital,"[9] P. App. 66; the Letter Agreement itself stated that L&M was acting "on behalf of the buyer," *id.* at 98; Martinez testified that L&M signed the Letter Agreement "as agent," Tr. 4:100[10]; Martinez testified that he told Lévy, "if the seller is interested in proceeding, I am ready to go forward," *id.* at 4:141, and that he "committed to the gallery to purchase the painting and they were relying on [his] commitment to go and purchase the painting from the seller," *id.* at 4:183; and Martinez informed L&M that he agreed to every term in the Letter Agreement, including terms that only he could perform.  Hoffman argues that a reasonable jury could have inferred from this evidence that Studio Capital and Martinez intentionally or negligently authorized L&M to do that which was necessary, including sign the Letter Agreement, to complete the transaction on the terms to which they had agreed.

---

[9]In their answer to Hoffman's third amended complaint—the operative pleading in this case—Studio Capital and Martinez removed the quoted statement, and they instead "den[ied] that L&M acted as agent for Martinez and Studio Capital."  Studio Capital & Martinez Ans. to 3d Am. Compl. ¶ 34.

[10]Studio Capital and Martinez dispute this interpretation of Martinez's trial testimony, arguing that "[p]lainly, what Mr. Martinez said, as was apparent to everyone in the courtroom, was that L&M had signed the [Letter] Agreement *without* having been authorized to act as an agent for Studio Capital."  Studio Capital/Martinez Reply 2.  They also cite Martinez's trial testimony that "I do *not* understand [L&M's] being my agent.  I understand them being a gallery that was going to buy the painting and sell it to me."  *Id.* (quoting Tr. 4:147).

2

The court holds that a reasonable jury could not have found that Studio Capital or Martinez intentionally conferred on L&M the authority to enter into a binding contract on its or his behalf, intentionally allowed L&M to believe it possessed this authority, or negligently allowed L&M to believe it possessed such authority.  *See United Residential Props.*, 378 S.W.3d at 564.  There was no evidence presented at trial that Studio Capital or Martinez ever directly communicated to L&M that it had the authority to enter into a contractual agreement with Hoffman that would be binding on Studio Capital or Martinez. Nor was there evidence that Martinez, Mnuchin, or Lévy believed that L&M had such authority.  Martinez (one of the principals) and Mnuchin and Lévy (the alleged agents) each testified that, despite the language used in the Letter Agreement, he or she did not actually believe that L&M was authorized to enter into a contract with Hoffman that would be binding on Studio Capital or Martinez.  *See* Tr. 3:188 (testimony of Mnuchin); *id.* at 4:74 (testimony of Lévy); *id.* at 4:147 (testimony of Martinez).  In fact, Martinez testified that he always believed the "role of the gallery as an intermediary" because "they buy paintings from people, they sell paintings to others [a]nd so there is always a contract between the gallery and the seller, in the same way that there is a contract between the gallery and the buyer, in this case Studio Capital and myself." *Id.* at 4:140.  Martinez also testified that "of course [he] knew that there was a contract" between L&M and Hoffman, but he had "never seen during [his] lifetime collecting art where the gallery shows [him], the buyer, the invoice

of the seller [o]r the agreement with the seller." *Id.* at 4:140-41.  Similarly, Lévy testified that

> [u]sually what you do, you mirror the terms of a contract in another document.  In this case it was the invoice.  But you mirror the terms with the buyer . . . *it is two transactions.*  You have a transaction with the seller, where you have heard all of the seller's wishes and requirement[s], and then you have a transaction with the buyer.  So it's two different documents if one would say.

*Id.* at 4:33 (emphasis added).

Hoffman argues that, because Martinez gave L&M his "blessing" to every term of the Letter Agreement, and because many of these terms were promises that only Martinez or Studio Capital could have made and kept, "a reasonable jury could infer that Martinez intentionally or negligently authorized L&M to do that which was necessary, including signing the [Letter Agreement], to complete the transaction on the terms to which [Martinez and Studio Capital] agreed."  P. Br. 3.  The court concludes that the evidence does not support Hoffman's position.  In fact, Martinez testified that he did not "authorize L&M to negotiate the purchase of" the Rothko painting, but instead merely "presented them a counteroffer to the offer that was presented to [him and Studio Capital]."  Tr. 4:100-01. Moreover, Martinez, Mnuchin, and Lévy each testified that, as is customary in the art industry, they contemplated that there would be two separate agreements in connection with the sale of the Rothko painting: a seller's agreement between Hoffman and L&M (in which L&M guaranteed payment in the event the sale fell through on the buyer's end), and a

- 15 -

buyer's agreement between L&M and Martinez or Studio Capital. *See id.* at 4:146 (testimony of Martinez that his understanding of agreements he had with galleries was "I'm buying paintings from them, and they are buying paintings from an unspecified seller," and that he did not understand that the relationship was any different in the 2007 sale); *id.* at 4:33 (testimony of Lévy about a similar understanding). Thus when considered in the only context that the jury could reasonably have drawn from the evidence, Lévy's testimony that Martinez gave his "blessing" to each of the terms, Martinez's statement to Lévy that "if the seller is interested in proceeding, I am ready to go forward," *id.* at 4:141, and Martinez's testimony that "I committed to the gallery to purchase the painting and they were relying on my commitment to go and purchase the painting from the seller," *id.* at 4:183, are all consistent with a belief that L&M would enter into a purchase agreement with Hoffman and that Martinez (or Studio Capital) would purchase the painting from L&M via a separate transaction.[11]

Because a reasonable jury could not have found that Studio Capital or Martinez ever communicated to L&M or otherwise implied through its or his conduct that L&M was

---

[11]In fact, the terms to which Martinez agreed were memorialized in a separate document: the April 18, 2007 invoice ("April Invoice"). The April Invoice details the terms to which Studio Capital and Martinez agreed and that Lévy represented constituted L&M's binding contract with the buyer. *See* Tr. 4:32 (testimony of Lévy that "the invoice in our profession is really the binding document, i.e., the contract"); *id*. at 4:39-40 (describing April Invoice as "a contract between [L&M] and Studio Capital," and explaining that "99 percent of the time" the invoice is the binding agreement between the gallery or auction house and the buyer).

authorized to enter into a contract with Hoffman that would be binding on Studio Capital and/or Martinez, or intentionally or negligently allowed L&M to believe it possessed this authority, the court holds that there was insufficient evidence for a reasonable jury to have found that L&M had actual authority to enter into the Letter Agreement on behalf of Studio Capital and/or Martinez.

D

The court considers second whether there was legally sufficient evidence for a reasonable jury to have found that L&M had apparent authority to enter into the Letter Agreement on behalf of Studio Capital and Martinez.

1

Studio Capital and Martinez argue that the jury could not have reasonably found that L&M had apparent authority to bind them to the terms of the Letter Agreement because there was no evidence presented at trial that Studio Capital or Martinez manifested to Hoffman or her agent, Van Doren, that L&M had such authority.  They posit that "the uncontradicted evidence is that Studio Capital and Mr. Martinez had no contact with Hoffman or her agent Van Doren."  Studio Capital/Martinez Br. 7.  Studio Capital and Martinez reason that, because there were no communications between Studio Capital or Martinez and Hoffman, there could not have been any manifestation that could have reasonably led Hoffman to suppose that L&M was acting with the authority it purported to exercise.

Hoffman responds that there was sufficient evidence for a reasonable jury to find that L&M had apparent authority to commit Studio Capital and Martinez to the terms of the

- 17 -

Letter Agreement because Hoffman was made aware of the following conduct: Studio Capital and Martinez did not dispute that they breached the February Agreement— which was the precursor to the Letter Agreement—by disclosing the potential sale to Brett Gorvy ("Gorvy"), the Head of Christie's Contemporary Art Department; Studio Capital and Martinez discussed this breach with L&M; and Martinez traveled with Lévy to Texas to inspect the Rothko painting.  Hoffman maintains that, when she learned that the undisclosed buyer wanted to proceed with the sale on new terms, she could have reasonably inferred, based on the undisclosed buyer's assent to the February Agreement, that L&M was authorized to sign the Letter Agreement as well.  Moreover, she argues that Martinez performed certain of the new terms in the Letter Agreement, such as permitting Hoffman to retain the painting for six months after the sale, and that a reasonable jury could have found that she reasonably believed the undisclosed buyer had authorized L&M to enter into the Letter Agreement on the buyer's behalf.

2

The court holds that a reasonable jury could not have found that L&M acted with apparent authority to enter into a binding contract.  Apparent authority "is based on the doctrine of estoppel, and one seeking to charge the principal through apparent authority of an agent must establish conduct by the principal that would lead a reasonably prudent person to believe that the agent has the authority that he purports to exercise." *Biggs*, 611 S.W.2d at 629 (citations omitted).  "The principal must have affirmatively held out the agent as possessing the authority or must have knowingly and voluntarily permitted the agent to act

in an unauthorized manner." *NationsBank*, 922 S.W.2d at 953 (citing *Douglass*, 504 S.W.2d at 778-79); *Huynh*, 180 S.W.3d at 623 (same).  As with actual authority, "only the conduct of the principal is relevant."  *Gaines*, 235 S.W.3d at 182; *id.* at 183 (holding that summary judgment evidence did not establish apparent authority because it "consist[ed] almost entirely of acts or statements attributed to the alleged agent . . . rather than to the putative principal").

In order for the jury to have reasonably found that L&M acted with apparent authority to bind Studio Capital and/or Martinez to the Letter Agreement, there must have been sufficient evidence to find that Studio Capital or Martinez engaged in conduct that reasonably led Hoffman to believe that L&M had this authority.  *See Biggs*, 611 S.W.2d at 629.  It is undisputed that neither Studio Capital nor Martinez had any direct interaction with Hoffman or her agent, Van Doren.  In fact, at the time of the April 2007 sale, Hoffman did not even know the identity of the undisclosed buyer of the painting.  Accordingly, the evidence did not permit the jury to have reasonably found that Studio Capital or Martinez affirmatively held L&M out as its or his agent who possessed the authority to enter into the Letter Agreement.  *See NationsBank*, 922 S.W.2d at 953; *Huynh*, 180 S.W.3d at 623.

Nor was the evidence sufficient for a reasonable jury to have found that Studio Capital or Martinez "knowingly and voluntarily permitted [L&M] to act in an unauthorized manner." *See NationsBank*, 922 S.W.2d at 953.  "[T]he principal's full knowledge of all material facts is essential to establish a claim of apparent authority based on estoppel."  *Gaines*, 235 S.W.3d at 182.  "[T]he party must show that the principal had full knowledge of all material facts at the time of the conduct alleged to be the basis for the apparent authority."  *Expro*

*Americas, LLC v. Sanguine Gas Exploration, LLC*, 351 S.W.3d 915, 925 (Tex. App. 2011, pet. denied).  Thus where there is no evidence that the principal had knowledge of the conduct alleged to constitute the basis of the estoppel, apparent authority cannot be established.  *See Rourke v. Garza*, 530 S.W.2d 794, 803 (Tex. 1976) (holding that where there was no evidence that company was aware of indemnity provisions included on back of delivery ticket signed by company's superintendent, company was not bound by terms of indemnity provisions under theory of apparent authority), *abrogated on other grounds by Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 45-46 (Tex. 2007); *Neubaum v. Buck Glove Co.*, 302 S.W.3d 912, 919 (Tex. App. 2009, pet. denied) (reversing finding of apparent authority where there was no evidence that principal was aware that agent—who was authorized to fill purchase orders for principal—was making unauthorized loans to third parties on behalf of principal); *Argyle Indep. Sch. Dist. v. Wolf*, 234 S.W.3d 229, 240 (Tex. App. 2007, no pet.) (holding that letter sent by school superintendent did not constitute valid and binding contract because there was no evidence that school district was aware of letter, and superintendent therefore did not have apparent authority to bind school district).

Hoffman maintains that the following is sufficient evidence of L&M's apparent authority to commit Studio Capital and Martinez to the Letter Agreement: when negotiating the Letter Agreement, Hoffman was made aware that Studio Capital and Martinez did not dispute that they had breached the February Agreement by disclosing the potential sale of the painting to Gorvey; Studio Capital and Martinez discussed the breach with their agent, L&M; Martinez traveled with Lévy to Texas to inspect the painting; and when Hoffman learned that

the undisclosed buyer wanted to proceed with the sale on new terms, she could have reasonably inferred, based on the undisclosed buyer's assent to the February Agreement, that L&M was authorized to sign the Letter Agreement as well.  Hoffman also relies on evidence that the undisclosed buyer performed certain new terms of the Letter Agreement, such as permitting Hoffman to retain the painting for six months following the sale.  She maintains that, in light of the performance by Studio Capital and Martinez of these terms and the other conduct of which she was made aware, a reasonable jury could have found that she reasonably believed the undisclosed buyer had authorized L&M to enter into the Letter Agreement on behalf of the buyer.  The court disagrees.

To understand why the evidence is legally insufficient, it is important to focus initially on the source of the information that Hoffman maintains supported her reasonable belief that L&M acted with authority.  As Studio Capital and Martinez point out in their reply brief, "whatever Hoffman claims to have 'been made aware of' by Van Doren, there is no evidence that it came from Defendants. . . .  Whatever came from L&M to Van Doren is irrelevant as a matter of law; an alleged agent cannot create apparent authority, whatever it does or says."  Studio Capital/Martinez Reply 4.  A reasonable jury could not have based a finding of apparent authority, for example, on what Van Doren related to Hoffman.[12]

---

[12]Moreover, to the extent Hoffman relies on Martinez's performance of certain of the terms contained in the Letter Agreement and his traveling with Lévy to Dallas to personally view the Rothko painting, neither of these facts is sufficient evidence that Martinez or Studio Capital had knowledge (actual or inquiry) of the existence of the February Agreement or the Letter Agreement, which is required for apparent authority.  *See Rourke*, 530 S.W.2d at 802.  Rather, Martinez's traveling to Dallas with Lévy to view the painting and his performing

- 21 -

The court must therefore assess what a reasonable jury could have found that Studio Capital and Martinez knowingly and voluntarily did to give Hoffman the reasonable belief that L&M was authorized to sign the Letter Agreement. The essence of Hoffman's argument is this: the undisclosed buyer authorized L&M to enter into the February Agreement; the undisclosed buyer breached the February Agreement; and when the undisclosed buyer was again interested in purchasing the painting, Hoffman could have reasonably inferred, based on the undisclosed buyer's assent to the February Agreement, that L&M was authorized to enter into the Letter Agreement on the undisclosed buyer's behalf as well. The fallacy with this argument is that the evidence was insufficient for a reasonable jury to have found that Studio Capital and Martinez acted with full knowledge of all material facts, which is "essential to establish a claim of apparent authority based on estoppel." *Gaines*, 235 S.W.3d at 182. According to the trial evidence, because of the way art sale transactions of this type are customarily structured, Studio Capital and Martinez would have thought that the seller of the painting had sold it to L&M, who, in turn, was selling it to Studio Capital and Martinez, i.e., in two separate transactions. Studio Capital and Martinez would not have acted with knowledge of the material fact that their conduct with respect to the February Agreement could reasonably have led Hoffman to believe that L&M had the authority to enter into the Letter Agreement. In fact, Martinez "never saw either of the two contracts .

_____

certain of the terms that the parties had agreed upon is entirely consistent with a belief that he (or Studio Capital) was contractually obligated *to L&M*, but not to anyone else (including Hoffman).

. . the February [Agreement] or the [Letter Agreement], until right at or immediately before [his] deposition in this case in 2012." Tr. 4:101.  There was no basis in the evidence for a reasonable jury to have found that Studio Capital or Martinez had any reason to inquire into whether L&M (specifically, Mnuchin) had, unbeknownst to it or him, purported to enter into a contract on behalf of Studio Capital or Martinez.  Without evidence that Studio Capital and Martinez had knowledge of the material fact that L&M had actually purported to enter into the February Agreement on their behalf, a reasonable jury could not have found that Studio Capital or Martinez conferred apparent authority on L&M to enter into the Letter Agreement on its or his behalf.  *See Rourke*, 530 S.W.2d at 802.

E

The court holds that the jury could not have reasonably found that L&M acted with actual or apparent authority to enter into the Letter Agreement on behalf of Studio Capital or Martinez.  Accordingly, the court grants the renewed motion of Studio Capital and Martinez for judgment as a matter of law and dismisses Hoffman's actions against them with prejudice.[13]

---

[13]In support of its motion for judgment as a matter of law, L&M argues in a footnote that, if the court holds that L&M lacked authority to sign the Letter Agreement on behalf of Studio Capital and Martinez, L&M is entitled to judgment as a matter of law on the ground that "a contract executed by an unauthorized agent, who makes the agreement on behalf of another, not in his individual capacity, is not enforceable."  L&M Br. 10 n.6 (emphasis, citation, and internal quotation marks omitted).  This argument would have force, however, only if L&M was not a party individually to the Letter Agreement, i.e., it made the agreement only on behalf of Studio Capital and Martinez, not in its individual capacity.  But a reasonable jury could have found that L&M *was* a party to the Letter Agreement in its individual capacity.  For example, L&M explicitly agreed in the Letter Agreement to

- 23 -

IV

The court now turns to L&M's motion for judgment as a matter of law.  L&M moves for judgment as a matter of law on the following grounds: (1) Hoffman elected a legally barred disgorgement remedy; (2) she failed to prove her breach of contract claim because there was insufficient evidence of a breach; and (3) she failed to prove her breach of contract claim because there was insufficient evidence of causation.

A

The court will consider first whether a reasonable jury could have found that L&M breached the Letter Agreement.  As noted, Hoffman sought to prove at trial that L&M failed to comply with the confidentiality clause in the Letter Agreement, which provided, in pertinent part: "[a]ll parties agree to make maximum effort to keep all aspects of this transaction confidential indefinitely."  L&M Ex. 28.  In *Hoffman v. L & M Arts*, 774 F.Supp.2d 826 (N.D. Tex. 2011) (Fitzwater, C.J.) ("*Hoffman I*"), the court construed this language to require defendants

> to make every reasonable effort to keep all aspects of the 2007 transaction confidential, measured according to what an average, prudent, and comparable person would or would not have done, under the same or similar circumstances, to make every reasonable effort when exercising due diligence and in the absence of neglect.

---

guarantee the buyer's payment of the purchase price of the painting.  And "[a]ll parties [to the Letter Agreement]"—not merely the seller and buyer of the painting—"agree[d] to make maximum effort to keep all aspects of this transaction confidential indefinitely."  L&M Ex. 28.

*Id.* at 834.  Consistent with this interpretation, the court instructed the jury that

> under the confidentiality clause, all parties to the contract agreed to use their best efforts to keep all aspects of the transaction confidential indefinitely.  Whether a party used such best efforts is determined by assessing whether the party made every reasonable effort to keep all aspects of the transaction confidential, measured according to what an average, prudent, and comparable person would or would not have done, under the same or similar circumstances, to make every reasonable effort when exercising due diligence and in the absence of neglect.

Ct. Charge 9-10.  The court also instructed the jury that "[t]he fact that the sale of the painting had occurred is an aspect of the transaction."  *Id.* at 9.  Under these instructions, the jury found that L&M breached the Letter Agreement.

L&M contends on two grounds that Hoffman failed to present sufficient evidence that L&M materially breached the Letter Agreement: (1) the "goal" of the confidentiality clause was met, regardless of L&M's efforts; and (2) there was no evidence that L&M disclosed any aspect of the Letter Agreement.[14]

---

[14]L&M adopted and incorporated by reference in its motion the arguments made by Studio Capital and Martinez in their renewed motion for judgment as a matter of law.  Studio Capital and Martinez maintain that the court erred in construing the Letter Agreement to contain a "best efforts" clause and in instructing the jury that "[t]he fact that the sale of the painting had occurred is an aspect of the transaction" that was intended to be kept confidential.  Studio Capital/Martinez Br. 9-10 (quoting Ct. Charge 9).  They also contend that the court erred in interpreting the "maximum effort" obligation of the confidentiality provision to be similar to a "best efforts" provision, and in instructing the jury that "all aspects" of the transaction include the fact of the sale.  The court's construction of the Letter Agreement represents its legal interpretation and is the law of the case.  The court therefore declines to accept this ground of the motion of Studio Capital and Martinez, which L&M adopted by reference.

B

L&M maintains that, to prove that L&M breached a best efforts-type confidentiality clause, Hoffman was required to establish two sequential sub-elements: first, that the goal of the clause (i.e., to keep all aspects of the transaction confidential) was not achieved; and, second, that L&M did not exercise its best efforts to meet that goal.  Citing and quoting the Fifth Circuit's decision in *Kevin M. Ehringer Enterprises, Inc. v. McData Services Corp.*, 646 F.3d 321 (5th Cir. 2011), L&M posits that a contracting party may fulfill the contractual goal "regardless of the quality of its efforts," and it maintains that no reasonable jury could have found that the goal of the confidentiality clause was not met because no aspect of the Letter Agreement was ever disclosed by anyone except Hoffman.  L&M Br. 6.

If L&M's argument is that the jury could not reasonably have found that the goal of the confidentiality clause was not achieved and that L&M did not exercise its best efforts to meet that goal, this contention is easily dismissed.  For reasons that the court explains in § IV(C), the court concludes that the jury could reasonably have found that the goal of the confidentiality clause was not achieved, and that L&M did not use its best efforts to keep all aspects of the transaction confidential indefinitely, measured according to what an average, prudent, and comparable person would or would not have done, under the same or similar circumstances, to make every reasonable effort when exercising due diligence and in the absence of neglect.

There is a suggestion in L&M's brief and in its counsel's oral argument on this

motion that L&M is making a different argument: that when *the goal* of a best efforts-type clause is met, a contracting party *cannot* be found to have breached that clause.  *See* L&M Br. 6 (citing and quoting *McData* for proposition that "a contracting party may fulfil the contractual goal 'regardless of the quality of its efforts'" (bold font omitted)); Tr. Oral Arg. 13-14 ("Under the *McData* case . . . if the goal of the clause is met there can be no breach. For example, if I promise to use my best efforts to consummate a transaction and the transaction is consummated and I have done nothing to make that transaction get consummated, the plaintiff doesn't have a breach claim against me.  The goal of the clause was met.").  If this is L&M's argument, it still fails, because the jury could reasonably have found, and it implicitly did find,[15] that the goal of the confidentiality clause was not achieved.[16]

---

[15]Concerning the third and fourth elements of Hoffman's breach of contract claim, the jury found that L&M breached the contract and that Hoffman suffered damages as a result of the breach.  Under these circumstances, the goal of the Letter Agreement could not have been achieved.

[16]It is also questionable whether such an absolute rule can be drawn from a correct reading of *McData* or the cases on which it relies.

    In *McData* the panel addressed, in pertinent part, whether the defendant (McData) could be held liable for fraudulently inducing the plaintiff (Ehringer) to enter into a product purchase contract on the basis that, despite its contractual promise to use its "best efforts" to promote, market, and sell the products during the contractual term, McData never intended to use its "best efforts."  *McData*, 646 F.2d at 323.  McData argued on appeal that, because "best efforts" had no precise meaning either in the contract or under the law, Ehringer could not prove that McData had no intent to perform, or that there was nothing by which to measure the breach and lack of intent to perform.  *Id.* at 325-26.  McData maintained that, to form the basis of a fraudulent inducement claim, it was necessary that the contract term be definite, specific, and unconditional.  *Id.* at 326.

    The question the panel addressed was whether, under Texas law, "the 'best efforts'

- 27 -

term is sufficiently definite to serve as a benchmark for analyzing McData's intent at the time it entered into the Agreement." *Id.* Because the Supreme Court of Texas had not analyzed the term "best efforts" to determine its meaning in a contract, the panel made an *Erie*-guess based on the rulings of Texas intermediate courts. In particular, it relied on *CKB & Associates, Inc. v. Moore McCormack Petroleum, Inc.*, 809 S.W.2d 577 (Tex. App. 1991, writ denied), and *Herrmann Holdings Ltd. v. Lucent Technologies Inc.*, 302 F.3d 552 (5th Cir. 2002), which had relied on *CKB*.

In addressing the question before it, the *McData* panel began by summarizing what *CKB* had noted: "best efforts" is a nebulous standard; under some circumstances, a party can use best efforts to achieve a contractual goal and fall well short, and under different circumstances, an effort well short of one's best may be sufficient to hit a target. *McData*, 646 F.2d at 326 (citing and quoting *CKB*, 809 S.W.2d at 581). Therefore, "to be enforceable, a best efforts contract must set some kind of goal or guideline against which best efforts may be measured." *Id.* (quoting *CKB*, 809 S.W.2d at 581). The *McData* panel then quoted *CKB* for a premise from which L&M draws the phrase "regardless of the quality of its efforts" that it uses in its brief:

> If the contract sets out such goal or guideline, [a] contracting party that performs within the guidelines fulfills the contract regardless of the quality of its efforts. When a party misses the guidelines, courts measure the quality of its efforts by circumstances of the case . . . and by comparing the party's performance with that of an average, prudent, comparable [party].

*Id.* (quoting *CKB*, 809 S.W.2d at 582) (brackets and ellipsis in original; internal quotation marks omitted).

The panel's purpose for quoting *CKB* was not to recognize the absolute rule for which L&M contends—a party who achieves the goal of a best-efforts type clause cannot have breached it—but to analyze whether such a clause is enforceable so that it can serve as the predicate for a fraudulent inducement claim. This is confirmed by the panel's ultimate conclusion that "these cases make clear that 'best efforts' provisions may be enforceable under Texas law if they provide some kind of objective goal or guideline against which performance is to be measured." *Id.* at 327. Moreover, the language quoted from *CKB* does not refer explicitly to fulfilling only the *goal* of the contract. It references performing *within the guidelines* when it states that such performance "fulfills the contract regardless of the quality of its efforts."

C

L&M also contends that there was no evidence that it disclosed any aspect of the Letter Agreement.

According to L&M, Van Doren, who drafted the Letter Agreement, admitted at trial that the phrase "this transaction" used in the confidentiality clause was intended to encompass only those things contained within the four corners of the agreement, which is consistent with the court's determination that the Letter Agreement is unambiguous; there is no evidence L&M disclosed anything contained within the four corners of the Letter Agreement; and because there is no such evidence, the jury had no basis reasonably to find that L&M breached the Letter Agreement.  L&M maintains that the only fact disclosed in the Sotheby's auction catalogue (which L&M neither prepared nor distributed) is the public fact that the Rothko painting was once displayed in the *Fast Forward* exhibition at the DMA, a public fact that could not be made non-public under the Letter Agreement.  It posits that disclosure of this public fact could not have constituted a breach of the Letter Agreement because it was not an aspect of the Letter Agreement and it was publicly known before the agreement was executed.  L&M contends that, even if Hoffman has established that the mere publication of the public fact of the Rothko painting's exhibition history in the Sotheby's auction catalogue could have disclosed an aspect of the Letter Agreement by allowing someone to deduce that Hoffman had sold the painting in April 2007, she did not present any evidence that any such deduction actually occurred, and her interrogatory answers prove that the only people who reached this deduction were those whom she told.

L&M's argument divides into two premises, both of which lack force. The first strand of the argument is that L&M could only have breached the Letter Agreement by disclosing something contained within the four corners of the agreement. This assertion is contrary to the law of the case and the court's instructions to the jury. L&M was contractually obligated to use its best efforts to keep all aspects of the transaction confidential indefinitely. The fact of the sale itself was an aspect of the transaction.

The second component of L&M's argument is that the only disclosure made was in the Sotheby's auction catalogue: the public fact that the Rothko painting was once displayed in the *Fast Forward* exhibition at the DMA. L&M maintains that this disclosure could not have breached the Letter Agreement. But this is not the only breach of the Letter Agreement that the jury could reasonably have found that L&M committed.

Regardless whether L&M disclosed to anyone that the transaction had occurred, it was obligated to use its best efforts to keep all aspects of the transaction confidential indefinitely. L&M did not show the Letter Agreement to Studio Capital or Martinez until after this lawsuit was filed. Nor did L&M advise Studio Capital or Martinez of the language in the confidentiality clause.[17] When L&M discovered that Studio Capital and Martinez intended to auction the Rothko painting at Sotheby's—which Hoffman's expert, Victor

---

[17]The language L&M provided Martinez in the April Invoice differs from the content of the confidentiality clause because the April Invoice does not contain the "maximum effort" language or the "all aspects" language of the Letter Agreement.

Wiener ("Wiener"), testified had "a huge broad outreach," Tr. 4:221[18]—it did not inform Sotheby's of the confidentiality clause in the Letter Agreement, nor did it attempt to persuade Sotheby's or Martinez to forgo the auction. The jury could have reasonably found that—even if L&M did not disclose the fact of the transaction to anyone—L&M failed to make every reasonable effort to keep all aspects of the transaction confidential, measured according to what an average, prudent, and comparable person would or would not have done, under the same or similar circumstances, to make every reasonable effort when exercising due diligence and in the absence of neglect.

Accordingly, the court holds that a reasonable jury could have found that L&M breached the confidentiality clause.

_____

[18]Wiener testified:

> Public auctions nowadays, and in 2007 as well, have huge broad outreach especially the high end auction houses. They produce tens of thousands of catalogs. They take out massive amounts of advertising. They use the Internet to solicit attention. They contact prospective sellers. They have dinner parties in which the works of art are displayed. They have receptions. They sometimes put art on tour. They have innumerable resources at their disposal. To give you an example, if I may, my new startup company which does have good funding and does have a big outreach has subscription base on the Internet of about 300,000 subscribers. And when we sold the drawing that made 3.5 million dollars, and we had a number of other good items in that sale, there were over ten million hits on that particular Internet site to see that object. Phenomenal.

Tr. 4:221-22.

V

L&M maintains that Hoffman failed to prove her breach of contract claim because there was insufficient evidence of causation.

According to L&M, a reasonable jury could not have found that Hoffman suffered any damages as a result of L&M's breach of the confidentiality clause because she failed to adduce sufficient evidence that L&M's failure to give a written copy of the Letter Agreement to Studio Capital actually caused Studio Capital to auction the painting, which is the sole source of her claimed damages.  L&M contends that the evidence conclusively shows that the May 2010 auction of the Rothko painting would have occurred regardless of anything L&M did or did not do.  It posits that the evidence conclusively establishes that Mnuchin shared all the terms of the agreement with Lévy, who in turn shared them with Martinez; that Martinez's counsel did see a copy of the Letter Agreement before the May 2010 auction; and that Martinez testified that, even if he had seen the agreement when it was signed, he would not have done anything different.  Therefore, L&M maintains that a reasonable jury could not have found that L&M's failure to show Studio Capital a copy of the agreement, or L&M's other alleged acts or omissions, caused Hoffman's claimed damages, which flow entirely from the public auction of the Rothko painting in May 2010.

The fallacy in L&M's reasoning is that it is made without reference to Hoffman's benefit of the bargain theory of damages, which the court addresses *infra* at § VII(D).  For reasons the court explains there, a reasonable jury could have found that Hoffman did not receive the benefit of her bargain with L&M.  She accepted a lower sale price in exchange

for L&M's agreement to make maximum effort to keep all aspects of the transaction confidential indefinitely. Her damages for breach of contract were caused when she did not get the benefit of her bargain. The jury could reasonably have found that she did not.

The court therefore holds that the jury could reasonably have found that L&M's breach of the confidentiality clause caused Hoffman damages in the form of the lost benefit of her bargain.

VI

The court now turns to L&M's contention that Hoffman has elected a disgorgement remedy that is legally barred under Texas law.

A

In Question No. 3(A) of the court's charge, the court asked the jury to find "[t]he difference, if any, between the sum of money for which Hoffman sold the painting in the transaction in question and what she could have sold the painting for at public auction on or around April 24, 2007." Ct. Charge 15. The jury answered "$500,000." *Id.* Question No. 3(B) asked the jury to find "[t]he difference, if any, between the value of the benefits Hoffman conveyed under the contract to the defendant in question and the value of the benefits she received in exchange." *Id.* The jury answered "0" for L&M and "0" for Studio Capital/Martinez. *Id.* Question No. 3(C) asked the jury to find "the value of the benefits that the defendant in question received in connection with the transaction." *Id.* The jury answered "$450,000" for L&M and "$750,000" for Studio Capital/Martinez. *Id.*

- 33 -

After the jury returned its verdict, the court directed Hoffman to elect her remedy. In a letter to the court, Hoffman stated that she was entitled to recover the aggregate sum of the damages that the jury found in answer to Question No. 3(A) and (C). Alternatively, she requested that the court award the sum of $1.2 million that the jury found in answer to Question No. 3(C). The court entered judgment in Hoffman's favor in the amount of her alternative request: $450,000 from L&M, and $750,000 from Studio Capital and Martinez (jointly).

L&M maintains[19] that Question No. 3(C) is a disgorgement-based question, and that, under Texas law, disgorgement is not available as a remedy for a breach of contract claim. It contends that Hoffman's attempt to re-characterize Question No. 3(C) as seeking "restitution" damages fails because restitution is designed to restore to the plaintiff the value of what she parted with in performing the contract, and Question No. 3(C) seeks only to measure the gross benefits that L&M obtained.[20] L&M maintains that, even if Question No. 3(C) covers restitutionary damages, such damages are unavailable as a matter of law because

[19]Because the court has granted the motion of Studio Capital and Martinez above, it refers in this section to all arguments as if made by L&M alone. Because L&M adopted by reference the motion and arguments of Studio Capital and Martinez, the court has relied on these grounds while attributing them to L&M alone (although citing the Studio Capital/ Martinez brief, where necessary).

[20]During the pretrial conference, the court stated that, in preparing its pretrial draft of the jury charge, it had "broken out the damages [Hoffman is] seeking into three parts that are based on [her] request," and it indicated that one of these parts was "intended to be akin to disgorgement." Pretrial Conf. Tr. 97. L&M contends that, because Question No. 3(B) covered restitution damages, Question No. 3(C) was "clearly" intended to cover disgorgement. Studio Capital/Martinez Br. 16.

restitution is based on the equitable principle of unjust enrichment, and the existence of an enforceable contract precludes restitution when the benefits that were allegedly wrongfully obtained were obtained under an express agreement.  L&M reasons that, under Restatement (Third) of Restitution and Unjust Enrichment ("Restatement") § 39 cmt. a (2011), restitution is only available if normal money damages provide "inadequate protection."  According to L&M, this is not the case here because the jury awarded Hoffman $500,000 in compensatory damages in response to Question No. 3(A) as a purported measure of the benefit of her bargain. L&M posits that Question No. 3(C) fails to take into account the benefits Hoffman received (i.e., the $500,000 donation to the DMA and the right to keep the Rothko painting in her home for six months) in connection with the sale, and that she is not entitled to restitution because she cannot return these benefits.  Finally, L&M argues that there is no evidence that Hoffman ever parted with $450,000 and gave it to L&M, and Hoffman is not entitled to any of the commissions earned by L&M in connection with the transaction because the commissions were paid entirely by the buyer, not by Hoffman.

Hoffman responds that Question No. 3(C) did not ask for a "disgorgement" measure of damages (the primary objective of which is deterrence) because the court's charge made clear that the jury could only award *compensatory* damages, the purpose of which are to make Hoffman whole.  She thus argues that Question No. 3(C) was consistent with a restitution theory of damages and cites to Restatement § 39, which allows "restitution" as damages for a deliberate breach of contract measured by "the profit realized by the promisor

- 35 -

as a result of the breach."  Restatement § 39.  She posits that the $1.2 million that the jury found in response to Question No. 3(C) constitutes the type of damages contemplated by Restatement § 39 and recovered in *Morgan v. Stagg*, 1987 WL 18703 (Tex. App. Oct. 22, 1987, no writ), and *City of Harker Heights, Texas v. Sun Meadows Land, Ltd.*, 830 S.W.2d 313 (Tex. App. 1992, no writ).  Citing *Morgan* and *Harker Heights*, Hoffman maintains that the existence of an enforceable contract does not preclude an award of restitution damages; that the measure of damages in Question No. 3(C) focuses entirely on defendants' ill-gotten gains and, accordingly, does not require that Hoffman make the type of factual showing that would be necessary to obtain restitution damages that restore the *status quo ante*; that awarding Hoffman the benefits defendants realized from the breach will not cause her to reap a "windfall" because the court clearly instructed the jury to award only damages caused by defendants' unlawful conduct as opposed to *all* of the benefits defendants obtained in connection with the transaction; that the benefits reaped by defendants from breaching their contract with Hoffman were more than double the amount she could recover under traditional benefit-of-the-bargain damages and she may elect to recover the higher amount; and, finally, that Hoffman is not required to show "opportunistic breach," just that defendants' conduct was not negligent and there is no evidence that defendants' actions in selling the Rothko painting at public auction were anything but conscious.

B

Under Texas law, "[t]he universal rule for measuring damages for the breach of a contract is just compensation for the loss or damage actually sustained." *Phillips v. Phillips*, 820 S.W.2d 785, 788 (Tex. 1991) (quoting *Stewart v. Basey*, 245 S.W.2d 484, 485-86 (1952)).   In *Hoffman v. L & M Arts*, 2013 WL 4511473 (N.D. Tex. Aug. 26, 2013) (Fitzwater, C.J.) ("*Hoffman V*"), the court explained:

> The normal measure of damages in a breach of contract case is the benefit-of-the-bargain measure[,] which seeks to restore the injured party to the economic position it would have been in had the contract been performed.   The benefit-of-the-bargain measure of damages is not based upon the facts as they actually occurred but instead is focused on what the injured party's economic position would have been if the contract had been fully performed. Benefit-of-the-bargain damages are calculated by subtracting the value received by the non-breaching party from the value the party expected to receive when the contract was made.

*Id.* at *6 (internal quotation marks and citations omitted; bracketed material added).

Although considered the "normal" measure of damages under Texas law, benefit-of-the-bargain is not the *only* measure of damages available for a breach of contract claim.   For example, courts may also award "reliance damages," which "restore any expenditures the non-breaching party made in reliance on the contract," and "restitution damages," which "restore property or money taken from the non-breaching party and restore it to the position it would have been in had no contract been made." *Wes-Tex Tank Rental, Inc. v. Pioneer Natural Res. USA, Inc.*, 327 S.W.3d 316, 320 n.4 (Tex. App. 2010, no pet.) (citing *Harker Heights*, 830 S.W.2d at 317; *Mistletoe Express Serv. of Okla. City, Okla. v. Locke*, 762

- 37 -

S.W.2d 637, 638-39 (Tex. App. 1988, no writ)).  Hoffman argues that the proper measure

of damages is the value of the benefits defendants derived as a result of their breach of

contract.  She relies on Restatement § 39, which provides:

> If a deliberate breach of contract results in profit to the
> defaulting promisor and the available damage remedy affords
> inadequate protection to the promisee's contractual entitlement,
> the promisee has a claim to restitution of the profit realized by
> the promisor as a result of the breach.  Restitution by the rule of
> this section is an alternative to a remedy in damages.

Restatement § 39(1).

The Supreme Court of Texas has not adopted § 39 of the Restatement.  Absent a

binding decision of the Supreme Court of Texas on an issue of substantive Texas law, this

court must make an "*Erie*-guess," i.e., a prediction under *Erie R.R. Co. v. Tompkins*, 304 U.S.

64 (1938), of how that court would resolve the issue if presented with the same case.

*Hoffman V*, 2013 WL 4511473, at *3 n.3 (citations omitted).

Restatement § 39 represents a departure from the traditional view that "'[d]amages

for breach of contract protect three interests: a restitution interest, a reliance interest, and an

expectation interest.'"  *Sharifi v. Steen Auto., LLC*, 370 S.W.3d 126, 148 (Tex. App. 2012,

no pet.) (quoting *Chung v. Lee*, 193 S.W.3d 729, 733 (Tex. App. 2006, pet. denied));

Restatement (Second) of Contracts § 344 (1981).  Although phrased in terms of "restitution,"

§ 39 does not seek to restore the plaintiff to her original position,[21] but instead "describes a

---

[21]Restitution "is generally defined [under Texas law] as an equitable remedy under which a person is restored to his or her original position before the loss or injury." *Fazio v. Cypress/GR Hous. I, L.P.*, 403 S.W.3d 390, 426 (Tex. App. 2013, pet. denied) (citing *In re*

*disgorgement* remedy." Restatement § 39 cmt. a (emphasis in original).

Under Texas law, disgorgement of profits is "an equitable remedy meant to prevent the wrongdoer from enriching himself by his wrongs." *Allstate Ins. Co. v. Receivable Fin. Co., L.L.C.*, 501 F.3d 398, 413 (5th Cir. 2007) (citation and internal quotation marks omitted). Unlike restitution, the purpose of disgorgement is not to make the victim whole but to prevent the wrongdoer's enrichment from ill-gotten profits. *SEC v. Huffman*, 996 F.2d 800, 802 (5th Cir. 1993). Courts interpreting Texas law have specifically held that disgorgement of profits is not an appropriate remedy for a breach of contract claim. *See Henry v. Masson*, 333 S.W.3d 825, 849 (Tex. App. 2010, no pet.) ("Disgorgement of profits is not a measure of damages available in a breach of contract action. 'The normal measure of damages in a breach of contract case is the benefit of the bargain, the purpose of which is to restore the injured party to the economic position it would have been in had the contract been performed.'" (quoting *City of The Colony v. N. Tex. Mun. Water Dist.*, 272 S.W.3d 699, 739 (Tex. App. 2008, pet. dism'd))); *see also UDV N. Am., Inc. v. Tequila Cuervo La Rojena, S.A.*, 2001 WL 1223638, at *10 (5th Cir. Sept. 26, 2001) (per curiam) (affirming

---

*J.R.*, 907 S.W.2d 107, 109 (Tex. App. 1995, no writ)); *see also Burlington N. R.R. Co. v. Sw. Elec. Power Co.*, 925 S.W.2d 92, 97 (Tex. App. 1996, no pet.) ("The purpose of restitution is to place an aggrieved plaintiff in the position he occupied prior to his dealings with the defendant."). Restitution damages are measured by the "amount which would put plaintiff in as good a position as he would have been in if no contract had been made." *Coon v. Schoeneman*, 476 S.W.2d 439, 441 (Tex. Civ. App. 1972, writ ref'd n.r.e.). In other words, restitution "restores to plaintiff the value of what he parted with in performing the contract." *Id.*; *see also Harker Heights*, 830 S.W.2d at 317 ("Restitution involves restoring property or money taken from the plaintiff.").

holding that, under Texas law, party was not entitled to disgorgement as remedy for breach of contract because disgorgement is not available as remedy for breach of contract unless contracting parties had confidential or fiduciary relationship and plaintiff failed to establish such a relationship); *Bancservices Grp., Inc. v. Strunk & Assocs., L.P.*, 2005 WL 2674985, at *6 (Tex. App. 2005, pet. denied) (mem. op.) ("For a breach of contract action, the measure of damages is not the benefits received by the defendant, but the loss or damage actually sustained by the plaintiff.").

The "primary object of § 39 is to prevent the unjust enrichment of the defendant at the expense of the plaintiff."  Restatement § 39 cmt. a.  Thus damages under § 39 are calculated solely by reference to the breaching party's ill-gotten gains; no consideration need be given to the benefit of the parties' bargain or to what amount is necessary to compensate the plaintiff for her losses.  In fact, "a claimant under [§ 39] may recover the defendant's profits from breach, *even if they exceed the provable loss to the claimant* from the defendant's defaulted performance."  *Id.* (emphasis added).  Under Texas law, however, "a plaintiff is not to be put in a better position by a recovery of damages for the breach of a contract than he would have been in if there had been performance."  *Guardian Trust Co. v. Brothers*, 59 S.W.2d 343, 345 (Tex. Civ. App. 1933, writ ref'd) (citation omitted); *accord Neuman v. Spector Wrecking & Salvage Co.*, 490 S.W.2d 875, 878 (Tex. Civ. App. 1973, no pet.).  Permitting a plaintiff to recover disgorgement as a remedy for breach of contract would thus be inconsistent with the "goal in measuring damages for a breach-of-contract

claim," which "is to provide just compensation for any loss or damage *actually sustained* as a result of the breach." *Parkway Dental Assocs., P.A. v. Ho & Huang Props., L.P.*, 391 S.W.3d 596, 607 (Tex. App. 2012, no pet.) (emphasis added) (citations omitted); *see also SAVA gumarska in kemijska industria d.d. v. Advanced Polymer Scis., Inc.*, 128 S.W.3d 304, 317 n.6 (Tex. App. 2004, no pet.) ("The normal measure of damages in a breach of contract case is the benefit-of-the-bargain measure" which "seeks to restore the injured party to the economic position it would have been in had the contract been performed.").

Because Texas law does not authorize disgorgement as a remedy for a breach of contract claim and § 39 would permit a plaintiff to recover more for breach of contract than is necessary to compensate her for the loss sustained as a result of the breach, the court makes an *Erie* prediction that the Supreme Court of Texas would neither adopt Restatement § 39 nor permit Hoffman to recover, as a remedy for breach of contract, the value of the profits that L&M derived from its breach of the Letter Agreement.

Hoffman relies on *Harker Heights* to argue that "Texas courts have applied the theory of recovery embodied in section 39 of the Restatement to award breach-of-contract plaintiffs the benefits derived from a defendant's breaches." P. Br. 15. In *Harker Heights* the defendant, the City of Harker Heights ("City"), had reached an agreement with two developers under which the City would approve the developers' subdivision plats if they would escrow their share of the City's projected costs of annexing and improving a road that was adjacent to and abutted the proposed subdivisions. *Harker Heights*, 830 S.W.2d at 315.

The City never annexed the road, and the developers filed suit seeking, *inter alia*, restitution of the escrowed funds and damages for breach of contract. *Id.* at 316. The court of appeals upheld the trial court's judgment permitting the developers to recover their escrowed funds, less the value of certain road improvements made by the city. *Id.* at 315. In affirming the trial court, the court of appeals did not award plaintiffs any *profits* that the City had obtained as a result of the breach (in fact, there was no evidence that the City had profited from the breach other than by retaining plaintiffs' escrowed funds and not performing as promised under the parties' agreement). Although the court of appeals explained that "restitution focuses on forcing the defendant to disgorge benefits that it would be unjust to keep, rather than on compensating the plaintiff," in affirming the trial court's judgment, it simply restored to the plaintiffs the value of what they parted with, less the value of what they received. *Id.* at 317.

Similar to *Harker Heights*, the jury in this case was specifically asked to find "[t]he difference, if any, between the value of the benefits Hoffman conveyed under the contract to the defendant in question and the value of the benefits she received in exchange." Ct. Charge 15 (Question No. 3(B)). The jury answered "0." *Id.* If the court were to follow the holding of *Harker Heights* and award damages consistent with that opinion, it would not, as Hoffman urges, award her "the value of the benefits that the defendant in question received in connection with the transaction." *Id.* (Question No. 3(C)). Instead, it would award $0, which represents the difference in the value of the benefits Hoffman conveyed under the

Letter Agreement (similar to the escrowed funds), less the value of the benefits she received in exchange (similar to the value of certain road improvements made by the City).[22]

Hoffman argues that the jury could not have awarded "disgorgement" in answering Question No. 3(C) because the court clearly instructed the jury that it could only award "compensatory damages," the "purpose [of which] is to make Hoffman whole." P. Br. 17 (quoting Ct. Charge 13). She maintains that the damages the jury found in answering Question No. 3(C) are restitution damages meant to compensate her "by awarding a monetary substitute for the performance she paid for and should have received." *Id*. (brackets and internal quotation marks omitted) (citing Restatement § 39, cmts. d-e). The court disagrees.

The damages Hoffman is describing are benefit-of-the-bargain damages, not restitution damages.[23]  *See Hoffman V*, 2013 WL 4511473, at *6 (stating that benefit-of-the-bargain measure of damages "'seeks to restore the injured party to the economic position it

---

[22]Hoffman also relies on *Morgan*, in which a Texas court of appeals affirmed a jury award of $3,000 in profits that the defendant had earned by breaching a non-competition clause. *Morgan*, 1987 WL 18703 , at *3. The *Morgan* court appears to have awarded the type of damages that Restatement § 39 contemplates (Restatement § 39 in fact cites *Morgan* as the basis for illustration No. 6). But it is an unpublished opinion, it does not cite any Texas law in support of its conclusion, and it addresses only whether the evidence supported the verdict rather than whether a plaintiff suing for breach of contract under Texas law can recover under a disgorgement theory of damages. Accordingly, this court declines—based on *Morgan* alone—to hold that Texas would follow the approach taken in Restatement § 39.

[23]To the extent Hoffman seeks to recover under a restitution measure of damages, as the court explains above, it is Question No. 3(B) ( the difference in value between what Hoffman gave and what she received) that sought the jury's finding in this respect.

would have been in had the contract been performed.'" (quoting *Advanced Polymer Scis., Inc.*, 128 S.W.3d at 317 n.6)).  As one Texas court of appeals has explained:

> expectation damages are benefit of the bargain damages that restore the non-breaching party to the same position it would have been in had the contract not been breached. . . . Restitution damages restore property or money taken from the non-breaching party and restore it to the position it would have been in had no contract been made.

*Wes-Tex Tank Rental*, 327 S.W.3d at 320 n.4 (citations omitted).  "Benefit-of-the-bargain damages are calculated by subtracting the value received by the non-breaching party from the value the party expected to receive when the contract was made." *Hoffman V*, 2013 WL 4511473, at *6 (citations omitted).  This calculation focuses solely on the value that will fairly compensate the plaintiff for her loss; it does not take into account any profit or other benefit that the defendant obtained through its breach.  Fairly read, Question No. 3(C) does not compensate Hoffman "by awarding a monetary substitute for the performance she paid for and should have received."  P. Br. 17.

The court therefore holds as a matter of law that Hoffman is not entitled to recover the sums that the jury found in answer to Question No. 3(C).

## VII

Having determined that Hoffman cannot recover from L&M based on the damages that the jury found in answer to Question No. 3(C), the court now decides whether Hoffman is entitled to judgment in the amount of her alternative request, based on the jury's answer to Question No. 3(A).

- 44 -

A

Before reaching the merits of this question, the court must address a procedural issue. L&M maintains that Hoffman has forfeited any right to recover the sum of $500,000 that the jury found in response to Question No. 3(A) because she failed to file a motion to alter or amend the judgment.  At oral argument, the court asked L&M's counsel whether Hoffman can now elect to recover based on the jury's answer to Question No. 3(A).  He responded:

> at this stage procedurally the only proper step for the court to take would be to enter a take nothing judgment, in which case the plaintiff then would have 28 days to move to alter or amend that judgment, but I do not think that under rule 59 and rule 5, which relate to the deadlines for moving to alter or amend the judgment, that the court has the jurisdictional power to reform the judgment in that way.

Tr. Oral Arg. 5-6.  Counsel also maintained that

> if the court entered a take nothing judgment [Hoffman will] do what [she does] and we would consider whether legally [she] can now elect a different remedy.  I think we would oppose that, but I can't tell you as a matter of law whether [she is] allowed to do it if [she] get[s] a second bite at the judgment, essentially.

*Id.* at 6-7.

The court concludes that Hoffman has not forfeited her right to recover the alternative measure of damages that the jury found in response to Question No. 3(A).  Hoffman elected her remedy in accordance with the court's directive.  She first argued that she was entitled to all damages awarded in Question No. 3(A) and Question No. 3(C).  She contended next that she was entitled to recover the sums awarded in Question No. 3(C).  Finally, she elected in the alternative to recover the sum of $500,000 that the jury found in response to Question

No. 3(A) if the court determined that equitable restitution was not allowed.  P. Jan. 3, 2014 Ltr. to Court at 3 (stating that Hoffman would "elect to recover the $500,000 that the jury awarded as compensatory benefit-of-the-bargain damages in the event that the Court determines that equitable restitution is not available as a matter of law as a remedy for breach of contract.").  Under no circumstances can it be said that Hoffman intentionally waived her right to recover the sum of $500,000 that she elected in the alternative.

Nevertheless, there is support for L&M's contention that the court cannot now enter an amended judgment in Hoffman's favor based on this alternative measure of damages. This is because Hoffman did not file a timely motion to alter or amend the judgment, and the time for the court to act *sua sponte* has elapsed.  There is authority for the proposition that a district court loses jurisdiction to grant relief under Rule 59(e) when the time for filing such a motion has expired.  *See, e.g.*, *Washington v. Patlis*, 868 F.2d 172, 174 (5th Cir. 1989) (quoting *de la Fuente v. Cent. Elec. Coop., Inc.*, 703 F.2d 63, 65 (3d Cir. 1983) (per curiam)) (stating that period for serving Rule 59(e) motion is jurisdictional and cannot be extended in discretion of district court); *Martin v. Wainwright*, 469 F.2d 1072, 1073 (5th Cir. 1972) (per curiam) (same).  And although there is also support for the premise that a district court can grant Rule 59(e) relief *sua sponte*, the courts that permit this require that the court act within the time for filing a Rule 59(e) motion, i.e., 28 days after the entry of judgment.  In *Burnam v. Amoco Container Co.*, 738 F.2d 1230 (11th Cir. 1984) (per curiam), the Eleventh Circuit held that, "so long as the court acts within [28] days after the entry of judgment, the court has the power on its own motion to consider altering or amending a judgment."  *Id.* at 1232

(bracketed material added to reflect current time period for filing Rule 59(e) motion); *see also, e.g., Hidle v. Geneva Cnty. Bd. of Educ.*, 792 F.2d 1098, 1100 (11th Cir. 1986) ("This court has held, in [*Burnam v. Amoco*], that where no motion has been filed by either party a district court has a limited power to act *sua sponte* to alter or amend a judgment so long as done within [28] days after the judgment is entered." (bracketed material added to reflect current time period for filing Rule 59(e) motion)).  "Courts have recognized that FRCP 59(e)'s language is ambiguous with regard to a trial court's authority to act *sua sponte*." *Cristobal v. Siegel*, 2014 WL 3029144, at *3 (Guam July 7, 2014) (citing *Burnam*, 738 F.2d at 1232).  "Other circuits have cited to the Eleventh Circuit without expressly adopting the rule."  *Id.* (citing *Dr. Jose S. Belaval, Inc. v. Perez-Perdomo*, 465 F.3d 33, 37 n.3 (1st Cir. 2006); *Marshall v. Shalala*, 5 F.3d 453, 454 (10th Cir. 1993)).  "In addition, several federal trial courts have found that they may amend judgments *sua sponte* pursuant to FRCP 59(e), as long as they act within the applicable time period."  *Id.* (collecting cases).

But this does not mean that there is no avenue available for Hoffman to recover under this alternative measure of damages.  L&M's counsel appeared to recognize this when he stated at oral argument that the court could enter a take nothing judgment, after which Hoffman would be able to file a timely motion to alter or amend the amended judgment.  In fact, the court *does* have jurisdiction to grant Hoffman this relief because it is today granting a timely motion to alter or amend the judgment, and in doing so is changing what the original judgment did, to Hoffman's detriment.  "A successive motion directed to the same judgment is ineffectual, but when there is a new judgment—an alteration independently sufficient to

- 47 -

restart the time for appeal—there is also a new period in which to file a motion under Rule 59." *Kraft, Inc. v. United States*, 85 F.3d 602, 607 (Fed. Cir. 1996) (quoting *Charles v. Daley*, 799 F.2d 343, 348 (7th Cir. 1986)).   To decide whether the period for filing a successive motion has commenced, the court determines whether the amendment to the judgment has made a change in what the judgment did.  *See Charles L. M. v. Ne. Indep. Sch. Dist.*, 884 F.2d 869, 870 (5th Cir. 1989) (stating "that the test is whether the amendment of the judgment made no change in what the judgment *did*[.]" (quoting *Harrell v. Dixon Bay Transp. Co.*, 718 F.2d 123, 128 n.4 (5th Cir. 1983) (internal quotation marks omitted)).  Such a change occurs when an amended judgment denies part of the damages that the plaintiff was awarded under a prior judgment.  For example, in *Harrell* the plaintiff's successive motion for reconsideration (which the Fifth Circuit treated as a Rule 59(e) motion) was deemed timely because, after the district court entered a judgment favorable to the plaintiff, it entered an amended judgment in response to the defendant's motion in which it set aside part of the damages that it had originally awarded to the plaintiff.  *Harrell*, 718 F.2d at 127-29.  The Eleventh Circuit followed *Harrell* in *Wright v. Preferred Research, Inc.*, 891 F.2d 886 (11th Cir. 1990), holding that a Rule 59 motion filed after the entry of a second judgment that reduced the amount of damages tolled the time for appeal.  *Id.* at 889-90.

In sum, because Hoffman did not move to alter or amend the original judgment, L&M appears to be correct that the court lacks jurisdiction to award her relief in the amended judgment under the alternative measure of damages.  The court must therefore enter an amended judgment that dismisses Hoffman's action against L&M.  This amended judgment

will change what the original judgment did by denying Hoffman the damages that she elected and on which the court based the original judgment.  Hoffman will then be able to file a timely motion to alter or amend the amended judgment, in response to which the court will enter a second amended judgment that will enable her to recover under her alternative election: the sum of $500,000 that the jury found in response to Question No. 3(A).[24]

B

Having addressed this procedural question, the court now turns to the merits of L&M's arguments.  L&M maintains that Hoffman cannot recover benefit-of-the-bargain damages for L&M's breach of the confidentiality provision of the Letter Agreement.[25]  It posits that the only damages that she can recover are consequential damages, and, had an instruction on consequential damages been given, no reasonable jury could have found any damages because there was no evidence of any injury to Hoffman as a consequence of the breach.  L&M maintains that, even if benefit-of-the-bargain damages were categorically available to Hoffman, the court's jury instruction was erroneous because it did not properly reflect the benefit of the parties' bargain.  L&M contends that the jury should have been instructed to find "(1) whether both buyer and seller agreed that 'the sale price for the [Rothko painting] was substantially reduced from what the price would have been if this

---

[24]The second amended judgment will adhere to the court's decision dismissing Hoffman's actions against Studio Capital and Martinez.

[25]This is an example of a contention drawn from the brief of Studio Capital and Martinez, which L&M adopted.

provision had not been included' and (2) 'the price that you find the buyer and seller would have agreed to under the April 24, 2007 contract if the contract had not included the confidentiality provision.'" Studio Capital/Martinez Br. 22 (quoting Studio Capital/Martinez Proposed Jury Charge 21).   In other words, L&M contends that Hoffman was required to prove that she would have sought a higher price had the confidentiality provision not been included in the Letter Agreement, and that she was obligated to prove that both parties would have agreed to that higher price without the confidentiality provision.  L&M maintains that Hoffman did not meet this burden because there is no evidence that Studio Capital or Martinez would have paid more for the Rothko painting had the confidentiality provision not been included.

Hoffman responds that this challenge to the jury instructions is not an appropriate basis for relief under Rule 50(b).[26]   She posits that, to recover benefit-of-the-bargain damages, she was not required to prove that Studio Capital and Martinez would have paid a higher price for the Rothko painting had the Letter Agreement not included a confidentiality provision.  According to Hoffman, "[w]hat matters is whether the amount for

---

[26]In making this argument, Hoffman relies on *Hancock v. Chicago Title Insurance Co.*, 2013 WL 2391500, at *2 (N.D. Tex. June 3, 2013) (Fitzwater, C.J.), in which the court held that the failure of the movant to move for judgment as a matter of law on an issue waived the movant's ability to seek relief on that issue under Rule 50(b).  Unlike in *Hancock*, however, defendants did move for judgment as a matter of law on this issue.  *See* Tr. 5:131("Finally, she didn't show damages.  There's no evidence here of benefit of the bargain damages, because there is no evidence of any discount in the sale price agreed or made for confidentiality."); *id.* at 5:135 ("there is no evidence that anyone would have paid more for the painting absent the existence of the confidentiality clause").

which she could have sold the [Rothko painting] at public auction was higher than the sum she received under the Contract," P. Br. 24, and there was sufficient evidence for the jury to find that she could have sold it for $500,000 more than she received.

C

In *Hoffman V* the court made an *Erie* prediction that Hoffman's damages theory is legally viable under Texas law. *Hoffman V*, 2013 WL 4511473, at *6 & n.9 ("so far as the court can determine, Hoffman's damages theory is legally viable"). The court explained that "the benefit of the bargain under the terms of the Letter Agreement can be measured by the reduction in monetary consideration that Hoffman was willing to accept when combined with other, non-monetary consideration—here, the promise of strict confidentiality—in exchange for the Rothko painting." *Id.* at *6. The court noted in a footnote that it had not found any case that suggested that what Hoffman is seeking to recover is unavailable under Texas law as a matter of law, but that the court could "revisit this issue after the verdict," if necessary. *Id.* at *6 n.9.

L&M contends that the court should now revisit the issue and hold that Hoffman is only entitled to recover consequential damages. But apart from arguments that the court considered and rejected in *Hoffman V*, L&M has not provided any basis for the court to revisit its decision. Having found no basis to call into question its *Erie* prediction in *Hoffman V*, the court denies L&M's motion to the extent it argues that Hoffman can only recover consequential damages.

- 51 -

D

L&M next argues that Hoffman was required to prove that both she and the buyer understood that the sale price was being reduced because of the confidentiality provision, and that without the confidentiality provision, the buyer would have paid a higher price.  In support, L&M relies on two opinions of the Supreme Court of Texas: *Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc.*, 960 S.W.2d 41 (Tex. 1988), and *Fortune Production Co. v. Conoco, Inc.*, 52 S.W.3d 671 (Tex. 2000).

In *Formosa* the plaintiff, Presidio Engineers and Contractors, Inc. ("Presidio"), was awarded a contract for a large construction project at one of the facilities of Formosa Plastics Corporation ("Formosa") based on its low bid of $600,000.  *Id.* at 43.  The project took substantially longer than expected, and, as a result, Presidio incurred additional, unanticipated costs.  *Id.*  Presidio alleged that, in preparing its bid, it had relied on information contained in a Formosa bid package that Presidio later learned was false.  Presidio sued Formosa, alleging, *inter alia*, a claim for fraudulent inducement.  *Id.*  At trial, the jury awarded Presidio $700,000 in fraud damages.  *Id.* at 49.  In response to Formosa's contention that the award was excessive, Presidio argued that, had it been told the truth about the project, it would have bid $1.3 million, and by subtracting the amount it was paid ($600,000) from what was reasonable and necessary to perform the work ($1.3 million), there is legally sufficient evidence to support the $700,000 damages award.  *Id.*

The Supreme Court of Texas held that the damages award was "entirely speculative

because there is no evidence that Presidio would have been awarded the project if it had made a $1.3 million bid." *Id.* at 50.  In fact, it is likely that, had Presidio bid $1.3 million, it would not have been awarded the project because two of the three other bids Formosa received were lower than $1.3 million.  Accordingly, the court did not permit Presidio to recover the full $700,000 in damages based on its benefit-of-the-bargain theory.

In *Hoffman V* the court relied on *Fortune Production* to make its *Erie* prediction concerning whether Hoffman could recover under her theory of benefit-of-the-bargain damages.  The court summarized the case as follows:

> In *Fortune Production* one of the issues the Supreme Court of Texas addressed was whether the plaintiffs, who were producers of natural gas, could recover as benefit-of-the-bargain damages the price they could have obtained under a contract with the defendant for their residue gas had they known that most of the gas was going to be resold under a preexisting contract between the defendant and Lone Star Gas Company ("Lone Star"), as opposed to being sold on the spot market at a much lower rate. The court concluded that, because there was evidence that the defendant had agreed to pay at least one producer the Lone Star contract rate for a fraction of its residue gas, there was some evidence of benefit-of-the-bargain damages, i.e., the difference between the contract price to which the plaintiffs agreed and the price they would otherwise have accepted had they known the truth.  The court explained that, "if there is evidence of the bargain that would have been struck had the defrauded party known the truth, there can be a recovery for benefit-of-the-bargain damages."

*Hoffman V*, 2013 WL 4511473, at *7 (citations omitted).  But because there was no evidence that the defendant would have agreed to pay $3.50 per Mcf for all of the plaintiffs' residue gas, as the jury found, the court concluded that the evidence did not support the amount of

damages found by the jury.  *Fortune Production*, 52 S.W.3d at 682.

In *Hoffman V* the court relied on *Fortune Production* because it appeared to support the premise that a party can recover benefit-of-the-bargain damages for breach of contract measured by the lower price that the non-breaching party was willing to accept in exchange for a promise of performance by the breaching party of certain contractual terms.  *See Hoffman V*, 2013 WL 4511473, at *7 (introducing discussion of *Fortune Production* by stating, "Although Hoffman does not cite, and the court has not found, a case that is factually similar to this one, the court has located Texas authority that appears to support the premise that the damages Hoffman seeks are legally available." (footnote omitted)).  Although the court noted that cases involving fraudulent inducement are instructive—because "the benefit of the bargain measure of damages is available for both fraudulent inducement and breach of contract claims," *id.* at *7 n.12 (quoting *Sterling Chemicals, Inc. v. Texaco Inc.,* 259 S.W.3d 793, 798 (Tex. App. 2007, pet. denied))—it did not suggest that doctrines and case law that control such cases apply equally to breach of contract claims.  L&M is attempting to derive from *Formosa* and *Fortune Production*—two cases involving fraud claims—the prerequisites for recovering benefit-of-the-bargain damages in the context of a breach of contract claim.  These requirements are found, however, in well-settled principles of Texas law that govern benefit-of-the-bargain damages sought as a remedy for breach of contract.

As explained in *Hoffman V*, "'[t]he goal in measuring damages for a breach-of-contract claim is to provide just compensation for any loss or damage actually

sustained as a result of the breach.'" *Hoffman V*, 2013 WL 4511473, at *6 (quoting *Parkway Dental Assocs.*, 391 S.W.3d at 607). Courts accomplish this goal through benefit-of-the-bargain damages, which "are calculated by subtracting the value received by the non-breaching party from the value the party expected to receive when the contract was made." *Id.* (citing *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 817 (Tex. 1997)). Hoffman bargained for—and expected to receive—$19 million (less commissions) plus confidentiality; she actually received $19 million (less commissions), but not the confidentiality for which she had bargained. One method of measuring the value of the confidentiality that she expected to receive as part of the bargain is to determine the difference between what she could have sold the painting for at public auction (i.e., without confidentiality) and what she in fact sold it for (i.e., with confidentiality). *Id.* at *7 (holding that "it is permissible to measure benefit-of-the-bargain damages by considering what Hoffman could have sold the Rothko painting for had she not agreed to a reduced price in exchange for non-monetary consideration in the form of the strict confidentiality provision."). To meet this burden of proof, Hoffman was not required to satisfy the requirements that L&M draws from *Formosa* and *Fortune Production*. For purposes of this measure of damages, it is irrelevant whether Studio Capital or Martinez would have paid this amount for the painting had the confidentiality provision not been included. It was only necessary for Hoffman to prove—as she did—the amount that *some purchaser* would have paid at a public auction.

Based on its *Erie* prediction in *Hoffman V*, and in the absence of persuasive arguments to the contrary, the court holds that Hoffman is entitled to recover benefit-of-the-bargain damages, and that these damages can be calculated by determining the difference between what she could have sold the Rothko painting for at public auction (i.e., without confidentiality) and what she actually sold the painting for in a private sale (i.e., in exchange for non-monetary consideration in the form of the confidentiality clause).  *See Hoffman V*, 2013 WL 4511473, at *7.  L&M has not established as a matter of law that Hoffman cannot recover benefit-of-the-bargain damages under this measure or under the evidence presented at trial.  Accordingly, this basis of L&M's Rule 50(b) motion is denied.

\* \* \*

For the foregoing reasons, the court grants the Rule 50(b) motion filed by defendants Studio Capital and Martinez, and it grants in part and denies in part L&M's Rule 50(b) motion. The court is today entering an amended judgment consistent with these rulings.[27]

**SO ORDERED.**

September 4, 2014.

_____
SIDNEY A. FITZWATER
CHIEF JUDGE

---

[27]There are other motions pending for decision: Hoffman's November 25, 2013 motion for sanctions against L&M; Hoffman's February 13, 2014 motion for attorney's fees and related non-taxable expenses; Hoffman's March 12, 2014 motion to increase the amount of costs taxed against defendants; and defendants' March 12, 2014 motion to retax costs. To the extent these motions are brought against or by Studio Capital and Martinez, they are denied because Hoffman's actions against these defendants are being dismissed by the amended judgment filed today. The motions otherwise remain pending to the extent brought against or by L&M.